**MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT**

**SENTENCE BY A PERSON IN FEDERAL CUSTODY**

| United States District Court | District **CENTRAL DISTRICT OF CALIFORNIA** |
|---|---|

| Name (under which you were convicted): **ANDRANIK PETROSIAN** | Docket or Case No.: **07-00708-SVW-1** |
|---|---|

| Place of Confinement: **EDEN DETENTION CENTER** | Prisoner No.: **45050-112** |
|---|---|

| UNITED STATES OF AMERICA | Movant (include name under which you were convicted) |
|---|---|
| v. **ANDRANIK PETROSIAN** | |

MOTION **CV12-06661-SVW**

1.  (a) Name and location of court that entered the judgment of conviction you are challenging:

    **Honorable District Court Judge Stephen V. Wilson**

    **U.S. DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA**

    (b) Criminal docket or case number (if you know): **07-00708-SVW-1**

2.  (a) Date of the judgment of conviction (if you know): **DECEMBER 12, 2009**

    (b) Date of sentencing: **DECEMBER 12, 2009**

3.  Length of sentence: **96 months imprisonment**

4.  Nature of crime (all counts): **18 U.S.C. §1001 and 18 U.S.C. §371**



5.  (a) What was your plea? (Check one)

    (1)   Not guilty **☒**          (2)   Guilty ☐          (3)   Nolo contendere (no contest) ☐

    (b) If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, what did you plead guilty to and what did you plead not guilty to?

6.  If you went to trial, what kind of trial did you have? (Check one)          Jury **☒**          Judge only ☐

Page 3

7.  Did you testify at a pretrial hearing, trial, or post-trial hearing?    Yes ☒X    No ☐
8.  Did you appeal from the judgment of conviction?    Yes ☒X    No ☐
9.  If you did appeal, answer the following:

    (a) Name of court: **NINTH CIRCUIT COURT OF APPEALS**

    (b) Docket or case number (if you know):    **CA. No. 09 - 50636**

    (c) Result: **AFFIRMED**

    (d) Date of result (if you know): **JULY 28, 2011**

    (e) Citation to the case (if you know):    **UNPUBLISHED OPINION**

    (f) Grounds raised: **1.EVIDENTIARY RULINGS OF TRIAL COURT**
                     **2.INEFFECTIVE ASSISTANCE OF COUNSEL**
                     **3.WITNESS INSTRUCTIONS**
                     **4.JUDGEMENT OF ACQUITAL**
                     **5.SENTENCE UNREASONABLE,**

    (g) Did you file a petition for certiorari in the United States Supreme Court?    Yes ☐    No ☒

    If "Yes," answer the following:

    (1) Docket or case number (if you know):

    (2) Result:

    (3) Date of result (if you know):

    (4) Citation to the case (if you know):

    (5) Grounds raised:

10.  Other than the direct appeals listed above, have you previously filed any other motions, petitions, or applications concerning this judgment of conviction in any court?

    Yes ☐    No ☒X

11.  If your answer to Question 10 was "Yes," give the following information:

    (a)  (1) Name of court:

        (2) Docket or case number (if you know):

        (3) Date of filing (if you know):

(4) Nature of the proceeding:

(5) Grounds raised:

(6) Did you receive a hearing where evidence was given on your motion, petition, or application?    Yes ❑   No ❑

(7) Result:

(8) Date of result (if you know):

(b) If you filed any second motion, petition, or application, give the same information:

(1) Name of court:

(2) Docket or case number (if you know):

(3) Date of filing (if you know):

(4) Nature of the proceeding:

(5) Grounds raised:

(6) Did you receive a hearing where evidence was given on your motion, petition, or application?    Yes ❑   No ❑

(7) Result:

(8) Date of result (if you know):

(c) Did you appeal to a federal appellate court having jurisdiction over the action taken on your motion, petition, or application?

(1) First petition:    Yes ❑   No ❑

(2) Second petition:    Yes ❑   No ❑

(d) If you did not appeal from the action on any motion, petition, or application, explain briefly why you did not:

12. For this motion, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States.  Attach additional pages if you have more than four grounds.  State the <u>facts</u> supporting each ground.

GROUND ONE:   **TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO REQUEST DECLARE A MISTRIAL**

(a) Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

**SEE ATTACHED BRIEF / MEMORANDUM**

(b) Direct Appeal of Ground One:   **YES**

    (1) If you appealed from the judgment of conviction, did you raise this issue?

        Yes ☒  No ☐

    (2) If you did not raise this issue in your direct appeal, explain why:

    **ISSUE RAISED BUT C.O.A. DIRECTED THE DEFENDANT TO ARGUE THE CLAIM ON a MOTION UNDER 28 USC 2255**

(c) Post-Conviction Proceedings:

    (1) Did you raise this issue in any post-conviction motion, petition, or application?

        Yes ☐  No ☐

    (2) If your answer to Question (c)(1) is "Yes," state:

    Type of motion or petition:

    Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):


(3) Did you receive a hearing on your motion, petition, or application?

Yes ❑   No ❑

(4) Did you appeal from the denial of your motion, petition, or application?

Yes ❑   No ❑

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes ❑   No ❑

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:


Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):


(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:


GROUND TWO: **APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILURE TO RAISE ISSUES RELATING TO THE SENTENCING ENHANCEMENTS OF A TOTAL OF 10 LEVELS**

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):


**SEE ATTACHED BRIEF / MEMORANDUM**

(b) **Direct Appeal of Ground Two:**

    (1) If you appealed from the judgment of conviction, did you raise this issue?

        Yes ❑   No ☒☒

    (2) If you did not raise this issue in your direct appeal, explain why:

(c) **Post-Conviction Proceedings:**

    (1) Did you raise this issue in any post-conviction motion, petition, or application?

        Yes ❑   No ❑

    (2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

    (3) Did you receive a hearing on your motion, petition, or application?

        Yes ❑   No ❑

    (4) Did you appeal from the denial of your motion, petition, or application?

        Yes ❑   No ❑

    (5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

        Yes ❑   No ❑

    (6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND THREE:**                **N / A**

(a)  Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

**N / A**

(b) **Direct Appeal of Ground Three:**

    (1) If you appealed from the judgment of conviction, did you raise this issue?

       Yes ❑   No ❑

    (2) If you did not raise this issue in your direct appeal, explain why:

(c) **Post-Conviction Proceedings:**

    (1) Did you raise this issue in any post-conviction motion, petition, or application?

       Yes ❑   No ❑

    (2) If your answer to Question (c)(1) is "Yes," state:

    Type of motion or petition:

    Name and location of the court where the motion or petition was filed:

    Docket or case number (if you know):

    Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):


(3) Did you receive a hearing on your motion, petition, or application?

Yes ❑   No ❑

(4) Did you appeal from the denial of your motion, petition, or application?

Yes ❑   No ❑

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes ❑   No ❑

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:


Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):


(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:




**GROUND FOUR:**                                **N / A**

(a)  Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):


                                **N / A**

(b) **Direct Appeal of Ground Four:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ❑   No ❑

(2) If you did not raise this issue in your direct appeal, explain why:


(c) **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ❑   No ❑

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:


Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):


(3) Did you receive a hearing on your motion, petition, or application?

Yes ❑   No ❑

(4) Did you appeal from the denial of your motion, petition, or application?

Yes ❑   No ❑

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes ❑   No ❑

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:


Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

13. Is there any ground in this motion that you have <u>not</u> previously presented in some federal court? If so, which ground or grounds have not been presented, and state your reasons for not presenting them:

14. Do you have any motion, petition, or appeal <u>now pending</u> (filed and not decided yet) in any court for the judgment you are challenging?     Yes ❏  No **XX**
    If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised.

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment you are challenging:

   (a) At preliminary hearing:  **MARK WERKSMAN,ESQ**
                                **888 WEST SIXTH STREET,4tb Floor**
                                **Los Angeles, CA 90017**

   (b) At arraignment and plea: **MARK WERKSMAN,esq**
                                **ID.**

   (c) At trial:                **MARK WARKSMAN,ESQ**
                                **ID**

   (d) At sentencing:           **THOMAS NISHI,ESQ**
                                **1000 WILSHIRE BLVD,Ste.600**
                                **Los Angeles, CA 90017**

(e) On appeal:  **Ms.MYRA D. MOSSMAN,ESQ / 1501-H Santa Barbara St. Santa Barbara, CA 93101**

(f) In any post-conviction proceeding:  **N/A**

(g) On appeal from any ruling against you in a post-conviction proceeding:

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?      Yes ☒ No ☐

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?      Yes ☐ No ☒

    (a)  If so, give name and location of court that imposed the other sentence you will serve in the future:

    (b) Give the date the other sentence was imposed:

    (c) Give the length of the other sentence:

    (d) Have you filed, or do you plan to file, any motion, petition, or application that challenges the judgment or sentence to be served in the future?      Yes ☐   No ☐

18. TIMELINESS OF MOTION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2255 does not bar your motion.*

NOT APPLICABLE

TIMELY MOTION / SEE ATTACHED BRIEF

---

* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2255, paragraph 6, provides in part that:

A one-year period of limitation shall apply to a motion under this section.  The limitation period shall run from the latest of —

(1) the date on which the judgment of conviction became final;

(2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making such a motion by such governmental action;

(3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

Page 14

Therefore, movant asks that the Court grant the following relief:

or any other relief to which movant may be entitled.

_____
Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Motion under 28 U.S.C. § 2255 was placed in the prison mailing system on

(month, date, year).

Executed (signed) on ___6 - 15 - 2012___ (date).

Signature of Movant

If the person signing is not movant, state relationship to movant and explain why movant is not signing this motion.

**BRIEF & MEMORANDUM OF LAW IN SUPPORT
OF MOTION TO VACATE OR CORRECT A SENTENCE
PURSUANT TO 28 U.S.C. § 2255**

**U.S. v. ANDRANIK PETROSIAN
Case No. 07 – CR – 00708 - SVW - 1
U.S.C.A. No. 09 – 50636**

**TABLE OF CONTENTS**

PAGE

TABLE OF AUTHORITIES...................................................................i

CASES...................................................................................i, ii

STATUTES................................................................................ii

OTHER AUTHORITIES..................................................................iii

JURISDICTIONAL STATEMENT............................................................1

ISSUES PRESENTED FOR REVIEW........................................................2

    WHETHER TRIAL COUNSEL FAILURE TO DECLARE A MISTRIAL
    DEPRIVED THE PETITIONER OF THE RIGHT TO EFFECTIVE
    ASSISTANCE OF COUNSEL........................................................2

    WHETHER THE APPELLATE COUNSEL WAS INEFFECTIVE FOR
    FAILURE TO ARGUE THE PETITIONER'S ENHANCEMENTS AT
    SENTENCING....................................................................2

EXHAUSTION OF ADMINISTRATIVE REMEDIES.....................................3

PROCEDURAL BAR.......................................................................3

STATEMENT OF THE CASE...............................................................4

STATEMENT OF FACTS...................................................................7

LEGAL STANDARD AND PRINCIPLES..................................................18

ARGUMENTS.............................................................................27

    **WHETHER TRIAL COUNSEL FAILURE TO DECLARE A MISTRIAL**
    **DEPRIVED THE PETITIONER OF THE RIGHT TO EFECTIVE**
    **ASSISTANCE OF COUNSEL**....................................................27

    **WHETHER THE APPELATE COUNSEL WAS INEFFECTIVE FOR**
    **FAILURE TO ARGUE THE DEFENDANT'S ENHANCEMENTS AT**
    **SENTENCING**.................................................................46

    **SENTENCES IMPOSTED TO RUN CONSECUTIVE INSTEAD OF**
    **CONCURRENT ACCORDING TO U.S.S.G. § 301.2**.........................48

    **ROLE IN THE OFFENSE ENHANCEMENT**..................................54

    **AMOUNT OF LOSS FINDINGS**..............................................60

    **OBSTRUCTION OF JUSTICE ENHANCEMENT**.............................67

    **FAILURE TO IMPEACH / FALSE WITNESS TESTIMONY**...............70

CONCLUSION............................................................................75

EVIDENTIARY HEARING REQUIRED....................................................76

CERTIFICATE OF SERVICE..............................................................77

TABLE OF EXHIBITS / ATTACHMENTS.................................................78

# TABLE OF AUTHORITIES

## CASES

ANDERS v. CALIFORNIA, 386 U.S. 738 (1967)..........................................42

BRAM v. UNITED STATES, 168 U.S. 532 (1897) ......................................36

CHAPMAN v. CALIFORNIA, 386 U.S. 18 (1967) ......................................25

COUNSELMAN v. HITCHCOCK, 142 U.S. 547 (1982) ...........................33,34

CUYLER v. SULLIVAN, 446 U.S. 346 (1987) .............................................23

DAVIS v. UNITED STATES, 417 U.S. 333 (1974) ...................................….1

FARETTA v. CALIFORNIA, 422 U.S. 806 (1975) ..................................42,43

FERRAN v. TOWN OF NASSAU, 11 F.3d 21 (2nd Cir.1993) ..........................20

GIDEON v. WAINWRIGHT, 372 U.S. 335 (1963) ................................…22,26

GREENWICH v. DIR.OCWP, 512 U.S. 267 (1994) ......................................65

GREENWICH v. DIR.OCWP, 990 F.2d 730 (3rd Cir.1993) ............................65

HARRIS v. NELSON, 394 U.S. 286 (1969) .................................................19

HUGHES v. ROWE, 449 U.S. 5 (1980) .......................................................20

IN RE GAULT, 387 U.S. 1 (1967) ............................................................34

JOHNSON v. NEW JERSEY, 384 U.S. 719 (1966) ......................................33

KASTIGAN v. UNITED STATES, 406 U.S. 411 (1972) ................................33

KIMMELMAN v. MORRISON, 477 U.S. 365 (1986) ...................................20

LINDSTAD v. KEANE, 239 F.3d 191 (2nd Cir.2001) ...................................22

LINKLETTER v. WALKER, 381 U.S. 618 (1965) ......................................37

MALLOY v. HOGAN, 378 U.S. 11 (1964) .................................................34

McCARTHY v. ARNDSTEN, 266 U.S. 34 (1924) .......................................23

McMANN v. RICHARDSON, 174 F.3d 276 (2nd CIR.1999) ...........................20

MIRANDA v. ARIZONA, 384 U.S. 436 (1966) .............................................33

MUSALDIN v. LAMARQUE, 555 F.3d 830 (9th Cir.2009) ............................20

POWELL v. ALABAMA, 287 U.S. 45 (1932) .............................................42

STRICKLAND v. WASHINGTON, 466 U.S. 668 (1984) ................21,24,26,41,42

TOUSSIE v. UNITED STATES, 397 U.S. 1112 (1970) ..................................51

ULMAN v. UNITED STATES, 350 U.S. 422 (1956) ……………………………………33

UNITED STATES v. BAYNES, 622 F.2d 66 (3rd Cir.1980) …………………………20

UNITED STATES v. BENLIAN, 63 F.3d 824 (9th Cir.1995) …………………………20

UNITED STATES v. BUCK, 324 F. 3d 786 (5th Cir.2003) …………………………65

UNITED STATES v. FERNANDEZ, 897 F.2d 1514 (9th Cir.1990) ………………..56

UNITED STATES v. GOVAN, 152 F. 3d 1088 (9th Cir. 1998) ……………………55

UNITED STATES v. HARPER, 33 F.3d 1143 (9th Cir.1999) …………………………58

UNITED STATES v. HOAC, 990 F.2d 1099 (9th Cir.1999) …………………………58

UNITED STATES v. JERONIMO, 398 F.3d 1149 (8th Cir.2008) …………………20

UNITED STATES v. JORDAN, 291 F.3d 1091 (9th Cir.2002) …………………57,58

UNITED STATES v. KISSEL, 218 U.S. 601 (1910) …………………………………51

UNITED STATES v. KRISTIC, 558 F.3d 1010 (9th Cir.2009) ……………………..51

UNITED STATES v. OLSON, 925 F.2d 1170 (9th Cir.1991) …………………………22

UNITED STATES v. PATTERSON, 890 F.2d 69 (8th Cir.1989) …………………..53

UNITED STATES v. RIVERA, 527 F.3d 891 (9th Cir.2008) ……………………54

UNITED STATES v. ROMERO-VILCA, 850 F.2d 177 (3rd Cir.1998) ……………20

UNITED STATES v. SCHAFLANDER, 743 F.2d 714 (9th Cir.1984) ……………...76

UNITED STATES v. VILLALPANDO, 250 F.3d 934 (8th Cir.2003) ……………...20

UNITED STATES v. WHITE, 341 F.3d 673 (8th Cir.2003) …………………………19

UNITED STATES v. WITHERS, 638 F.3d 1055 (9th Cir.2010) ……………………76

WATKINS v. UNITED STATES, 354 U.S. 178 (1957) ……………………………34

## STATUTES

Title 18 U.S.C. § 371…………………………………………….………………………48

Title 18 U.S.C. §1001………………………………………………………………………48

Title 28 U.S.C. §2255……………………………………….…………1,19,20,31,75

## **OTHER AUTHORITIES**

U.S.S.G. § 1B1.3.................................................................................50

U.S.S.G. § 2B1.1.................................................................................64

U.S.S.G. § 2T4.1.................................................................12,15,46,60

U.S.S.G. § 3B1.1.................................................................14,46,54,56

UNITED STATES CONSTITUTION, 5th Amendment .................................33,34

UNITED STATES CONSTITUTION, 6th Amendment..........................21,22,23,41

RULE 7 of SECTION §2255...........................................................75,76

RULE 8 of SECTION §2255..............................................................76

RULE 32 of FED.RUL.CRIM.PROC.....................................................61,65

## **JURISDICTIONAL AND VENUE STATEMENT**

      The Jurisdiction of This Court to hear the Petitioner's Motion to Vacate, Set Aside or Correct the Sentence, is conferred by the Title 28 U.S.C. §2255.


      The Venues is correct in the CENTRAL DISTRICT OF CALIFORNIA because this is where the case was heard originally, and the said sentence that is contested is imposed by This Honorable Court, see **DAVIS V. U.S., 417 U.S. 333,344-45 (1974).**

1

## ISSUES PRESENTED FOR REVIEW

1. **WHETHER TRIAL COUNSEL FAILURE TO DECLARE A MISTRIAL DEPRIVED THE PETITIONER OF THE RIGHT TO EFFECTIVE ASSISTANCE OF THE COUNSEL**

2. **WHETHER THE APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILURE TO ARGUE THE PETITIONER'S ENHANCEMENTS AT SENTENCING, NAMELY:**


A) **SENTENCES IMPOSED ON COUNT 1 AND 3 SHOULD HAVE BEEN IMPOSED TO RUN CONCURRENT ACCORDING TO U.S.S.G. §3D1.2, RATHER THAN CONSECUTIVE;**
B) **ROLE IN THE OFFENSE ENHANCEMENT;**
C) **AMOUNT OF LOSS DETERMINATION;**
D) **OBSTUCTION OF JUSTICE ENHANCEMENT;**
E) **FAILURE TO IMPEACH | FALSE WITNESS TESTIMONY**

## EXHAUSTION OF ADMINISTRATIVE REMEDIES AND PROCEDURAL

## BAR

This is a Petition for Ineffective Assistance of Counsel brought by an inmate incarcerated in federal custody for a sentence under the federal laws of the United States, therefore he does not need to exhaust any administrative remedies.

This Petition does not have any procedural bar that it can prevent it to be heard. The Petitioner files this Petition within 1 year time limitation imposed by A.E.D.E.P.A., see cover for details.

The Court of Appeals entered the order Affirming the Petitioner's sentence and conviction of JULY 28, 2011, therefore the date limit according to A.E.D.E.P.A. to file the instant is JULY 28, 2012.

ACCORDINGLY, there is no procedural bar and the Petition is timely.

## STATEMENT OF THE CASE

This case stemmed from an investigation of KONSTANTIN GRIGORYAN (hereinafter "GRIGORYAN") by the I.R.S., concerning alleged crimes of Income Tax and Medicare fraud. GRIGORYAN along with individuals in his crew (co-conspirators) eventually have been arrested, pled guilty and agreed to testify as Cooperating Witnesses in exchange for different concessions made by the U.S. Attorney to them or their families.

During the said investigation, Special Agents from I.R.S. have approached the Petitioner at his place of business, in Burbank, California. The subject of the interviews was the Petitioner's relationship with GRIGORYAN, to which the Petitioner agreed to provide information or to testify to a Grand Jury regarding the business relationship and the mechanics of it between them, not knowing at the time the Government had a different and twisted view of the said business. Although the Petitioner appeared in front of the Grand Jury twice, the meetings were postponed because of issues relating with the translator provided, which was an Armenian translator rather than a Russian one of which the Petitioner had requested.

The Petitioner was eventually arrested on JULY 12, 2007, date at which a Proffer Agreement was signed by the petitioner in the presence of his attorney and again an Armenian translator instead of a Russian one. The same happened again at the proffer meeting on AUGUST 15, 2007 and later on at trial.

After many continuances of the trial date (some four times), after 9 months, trial begun on APRIL 08,2008. At trial several Cooperating Witnesses have testified along with Special Agent Paramo (I.R.S.). At trial the government sought to admit the Petitioner's proffer statements on the basis that the Petitioner has not been completely truthful about his association with key people charged, therefore creating a breach of contract. The Court determined that the Government acted in good faith, found that the Petitioner had not been completely truthful and admitted the statements.

By admitting the proffer statements, automatically the Petitioner was compelled to testify, against his will, for no other reason but to correct the misunderstanding or misinterpretation of what he said. As we recall his words at the proffer meeting were being translated into Armenian rather than Russian, which the defendant actually speaks.

The District Court after observing the possible Fifth Amendment violation, asked the defendant's counsel if he thought a mistrial was in-order, but the counsel responded in negative.

Due to the fact that the Petitioner's counsel was not aware that the Petitioner would testify until the eve of the trial, he was not prepared for it, nor had time to form a strategy. The Petitioner eventually testified to what he believes and still sustains that the truth, namely that the Petitioner provided a 10° commissions for placing advertisements, that he was running a legitimate business that can be verified, and that he had no knowledge of any fraud being perpetuated by his associates or his sales people. He

5

further explained that although he is an Armenian national he speaks Russian, not Armenian.

After the defense rested, the defense counsel moved for a Judgment of Acquittal pursuant to Fed.Rul.Crim.Proc. Rule 29, but for reasons unknown to the Petitioner, had refused to file a companion motion for a new trial under Rule 33 of the Fed.Rul. of Crim. Proc.

The Court denied the motion without a hearing, and after the closing arguments, the case was given to the jury to deliberate.

The jury returned a verdict of guilty to the conspiracy and making false statements charges, but was hung on the charges of providing false documents to the I.R.S.

The District Court sentenced the Petitioner to 96 months in prison and ordered a restitution of $521,845.

## STATEMENT OF FACTS

The Petitioner was born in Armenia, and he came to the United States 17 years ago as a beneficiary of an Investor Visa. He eventually became the owner and operator of several for-profit businesses and not-for-profit organizations, based in Burbank, California.

The said businesses produced and sold Russian-language publications, such as "Tet-A-Tet", "Kakadu" and "Contact Weekly" along with publishing calendars, books, advertising, tv shows, printing and other services.

The Government indicated GRIGORYAN sometimes in 2006. The first approach by the I.R.S. agents to the Petitioner was on or around MAY 02, 2006, asking questions about the GRIGORYAN and the connection between them. At the second encounter, on or about MAY 10, 2006, the Petitioner was served at his place of business with a subpoena that directed him to appear on JUNE 01, 2006 in front of a Grand Jury as a witness. The Petitioner complied but the meeting was postponed because there were problems with the interpreter that was a translator of Armenian language, fact that was not helpful to the Petitioner because he speaks Russian.

Nevertheless the Petitioner, without a counsel and a Russian interpreter agreed to provide the AUSA with documents and invoices related to the businesses of the publications run by the Petitioner.

7

On JULY 12, 2007 the Petitioner was arrested by Special Agent Paramo, after his rights were read to him; and he interviewed him in the car that he was driving the Petitioner to the I.R.S. Field Office. Once again, an interpreter was not provided.

On AUGUST 15, 2007 a proffer session occurred where I.R.S. Agents Paramo and Twedt were present along with AUSA, the defense counsel and an (amazingly) Armenian interpreter. A proffer agreement was signed by the same. As expected an issue arose at the said meeting because the Petitioner spoke Russian and an Armenian interpreter was provided to him, in spite of his now, repeatedly, protests that he needs a Russian language interpreter. More specifically the Petitioner was having a hard time to grasp the meaning of "cash-back" as opposed to "rebate", as the Special Agent Paramo later recanted at trial in his testimony. The report that was later written and filed failed to mention the issue with the translator.

The issue regarding the Petitioner's problem and disagreement on the use of the Armenian translator, over the Russian one, was later recollected by the AUSA at trial, but according to his statements, he concluded that the disagreements were not material to the admissions in questions.

The District Court was concerned over the government's practice of not providing a proper translator at such an important stage, and also he explained why the Court has reservations:

THE COURT: What your practice is, is almost beside the point. It's a bad practice, I'll tell you that [....] But why wasn't, at a minimum, the statement that was ultimately transcribed shown to the defendant for his adoption or at a minimum his lawyer? Now we have a dispute, and specter of perhaps having the defendant being compelled to testify, if for no other reason than to correct what he says was a misunderstanding or misinterpretation of what he said. And that presents another issue, **which might be of constitutional dimension.**

MR. SEARBY: Your Honor, the answer to your question is, frankly, that there **was no time to follow the procedures suggested by the court** [...]

The Government went on and argued that it acted in good faith and that the Petitioner was not completely truthful about his association with the managers, ALEX AYRIYANS, and VARDEN of the WINKLER MEDICARE CLINIC, and the alleged cash-back scheme, therefore according to the proffer agreement that was signed by the Petitioner, without an interpreter of Russian language (again), he can use the statements in it's case-in-chief.

After many other inquiries, the Court has ruled that the AUSA has acted in good faith and that the statements have to be admitted. However, the Court being troubled by the issue being "of a constitutional dimension", namely that the Petitioner's Fifth Amendment rights against self-incrimination will be violated by him being obligated to testify in order to clarify the statements of misunderstanding that will automatically be

9

created; therefore, opening the door of a cross-examination to a proffer that actually, the jury viewed as "some kind of confession".

The Court eventually inquired if defense counsel would be moving for a mistrial, and stated:

> THE COURT:        So in other words, I can see arguments both ways, but if you had a motion for a mistrial, **I would seriously consider it.** I want to make that clear […]

Defense counsel responded in the negative and the Court declared the matter waived, proceeding with the trial. The Petitioner took the stand, and testified to his "own defense" as the defense counsel has stated to the Court, clearly denoting the missing due diligence in preparation of the said testimony.

The Court had to admonish the AUSA throughout the Petitioner's examination, that he didn't know how to question the defendant:

> THE COURT:        Can I make a suggestion? The witness is answering your questions in English, but when you use words like "pose" and things, these are not the usual conversational words. So if you want to make this go more smoothly, you have to ask very reduced-type questions. (TRIAL TRANSC. [2] P.78)

Apparently, the Court was aware of the fact that the Petitioner's skills in English was very limited and that he cannot grasp technical words, as he earlier argued when he

said that the statements made to the I.R.S. agents were understood differently than what the AUSA tried to depict and later wrote in reports to base their "untruthful statements".

After the Petitioner was found guilty on the 2 counts, the Court set a sentencing date. The Petitioner had had enough of his trial counsel's deficient performance, and on AUGUST 01, 2008 had filed a Motion requesting a substitute counsel, namely attorney JILBERT TAHMAZIAN. On AUGUST 12, 2008 the Court granted the said motion and the counsel was substituted.

On JUNE 26, 2009 the Petitioner filed a motion with the Court requesting that his attorney be replaced due to ineffective and deficient approach towards the Petitioner's case and sentencing motion, which was granted by the Court on JULY 06, 2009. Attorney THOMAS NISHI was appointed by the Court to represent the Petitioner at sentencing.

On NOVEMBER 30, 2009 the Petitioner's new counsel, Mr. Nishi filed his Sentencing Memorandum. In the said memorandum, the Petitioner contested the upward adjustments and the amount of loss calculation by the P.S.R., namely amount of $2,354.228.

In support of requested sentence of 3 years, the Petitioner cited his crime-free background, his self-employed status as a legal immigrant, and the needs of his wife and their two young children.

11

The Sentencing Hearing took place on DECEMBER 07, 2009, with the Court having to resolve the dispute between the parties, as the Government filed their own Sentencing Position Papers on DECEMBER 04, 2009.

First, the Court took up the amount of loss issue. The central disagreement between the parties was the amount of loss, since it was a significant discrepancy between the sum contemplated at the trial, namely aprox. $4,000,000 and the sum contemplated in the Government's sentencing papers, namely over $10,000,000.

The Petitioner's counsel argued that, at best, the amount of payments that can be considered payments, and illegally to hide assets from I.R.S. is $8,407,957, therefore as a result when the tax rate of 28% is applied, the resulting los amount will be equal to $2,345,288, which translates to an Offense Level of 22, as opposed to the loss amount of $2,897,452 that corresponds with an Offense Level of 24 according to the Tax Table §2T4.1(j).

The defense argument was that the Government has not proved by a preponderance of evidence certain transactions contained in the Government's spreadsheet with the alleged illegal payments.

The Government generalized the illegal payments, as **all transactions over $1,000 between (defendant's) business and known or apparent health care business"**

12

(See Gov.Sent.Memo.@P.5). The Government based their conclusion that all the $1000+ transactions were illegal, on the trial testimony of Ms. Inga Zueva, the advertising manager of "Contact Weekly", "Tet-a-Tet" and "Kakadu".

Ms. Zueva testified that the legitimate advertisements payments were on the order of tens or hundreds of dollars apiece that reflect only advertising cost for "Contact Weekly." [1] While assuming **arguendo** that the testimony is true and accurate, Ms. Zueva did not offer any testimony regarding the advertising costs of "CENTURY CALENDAR COLLECTION" nor "NATIONWIDE ADVERTISING AND PUBLISHING" nor "TET-A-TET". [1] Also, the fact that she never sold advertising for "Tet-a-Tet" and "Kakadu", she worked solely for "Contact Weekly".

The Government apparently included the payments made to the "CENTURY CALENDAR" and "NATIONWIDE" (ALL OF THEM) because their star witness, Mr. GRIGORYAN, testified that his companies made payments to the said companies, and the other two witnesses, like Dr. WINKLER and Ms.SARKISSIAN.

While the Petitioner submits itself to the Government's logic of including the Payments made by the companies related with the three cited witnesses, he objects to the fact that an additional payment of $1,950,086 which was not proved by a preponderance of evidence regarding the legitimacy, nor the Government secured the services of a forensic accountant to trace the source and the justification of the said payments.

---

[1] The testimony concerning only the advertising costs of "Contact Weekly" not all other publications as the government applied the formula expression by Ms. Zueva

Second, the Court analyzed the Government's and the P.S.R. proposal that the Petitioner be enhanced further 4 level for an aggravated role in the offense, as the Leader or Organizer provided by U.S.S.G. §3B1.1(a).

The P.S.R. (as adopted in its entirety by the Government) had justified the application of the leadership enhancement because the Petitioner "instructed the medical businesses to make payments by check, instead of cash… and provided the false invoices for the Medicare businesses to use for tax purposes". Not being able to identify 5 or more people that are criminally culpable in order to apple the 4 levels versus 2 levels afforded to conspiracies under 5 people, the P.S.R. concluded that the operation/crime was "otherwise extensive" than it justifies the 3 level enhancement. The justification for the said finding was that the crime was "extensive", in view of "the number of years during which the offense lasted, the large number of transactions and medical businesses involved". No evidence was provided regarding the Petitioner control or supervision of another **criminally culpable** individual, nor that he had recruited somebody or directed another in the course of the crime charged. The whole enhancement was based on a faulty logic, which the petitioner will analyze in the instant petition.

The District Court after hearing both sides and reading the submissions related to the issue, agreed with the P.S.R. and the Government and allowed the enhancement to stand.

14

Third, the P.S.R. and the Government argued that a further enhancement of 2 Levels for "Sophisticated Means" pursuant to U.S.S.G. §2T1.4(b)(2). The P.S.R. argued that the enhancement applies in this case because the offense "provided the kick-backs in cash, and supplied false invoices, thus making the crime difficult to detect… and involved conduct pertaining to the concealment of the offense."

Without any other independent piece of evidence to sustain the enhancement for the crime being "sophisticated" aside from the use of cash and false invoices that in all respects are sole elements of the crime charges, the District Court allowed the enhancement to stand.

Fourth, the P.S.R. assigned an increase of 2 levels for the Obstruction of Justice, based on the statements of GRIGORYAN and his son-in-law GERSHELIS that had accused the Petitioner of trying to influence their testimony by making use of perceived threats.

The Government joined the P.S.R. in the proposal without any additional investigation into the allegations, especially because the statements came from two convicted felons who were at the mercy of the Government for a reduced sentence. At best, the allegation should have been taken with a grain of salt and investigated to the veracity of the facts alleged. The District Court not being persuaded by the defense argument allowed the enhancement to stand.

After hearing from the Petitioner, the District Court announced the sentence of 96 months imprisonment and a restitution of $521,845 after acknowledging that the Sentencing guidelines were advisory.

On DECEMBER 15, 2009 the Petitioner, through his attorney, filed a NOTICE OF APPEAL with the Ninth Circuit Court of Appeals, notice that was entered in DECEMBER 22, 2009.

On DECEMBER 16, 2009, the Ninth Circuit Court of Appeals Clerk notified the District Court of the appeal being docketed as Appeal No. 09-50636.

On DECEMBER 17, 2009, counsel Thomas Nishi, filed a Motion for Substitution of Counsel for Appeal purposes, and was docketed, see Docket #165.

On JULY 12, 2011 the appeal was submitted to the Ninth Circuit Court of Appeals for consideration after the full briefing was closed. Counsel MYRA D. MOSSMAN submitted the brief behalf of the Petitioner after being appointed to represent him.

The Petitioner argued in the direct appeal the claim that his trial counsel was ineffective, but the Ninth Circuit rejected the argument as based on **U.S. v. Benford, 574 F. 3d 1228 (9th Cir.2009).**

On JULY 28, 2011, the Ninth Circuit Court of Appeals through Hon. Fernandez, Rymer, and Tallman, Circuit Judges issued the memorandum AFFIRMING the District Court decision in its entirety.

Subsequently, the Petitioner filed the instant petition under Section 2255, less than a year after the Court of Appeals had affirmed the District Court on all aspects. The Petitioner has not filed a Petition for Rehearing en banc with the Ninth Circuit, therefore JULY 28, 2011 (corresponding JULY 28, 2012) should be the benchmark in measuring the timeliness of this motion.

## LEGAL STANDARD AND PRINCIPLES OF MOTION TO VACATE OR SET ASIDE THE SENTENCE UNDER 28 U.S.C. §2255

### I.    INTRODUCTION:

The United States Constitution became effective on SEPTEMBER 13, 1788, when the Continental Congress passed a resolution and putting it into effect. The Constitution itself is divided in 7 parts, called articles.

Article 1 of the United States Constitution establishes the legislative branch of the Government, and also imposes limitation on the Government's own power over the People. In particular section 9,c 12 reads: "The Privilege of the Writ of Habeas Corpus Shall Not be suspended, unless when in case of Rebellion or Invasion of public safety may require it." This article is the fundamental authority for the modern Federal Habeas Corpus practice.

The term "habeas corpus" is Latin, meaning "to have the body"' its history traces back to old English Law and was a writ that commanded an official, holding someone in custody (prisoners), to have that person brought before the court to determine whether his imprisonment was lawful. The Writ of Habeas Corpus is the only fundamental instrument for safeguarding individual freedom against arbitrary and lawless state action, see **Harris v. Nelson, 394 U.S. 286,22 L.Ed.2d 281, (1969);**

18

In 1867, the Congress enacted a statute providing that federal courts "shall have the power to grant writs of habeas corpus in all cases where any person may be restrained of his/her liberty in violation of the U.S. own Constitution, or of any treaty or law of the U.S."

When direct appeal has come to an end, the defendant may elect to raise the claim of Ineffective Assistance of Counsel. When such a claim is brought, it is called collateral attack to the conviction.

On APRIL 24, 1996, President Clinton signed into law the now famous **Anti-terrorism and Effective Death Penalty Act of 1996 (AEDEPA),** codified as 28 U.S.C. §2241-2255. The new law affects both, the state prisoners and the federal ones, and has significantly changed the scope and authority of federal courts to grant habeas relief. The said act was a revamp of the old §2255 statute that was enacted by the Congress in 1948.

## II.    Jurisdiction and Venue:

A federal district court has jurisdiction to entertain a Section §2255 motion only if the movant it is in the custody under sentence of a federal court, see <u>**U.S. v. White, 341 F.3d 673 (8th Cir.2003).**</u>

If a person no longer satisfies the custody requirement under Section §2255, he/she may still be able to vacate his/her conviction by filing a writ for coram nobis.

A Section §2255 motion must be filed in the district court where the prisoner was sentenced, see **U.S. v. Romero-Vilca, 850 F.2d 177,178-79 (3rd Cir.1988).**

A collateral post-conviction action under §2255, is typically how a claim of ineffective assistance of counsel is presented so that the record is sufficient to examine the counseled performance can be created, **see U.S. V. Villalpando, 259 F.3d 934(8th Cir.2001)** and **Musaldin v. Lamarque, 555 F.3d 830, 836 (9th Cir.2009).** As a "general rule" the Ninth Circuit does not review claims of ineffective assistance of counsel in direct appeal, see **U.S. v. Jeronimo, 398 F.3d 1149 (th Cir.2005),** and the denial of a §2255 claim is reviewed de novo, see **U.S. V. Benlian, 63 F.3d 824 (9th Cir.1995).**

The Submissions of a Pro Se litigant, as in this case, must be held to a less stringent standard than formal pleadings drafted by a lawyer, **Ferran v. Town of Nassau, 11 F.3d 21, 22 (2nd Cir.1993),** quoting from **Hughes v. Rowe, 449 U.S. 5, 9 (1980).** The Court must construe the Pro Se petitioner liberally and interpret them to raise the strongest arguments that they suggest, **Mcpherson v. Comb, 174 F. 3d 276, 280 (2nd Cir.1999).** The Court is "mindful that in a Pro Se §2255 petition must be accepted as true allegations of the petitioner, unless they are clearly frivolous, **U.S. v. Baynes, 622 F.2d 66 (3rd Cir. 1980).**

The Sixth Amendment to the U.S. Constitution guarantees criminal defendant to the right of effective assistance of counsel as announced in **Kimmelman v. Morrison, 477 U.S. 365,374-75 (1986).**

In **Strickland v. Washington, 466 U.S. 668,687 (1984),** the Supreme Court of the United States announced and established a two-part test to determine whether the defendant's counsel assistance was ineffective.

First, the Defendant must show through his submission, that the counsel's representation fell below an objective standard of reason… under prevailing norms, **Strickland at 687.** Second, the Defendant must show that he suffered prejudice as a result of his counsel's defective performance, **ID at 693.**

Prejudice can be established where "there is a reasonable probability that, but for counsel's errors, the outcome of the proceedings would have been different, **ID at 694.** A reasonable probability is sufficient to undermine confidence in the trial or sentencing phase outcome.

Pursuant to **Strickland** and its progeny, counsel has a duty to investigate that facts and law pertaining to the defendant's defense, and put up an argument that may help the defendant achieve the best outcome of his/her trial or sentencing.

Consequently, the **Strickland** standard is rigorous, and the great majority of habeas corpus petitions that alleges the constitutionality Ineffective Assistance of Counsel founded on that standard, see **Lindstad v. Keane, 239 F.39 191 (2nd Cir.2001).**

To satisfy the both prongs of the **Strickland** effectiveness inquiry, the petitioner bears the burden of proving his claims using a "preponderance of evidence" standard, that is clearly less rigorous than a "beyond reasonable doubt," see **U.S. v. Olson, 925 F.2d 1170 (9th Cir.1991).**

The specific allegation against the counsel in this case, amounts to a clearly case in which the counsel's efficiency was so well below the acceptable standard, that the Court should grant the petition and remand the case for retrial or resentencing.

A fair trial is one in which evidence subject to adversarial testing is presented too an impartial tribunal for resolutions of issues defined in advance of the proceedings. The right to an effective counsel plays a crucial role in the adversarial system embodied in the Sixth Amendment, since access to counsel's skill and knowledge is necessary to accord the defendants the ample opportunity to meet the case of prosecution to which they are so entitled. In **Gideon v. Wainwrite, 372 US 335(1963),** the Supreme Court established that "a person accused of a federal or state crime has a constitutional right to counsel appointed or retained.

That a person who happens to be a lawyer is present at trial alongside the defendant, however, is not enough to satisfy the constitutional command. The Sixth Amendment recognizes the right to the assistance of counsel because it envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results. For that reason, it is widely and largely recognized that "the right to counsel is the right to the effective **assistance** of counsel", **McMann v. Richardson, 397 U.S. 759,771 (1970).**

Representation of a criminal defendant entails certain basic duties. Counsel's function is to assist the defendant, and hence counsel owes the client a duty of loyalty and candor, see the **Cuyler v. Sullivan, 446 U.S. 346(1987).**

While the petitioner agrees that the counsel is to be afforded a "wide latitude in defining and implementing a trial strategy," and when making "tactical decisions," it is the petitioner's view that many aspects of the job of a criminal defense attorney is more amenable to judicial oversight. For example, much of the work involved in preparing for trial, conferring with one's client, making timely and rigorous objections to significant, arguably erroneous rulings of the trial judge, and preparing for sentencing are colorable grounds therefore could profitably be made the subject of a uniform standard of representation, upon which a collateral attack at a later phase can be matched against.

Throughout this petition, the Petitioner invites the Court to expand the scope of the inquiry into the effectiveness of the trial counsel, when viewed through the

constitutional minima dictated by the Sixth Amendment announced in **Strickland**, and also to raise the bar of the attorney performance to more than a simple "standard reasonableness" that today is the norm in judging the Ineffective Assistance of Counsel Claims.

It is the Petitioner's view that if the performance standard that are being followed since 1984 is so malleable that, in practice, it will either have no grip at all or will yield excessive variation in the manner in which the Sixth Amendment is interpreted and applied by different courts.

The Petitioner believes that by an eventual refusal of this Court to follow the invitation, and by refusing to address the merits of the said proposals, and indeed suggesting that such effort is worthwhile, will stunt the development of constitutional doctrine in the area of Sixth Amendment.

The actual "prejudice standard" employed today nationwide in the federal courts when analyzing petitions like the instant is outdated at least and unrealistic at most. First, it is very difficult (if not impossible) to tell whether a defendant convicted after a trial in which he was ineffectively represented would have fared better if his lawyer had been competent. Seemingly impregnable cases can sometimes be dismantled by a good defense counsel. On the basis of cold record, it may be impossible for a reviewing court to confidently ascertain how the government's evidence and arguments would have stood up against rebuttal and cross-examination by a shrewd, well-prepared lawyer. Like in this

case, the difficulties of estimating prejudice after the fact are exacerbated by the possibility that **evidence of injury to the defendant may be missing from the record** (i.e. missing expertise of a forensic accountant in a tax fraud case to ascertain losses) precisely because of the incompetence of defense counsel.

In view of all these impediments to a fair evaluation of the probability of the outcome of a trial was affected by ineffectiveness of a counsel, it seems senseless to impose on a defendant, whose lawyer is shown to have been incompetent, the heavy burden (if not impossible) of demonstrating prejudice.

Second, and more fundamentally, is that the only purpose of the constitutional guarantee of "effective assistance of counsel" is to reduce the chance that innocent persons (like in this case) will be convicted. The same guarantee also functions to ensure that convictions are obtained only through fundamentally fair procedure, which is not the case here.  A proceeding, in which the defendant does not receive meaningful assistance in meeting the forces of the prosecutor, does not constitute Due Process.

In **Chapman v. California, 386 U.S. 18,23 (1967),** the Supreme Court of the United States acknowledged, "constitutional rights are so basic to a fair trial that their infractions can never be treated as a harmless error. Among these rights is the right to the assistance of counsel at trial, see **Gideon at 335.**

In Petitioner's view, the right to **effective** assistance of counsel is entailed by the right to counsel, and the abridgement of the former is equivalent to abridgement to the latter. It is then logic to hold that a showing that the performance of a defendant's lawyer departed from constitutionally prescribed standards required a new trial regardless of whether the defendant suffered demonstrable prejudice thereby.

Last but not least, the Supreme Court urges the lower courts in **Strickland,** to "indulge a **strong** presumption that the counsel's conduct was constitutionally acceptable, and should apply a **heavy** measure of deference to the counsel's judgments. Taken as written and literally, those adjectives used by the Supreme Court would be read to impose an unusually and impossible weighty burden of persuasion on the defendants, that already engaged in a fight for their lives have to conduct themselves (through the petition filed) more professionally and legally sound than a trained lawyer.

To afford attorneys more latitude than the ones defined by the "prevailing professional norms" (i.e. ABA Standards), all that by "strongly presuming" that the behavior will fall within the zone of reasonableness is covertly legitimate convictions and sentences obtained on the basis of incompetent conduct by defense counsel at trial or sentencing strange.

## ARGUMENTS IN SUPPORT

## ISSUE 1:

**WHETHER COUNSEL'S FAILURE TO DECLARE A MISTRIAL DEPRIVED THE PETITIONER OF THE RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL:**

Following the Petitioner's arrest, on AUGUST 15, 2007 the Petitioner engaged in a proffer session with the government. The proffer agreement that was signed by the AUSA, the defense counsel, the Petitioner, and an Armenian translator (an error that will be explained further), stipulated that the statements made by the Petitioner will not be used against him, unless he will not be completely truthful.

At the said proffer session, a dispute arouse with regards to the Armenian translator. The same dispute took place earlier, in JUNE 01, 2006, at a Grand Jury meeting, where the Petitioner explained/complained that although he is Armenian, he does not speak Armenian but Russian, and that he is in need of a Russian language translator. The Petitioner further explained that in Armenian, the west part of the country speaks native Armenia language, and the eastern part speaks Russian, and that **he is from the east part.** At both times, the Grand Jury and the Proffer Session, the dispute remained unadressed, and took place with the Armenian translator.

27

During the proffer session the Petitioner made certain factual statements that viewed through an independent eye, not privy to the meeting, can translate into an admission of guilt.

As an example, I.R.S. Special Agent Paramo drew a chart that represented the defendant in the middle and certain two-way arrows going between him and certain individuals. The arrows then were described and marked as "Checks" and "Cash." A figure of 90% and 10% was thrown in, as well as verbally used word of "Cash-Back."

The Petitioner in turn, proceeded and crossed the arrows because he tried to explain that the money he paid in connection to the checks, were the payments, which he made to the subcontractors, not back to the medical company; the company is a client but subcontractor is the person who brought the order. He explained that he indeed received the checks from businesses, as form of payment for advertisement in his magazines, and that indeed he paid a 10% back to the subcontractors who gave him advertising (e.g. GRIGORYAN), as a "promotional rebate."

The whole issue with the Armenian translator at the proffer session, was that the Russian language does not have a word for the term "rebate" and that "cash-back" is used instead. He also had trouble explaining that the "cash-back" was used instead of "rebate" and NOT as "kick-back" which would be an illegal act.

28

The whole issue was later recounted into a report written and filed by I.R.S. S.A. Twedt, which failed to mention the whole issue regarding the translator, and as S.A. Paramo later confirmed "the issue was never whether [the defendant] gave cash back, it was just what he wanted to call it." (Tr.04/10/08 @P.177-179).

In other simple version the proffer statement that was filed in the report was that the Defendant has acknowledged cash being exchanged with checks. That, legally speaking, is constituted by a reasonable observer (without any legal training) to be a full admission of guilt/confession.

The Petitioner has refused to plead guilty, and chosen to exercise his constitutional right to have his case presented in a trial by a jury of his peers.

In the middle of the trial, during S.A. Paramo's testimony, the Government sought to introduce the Petitioner's proffer statements as Exhibit. To justify such request, the Government stated that they have the right to introduce such statements, due to the fact that the Petitioner has been untruthful, and according to the proffer agreement, such statements can be used against him.

The District Court acknowledged that the agreement indeed had such provision, but had an issue with the bad practice of the Government that at a proffer session, a proper translator was not provided. Further, he announced that he will allow such

statements in, having found that the Government acted in good faith and should not be penalized for a "bad practice."

However, the Court, after had made such ruling, stated that now another issue, of a "constitutional dimension" has arisen.

The Court now realized, and stated, that now the Petitioner may be compelled to testify, "if for no other than to correct what he says was a misunderstanding or misinterpretation of what he said." (Court Statement, See Attachment ___ ). That the Court concluded that is a problem of constitutional dimension, potential a violation of Petitioner's Fifth Amendment violation.

Second, if the proffer statements will be shown to the jury, will be considered as an admission of guilt/confession. That again in violation of the Constitution, that specifically states, "no person... shall be compelled in any criminal case to be a witness against himself."

In the light of the situation created, the court offered the defense counsel the opportunity to move for a mistrial, and he stated, "I can see arguments both ways, but if you had a motion for a mistrial, **I would seriously consider it.**" (See Exhibit ___).

Then the Court went further to caution the counsel about the decision he is about to take, and stated, " I want to make sure clear, and if you're saying that notwithstanding

that view, you want to go forward, then **you'll have to do that with consequences**, and I want to make sure your client is well informed."

The Counsel has chosen to proceed and not to request a mistrial, **all that against the request to do so by the Petitioner.** Accordingly, the Court declared the matter waived.

The trial continued, the jury heard testimony regarding the Petitioner's proffer statements, and not surprisingly they had returned a verdict of GUILTY. On DECEMBER 07, 2009, This Court sentenced the Petitioner to 96 months incarceration and ordered a restitution in the amount of $521,845.88

The Petitioner appealed to the Ninth Circuit. Aside from other four grounds, the Petitioner argued that his counsel was ineffective due to the failure/refusal to declare a mistrial. The Ninth Circuit declined to hear the claim stating that the claim has to be brought in form of a Motion under 28 U.S.C. §2255.

The Petitioner filed his Motion under Section §2255 on _____, less than one year after his appeal was concluded.

## A) DEFENDANT/PETITIONER'S HAS BEEN COMPELLED TO TESTIFY IN CLEAR VIOLATION OF HIS FIFTH AMENDMENT TO THE U.S. CONSTITUTION RIGHT:

## 1.  INTRODUCTION:

Before the jury was impaneled, the Petitioner stated to his counsel that he will not take the stand to testify in his behalf, and that he will assert his rights under the Fifth Amendment.

When, in the middle of the trial, the Government sought to introduce the statements that he made at the proffer session, statements that amounted to nothing else than a confession in the eyes of the jury unless, the Petitioner felt compelled to take the stand and explain what he said and shed light in any kind of misunderstanding that might arouse.

The Petitioner has decided to testify against the advice of his counsel, as he explained to the Court, " I didn't know my client might testify until a week ago." (See Transcript at p. 74).

After the Court acknowledged, the counsel explained further to the Court, "[Mr. Petrosian] would testify **only** if the proffer material came in because then he will go to the witness box and explain that when he said there was a 90/10 percent split, he meant that he kept the 90 percent and gave the 10 percent to the people who gave him the advertising, as commission." (See Transcript at p.120-121 from 04/10/08). The Petitioner, once on he took the stand, did just that.

Had the Petitioner not taken the stand, his statements would have gone unexplained, or the matter was taken as a confession.

## 2.  ANALYSIS:

The history of the Fifth Amendment right against compulsory self-incrimination, and the evils against which it was directed have received considerable attention in the opinions of the Supreme Court of the United States, see e.g. **Kastigan v. U.S., 406 U.S. 411 (1972), Miranda v. Arizona, 384 U.S. 436 (1966), Counselman v. Hitchock, 142 U.S. 547 (1982).**

At this point in time, virtually every schoolboy is familiar with the concept, if not the language (an 8th Grade Level) of the provision that reads: "No Person... Shall be compelled in any criminal case to be a witness against himself..."

The Supreme Court decisions have reffered to the right as "the mainstray of our adversary system of criminal justice," as we see in **Johnson v. New Jersy, 384 U.S. 719, 729 (1966),** and as "one of the great landmarks in man's struggle to make himself civilized," see **Ullmann v. U.S., 350 U.S. 422,426 (1956).**

It is not surprising that the Constitution of virtually every State in the Union has a similar and comparable provision against one's right against self-incrimination.

33

The importance of a right does not, by itself, determine it's scope, and therefore we must continue to hark back to the such historical origins of the privilege, particularly the evils at which it was to strike. The privillege against compulsory self-incrimination was developed by painful apposition to a course of ecclesiastical inquisitions and Star Chamber proceedings occurring several centuries ago, see L. Levy "Origins of the Fifth Amendment" (1968).

Where there has been genuine compulsion of testimony, the right has been given broad scope. Although the constitutional language in which the privilege is cast might be construed to apply only to situations in which the prosecution seeks to call a defendant to testify against himself at his criminal trial, it's application has not been so limited as it may appear.

The right has been held applicable broadly in other kind of proceedings concerning the criminal process, like proceedings before a Grand Jury, see **McCarthy v. Arndsten, 266 U.S. 34 (1924),** to proceedings involving congressional investigations, see **Watkins v. U.S., 354 U.S. 178 (1957),** to juvenile proceedings, see e.g. **In Re Gault, 387 U.S. 1 (1967),** and to other statutory inquires, see **Malloy v. Hogan, 378 U.S. 11 (1964).**

The natural concern which underlies many of the decisions enumerated above, as it is in the case at bar, is that a stated inability to protect the right at one stage of a proceeding, e.g. proffer session/pre-trial, may make it's invocation useless at a later stage, e.g. trial or sentencing. For example, a defendant's right not to be compelled to

testify against himself at his own trial might be practically nullified if the prosecution could previously have requested him to give/produce evidence, or any incriminatory testimony, against himself before a Grand Jury.

The same seemed to be happened in this case. The sole element to be proven by the Government was that the Petitioner has been an integral part of the charged conspiracy, whether **or not** knew of the underlying part, namely the Medicare fraud, and that he had offered "cash-back" to the advertisers, who were engaged in a separate fraudulent conspiracy.

Once the Government proved that cash was given back, an action triggered by a payment in form of a check, the jury can find the Petitioner guilty. Accordingly, when the Government sought, and received approval, to use the Petitioner's statements, which with the help of the confusion created by the Armenian translator, seems to confess to the Government's case that has to be proven.

Once those "confessions" were to be introduced to the jury, a constitutional violation [technical] would take place, and put the Petitioner in the position to be a "witness against himself" in his trial, and compelled to testify [against his desire] in order to explain the confusion created.

Due to the fact that a proper Russian language translator was not provided, and due to Petitioner's limited comprehension of English language, the statement's made

35

were misinterpreted, and transcribed to a report to reflect a position different than the Petitioner has exprimed.

When such a report was created, reflecting the Petitioner's proffer "statements," one can legally argue that the alleged "confession" is incompetent, and can be deemed "involuntary," when words were "put into Petitioner's mouth" to reflect a hollow reality, that later will be used to convict him at trial.

The Supreme Court stated in **Bram v. U.S., 168 U.S. 532 (1897),** that: "In criminal trials, in the courts of the United State, whenever a question arises whether a confession is incompetent because not voluntarily, the issue is controlled by that portion of the Fifth Amendment to the Constitution of the United States, commanding that "No Person Shall be compelled in any criminal case to be a witness against himself."

The remaining question in this chapter is whether the Petitioner trial testimony was in fact compelled by the prosecution's wrongful use of his proffer statements which we established that amounted to an extrajudicial confession. It is, of course, difficult to unravel the many considerations that might have led to the Petitioner to take the witness stand at his trial. But having improperly placed his alleged "confessions" before the jury, the Government can hardly demand demonstration by the Petitioner that he would not have testified as he did if his wrongful and misinterpreted proffer statements were not introduced before the jury as a "confession" to the crime alleged. The springs of the conduct are subtle and varied, as the Supreme Court Justice Cardozo once observed:

36

"One who meddles with them must not insist upon too nice a measure of proof that the spring which he released was effective to the exclusion of all others." Having released the "spring" by using the Petitioner's proffer statements against him, the Government must show that its improper action did not induce his actions.

No showing can be done in this case. The defense counsel stated to the Court that the Petitioner did not intend to take the stand at the beginning of the trial, and that he asserted to his counsel that he will take the stand only if the proffer statements will be introduced, because he has to explain the misinterpretations and misunderstandings in it.

As once Mr. Justice BLACK stated: "It certainly offends my sense of justice to say that a State holding in jail people who were so convicted by unconstitutional methods have a vested interest in keeping them there that overweighs the right of persons adjudged guilty of crime to challenge their constitutional convictions at any time, see **Linkletter v. Walker, 381 U.S. 618,653 (1965).**

**B) COUNSEL'S TACTICAL DECISION NOT TO DECLARE A MISTRIAL AT THE COURT'S URGING DEPRIVED THE PETITIONER OF HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL:**

## 1.  INTRODUCTION:

It is the Petitioner's view that his counsel provided him with substandard representation that severely prejudiced him at trial, prejudice that led to his conviction and sentence to a lengthy sentence.

Although the Petitioner could go into a myriad of decisions that can arguably qualify as a ground for this honorable Court to find him ineffective, a sole one is approached in this part, namely the counsel's failure to request a declaration of mistrial, as suggested and even encouraged by this Court, when the Petitioner's proffer statements were ruled as admissible.

As established in previous chapter, those statements could be read or inferred by the jury as being a confession of the defendant to the crime charged. That in turn led to the Petitioner to be compelled into testifying, against his will, in order to clarify any misinterpretation or misunderstanding regarding his statements, due to the conflict regarding Armenian language translator that was used in error, instead of a Russian language one. That wrong language translator led to the misinterpretation of Petitioner's statements, and that required him now, at trial, to take the stand.

The Court expressed the concern that the Petitioner was being compelled to testify:

THE COURT: Now we have a dispute, and the specter of perhaps having the defendant being compelled to testify, if for no other reason than to correct what he says was a misunderstanding of a misinterpretation of what he said. (TR.04/10/09 @P.124-125).

The Court went further and asked if the defense counsel was concerned that the defendant was being forced to testify, to set the record straight about any "confusion about or misunderstanding about the meaning of words at the [proffer] interview" (ID at P.239-240). The defense counsel answered nonchalantly that he did not, even though he had also asserted that the defendant was not supposed to take the stand.

Then the Court went on to explain:

THE COURT: So, in other words, I can see arguments both ways, but if you **had a motion for a mistrial, I would seriously consider it.** I want to make that clear, and if you're saying that notwithstanding that view you want to go further, then you'll have to **do that with consequences;** and I want to make sure your client is fully informed.

The defense counsel, against the Petitioner's protestations and direction to agree to a mistrial, he waive it, and not bring a mistrial motion.

The Court, probably not believing what is hearing, he stated:

39

THE COURT: All right. You understand, you know, the consequences. You're waiving it.

COUNSEL: I do.

Rather than declare a mistrial as any reasonable competent counsel would do, this counsel chose to waive it, which the Court reluctantly did. If a mistrial motion would have been brought, and the Court most likely granted it, the prejudicial effects of the proffer statements of the defendant's urgent need to testify would be thwarted.

## 2. ANALYSIS:

It is established that decisions made by the counsels, can be reviewed by the Court, in collateral proceedings, to inquire if he legal representation rendered to the criminal defendant at Pre-trial, trial, or sentencing stage was effective.

The Supreme Court of the United States, in **Strickland v. Washington**, established the standard of review of ineffective assistance of counsel.

In doing so, the Court stated that "tactical decisions" <u>after consultation with the client,</u> are "virtually unchallengeable." A year earlier, prior to deciding **Strickland**, the same Court had established the decisions that belong exclusively to the defendant: (1) whether to plead guilty; (2) whether to waive a jury of his peers; (3) testify on his or her behalf; (4) take an appeal;

Tactical decisions like requesting a declaration of mistrial, calling or not a certain witness, or introducing or not a certain piece of evidence, is left to the <u>sole discretion</u> of the counsel, even if the decision is made over the disapproval and even the protestation of his client.

In this particular case, the Petitioner's counsel indeed had decided to not direct a mistrial, without any apparent logic, nor a particular obvious trial strategy, and the government would argue that the decision falls in the area of "tactical decision" that is alleged to be "unchallengeable." The Petitioner begs the Court to differ.

The Sixth Amendment to the United States Constitution, provided that "in all criminal prosecutions, the accused SHALL enjoy the right.. to have the **assistance** of counsel for his defense."

The importance of words like "assistance" and "counsel" seems inconsistent with a regime under which counsel appointed by the government (or retained) to represent a criminal defendant, can refuse to raise issues with arguable merit when his client, after hearing counsel's assessment of the situation/case and rendered his advice, has directed him to raise them indeed.

The Constitution does not on its face define the phrase of "assistance of counsel," but surely those words are not empty of content. No one would doubt that counsel must

41

be qualified to practice law in the courts of the State or Circuit in question, or that the representation afforded must meet minimum standards of effectiveness, see **Powell v. Alabama, 287 U.S. 45 (1932),** and **Strickland v. Washington, Supra, I.D.**

To satisfy the Constitution, counsel must function as an **advocate** for the Petitioner, as opposed to a friend of the Court, see **Anders v. California, 386 U.S. 738,744 (1967).** Admittedly, the question presented by the Petitioner in this Section 2255 petition is requesting This Honorable Court to look beyond those clear guarantees.

What is at issue here, is the relationship between lawyer and his client – "Who has the ultimate authority to decide the filing or not of a mistrial motion, a non-frivolous issue, when the said mistrial is in fact suggested by the Court itself?"

It is the Petitioner's behalf that the right to "the assistance of counsel" carries within a right, personal to the defendant, to make that decision against the advice or desire of his counsel if he so chooses.

The Petitioner believes that any decision that can potentially affect the outcome of the criminal proceedings against him, that have the potential to effect his fate or life, should be **his only** to make; as Mr. Justice Blackmun aptly stated in the landmark case, **Farreta v. California, 422 U.S. 806 (1975):**

42

"It is undeniable that in the most criminal prosecutions defendant could be better defend with counsel's guidance, than by their own unskilled efforts. But where the defendant will not voluntarily accept the [representation] by counsel, the potential advantage of a lawyer's training can be realized, if at all, only imperfectly. To force a lawyer's…[decision]… on a defendant can only lead him to believe that the law contries against him.. personal liberties are not rooted in the law of averages. The right to defend is **personal**. The defendant, and not his lawyer or the state, will bear the personal consequences of a conviction. It is the defendant therefore, who must be personally to decide.. and although he may conduct his own defense ultimately to his own detriment, his choice must be honored out of "that respect for the individual which is the lifeblood of the law." (**Mr. Justice Blackmun, Dissenting**).

**Faretta** establishes that the right to counsel is more than a right to have one's case presented correctly and effectively. It is predicated on the view that the function of a defense counsel under the Sixth Amendment is to protect the dignity and autonomy of a person on trial by **assisting** him in making choices that **are his to make,** not to make choices for him that may or may not affect the whole outcome of the trial, therefore one's life.

It is the Petitioner's view that, the defense counsel that represented him in trial was ineffective, and deprive him of his right to effective assitance of counsel, by not

moving for a mistrial as the Court suggested, and by not respecting his directions to move for such motion of mistrial.

It is the Petitioner's view that prejudice has occurred that cannot be considered harmless, but that affected the outcome of the trial, the integrity of it, and deprived the Petitioner of his right to have a fair trial.

3. **CONCLUSION:**

A ruling that the counsel's decision not to bring a mistrial motion, and to proceed knowing well the prejudice that will take place by such proffer statements rebuttal by the Petitioner's taking the stand would be unfair and will not be justice done.

Such a ruling would denigrate the values of individual autonomy and dignity, central to many constitutional rights, especially those Fifth and Sixth Amendment rights that come into play in the criminal process.

Certainly a person, like the Petitioner in this case, changes when he is charged with a crime and is brought to trial. He must, if he arbors any hope for success, defend himself on terms often technical and hard to understand, that are Government's not his own. In many ways, having a lawyer becomes one of many indignities visited upon someone who has the ill fortune to have run, allegedly, afoul of the criminal justice

system, but should not be that lawyers are one of the punishments a person receives

merely for being accused of a crime.

## ISSUE 2:

**WHETHER THE APPELLATE COUNSEL WAS INNEFFECTIVE FOR FAILURE TO ARGUE THE DEFENDANT'S ENHANCEMENTS AT SENTENCING:**

### 1.  INTRODUCTION:

As a result of the Petitioner's conviction, the court directed the parties, and the P.S.R. to file their position in regards to what the sentencing should be.

As it happens in virtually all cases, the P.S.R. adopted the Government's position, and vice versa. Both, the Government and the P.S.R. arrived to a Offense Level of 34, with a Guideline Range of 151-188 months, that was composed from the following components:

**A) BASE OFFENSE LEVEL 24:** That based on the Government's position that the tax loss amount, pursuant to §2T4.1 is approximately @2,897,452. That amount was calculated as being required 25% tax rate from the spreadsheet presented at sentencing, in amount of $10,348.043 (allegedly representing ALL the payments that the Petitioner's business received as payment for the advertising in his magazines and calendars)

**B) ROLE IN THE OFFENSE ENHANCEMENT:** The Government and the P.S.R. stated that the Petitioner in qualifying for an enhancement for leadership in the offense, namely 4 levels. Pursuant to the Guideline §3B1.1 a 4 level enhancement if the

offense included more than 5 culpable individuals or otherwise the offense is found to be "extensive."

**C) OBSTRUCTION OF JUSTICE ENHANCEMENT:** An upward adjustment of 2 levels was found to be applicable, by the Government and the P.S.R., based on the Petitioner's alleged threats and intimidation of the Government's witness.

**D)USE OF SOPHISTICATED MEANS ENHANCEMENT:** Two levels upward adjustment, was alleged by the Government and the P.S.R. to apply, for use of sophisticated means.

Applying 2 more levels to the total offense levels adjustment for deriving a substantial portion of money from the tax offense, that will not be contested by the Petitioner, the Government and the P.S.R. arrived at a total Offense Level of 34.

The Appellate counsel, in spite of the Petitioner's requests, failed to challenge that stated enhancement, a non-frivolous request as it will be shown by the Petitioner heretofore, where at least, at minimum appellate counsel should have argued the following matters:

### A) SENTENCES IMPOSED ON COUNT ONE AND THREE SHOULD HAVE BEEN IMPOSED TO RUN CONCURRENT AND NOT TO RUN CONSECUTIVE

### 1) INTRODUCTION:

The jury returned a GUILTY verdict on COUNT 1 and 3 of the First Superseding Indictment, and on COUNT 2 was hung.

The District Court dismissed Count 2 at sentencing, and imposed a sentence of 60 months on Count 1 (Count 1 charged Conspiracy 18 U.S.C. §371, with a maximum of 60 months) and 36 months on Count 3 (Count 3 charged False statements to a Federal Agent, 18 U.S.C. §1001, with a maximum of 60 months).

The District Court decided to run the sentences consecutive, and the defense counsel have not objected, nor argued the imposition of the sentences in light of U.S.S.G. §3D1.2. The appellate attorney have not challenged the imposition of the sentences, even though was requested by the Petitioner, and as will be shown in this chapter as not frivolous.

### 2) ANALYSIS:

The Petitioner has been sentenced to two counts that they were closely related, namely to a Count of Conspiracy to defraud the United States, and to a count of lying to the federal agents when questioned about said conspiracy.

The U.S.S.G. §3D1.2 requires that "all counts involving substantially the same harm **shall**.. be grouped together into a single group" for purposes of calculating the offense level that pertains to a multiple-count conviction.

Pursuant to U.S.S.G. §3D1.3, the offense level for an entire group is simply the highest offense level pertaining to any one of the group's consistent offenses.

There are four sets of criteria under which separate counts may be found to "involv[e] substantially the same harm," as is stated on U.S.S.G. §3D1.2.

The **first,** described in subsection (a) of that provision, requires that "the counts involve the same victim and the same act or transaction," see U.S.S.G. §3D1.2(a). In this case the Petitioner (assuming arguendo) engaged into a scheme to deprive the United States of its tax funds, and when question by the agents of the U.S. about it had lied the same. "Counts are to be grouped together [under this subsection] when they represent essentially a single injury or are part of a single criminal episode or transaction involving the same victim," see the **Application Note 3 of U.S.S.G. §3D1.2.**

The **second** set of criteria requires that the "counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a said **common scheme or plan,"** see U.S.S.G. §3D1.2(b).

The U.S.S.G. §3D1.2, Application Note 4 states:

"Counts that are part of a single **course of conduct** with a single criminal objective and represent essentially one composite harm to the same victim are to be grouped together, even if they constitute legally distinct offenses occurring at different times."

The terms **"common scheme or plan"** and the **"same course of conduct"** are the key to the application of the U.S.S.G. §3D1.2, and are explained by the U.S. Sentencing Commission in the U.S.S.G. §1B1.3 Application Note 9:

(A) <u>**Common scheme or plan.**</u> For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, **common purpose,** or similar modus operandi.

(B) <u>**Same course of conduct.**</u> Offenses that do not qualify as part of a ommon scheme or plan may nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are **part of a single episode, spree, or ongoing series of offenses.**

In other words if the counts that the defendant is to be sentenced are part of the same course of conduct, or part of the same common scheme or ongoing series of offenses, the said count (the sentences) should be concurrent and not consecutive.

A conspiracy is **continuing offense**, and take together with the relevant conduct is paramount to a moving picture, see <u>**U.S. v. Kissel, 218 U.S. 601,607 (1910).**</u> A

continuing offense is, in general, one that involves a prolonged course of conduct; it's commission is not complete until the conduct has run its course, see **Toussie v. U.S., 397 U.S. 112,115 (1970),** see also in addition **U.S. v. Kristic, 558 F.3d 1010 (9th Cir. 2009).**

In this case there is no doubt that the conspiracy charged in Count 1 is part of same course of conduct/scheme with the Petitioner's lying about the commission of Count2 (charged as Count 3), and that the Count 3 is the continuation of Count 1.

The **third** set of criteria requires that each of the counts "embody conduct that is treated as a specific offense characteristic or other adjustments to the guidelines application to another counts, see U.S.S.G. §3D1.2(c).

The intent behind this subsection is to "prevent double counting" of offense behavior, see Application Note 5.

The **fourth** set of criteria applies when the offense level for all the counts is determined on the basis of the total amount of harm or loss.. or some other measure of aggregate harm."

This subsection applies when all the relevant conduct fall under a single rubric, and other crimes where the guidelines are based primarily on quantity or contemplates **continuing behavior** (see explanation ante).

51

In addition to the four criteria that are outlined, and under which the Petitioner's case **clearly** falls, the Guideline 3D1.2 specifies exactly which offenses are covered for grouping, see U.S.S.G. §3D1.2(d) Table ex.

As a last example that should give the Court all the necessary direction in how the grouping applies to the Petitioner's case, it can be found on U.S.S.G. §3C1.2 Application Note 8:

**8. <u>Grouping Under</u> §3D1.2(c). –** If the defendant is convicted of both of an obstruction offense... and an underlying offense (the offense with respect to which the obstruction conduct occurred), the count for the obstruction offense **will be grouped** with the count for the underlying offense under subsection © of §3D1.2...

If the Court is still not persuaded, then it should look no further than that Government's own Sentencing Paper position that amazingly agrees with the Petitioner's claim, see Gov.Sup.Sent.Mem.,Docket #153 @ P.9.

As a last remark, one can argue that the charge contained in Count 3 (False Statement to a Federal Officer), cannot be associated or considered as "obstruction of justice," so as to apply the said Application Note directing the sentences to run concurrent rather than consecutive.

But there is a case where we can get the needed guidance, see **U.S. v. Patterson, 890 F.2d 69 (8th Cir.1989)** ("false statements can be considered as obstruction of justice for purposes of the sentencing guidelines, even when not made during judicial proceedings.")

### 3) CONCLUSION:

It is the Petitioner's view that the Appellate counsel was ineffective for not arguing, at Petitioner's express request, the consecutive imposition of the sentences on COUNT 1 and 3, a non-frivolous argument as demonstrated above.

IT is the alternative Petitioner's request that the Court should re-enter the sentence and give the Petitioner's another chance with a fresh effective counsel.

## B) ROLE IN THE OFFENSE ENHANCEMENT:

When calculating the advisory sentencing guidelines range, the Court has to consider the defendants' role n the offense, being either an upward adjustment for a leadership, manager or supervisor role in the offense, or a downward adjustment for being a minor participate in the offense, see **U.S. v. Rivera, 527 F.3d 891 (9th Cir.2008).**

As in the case here, the guidelines provides that a 4 level increase in the offense is applicable, where the defendant to be sentenced was "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive," see U.S.S.G. §3B1.1.

In the instant case, the Government argued, and the Court eventually agreed, that the Petitioner qualified for the said enhancement. The prosecutor, as well as the P.S.R., justified such enhancement due to the fcat that the "…defendant instructed the medical companies to take certain actions and provided the companies with documents that permitted them to file false tax returns" see P.S.R. @P.45.

Based on that faulty and speculative logic, the P.S.R. had concluded that the Petitioner indeed qualifies for the leadership enhancement, because he was a "leader."

The Government followed the P.S.R. lead, and in their infinite wisdom went on and justified that the enhancement do applies because the "defendant **conducted the transactions personally…** defendant **was the sole proprietor of the front business**

54

used as "payees" on the checks... defendant **counted and gave cash back,** and..
**arranged for the phony advertising"** see Gov.Sent.Paper @P.3-4, DOCKET #153.

Incredible as it may sound the reasons enumerated by the Government were the sole reasons that the enhancement was proposed. As more incredible, the appellate attorney chose not to challenge such enhancement, an act that the Petitioner believes is non-frivolous and should have been raised.

A finding that a defendant is eligible for a sentence enhancement ordinarily does not require specific fact-finding, see **U.S. v. Govan, 152 F3d 1088,1096 (9th Cir.1998).**

However, more is required when a defendant contest specific factual statements or conclusions made in the P.S.R., as directed by the **Rule 32(c)(1) of Fed.Rul.Crim.Proc:**

(ii) the court finds that the information in this record enambles it to meaningfully exercise its sentencing authority under the 18 U.S.C. §3553, and the court **explains its findings on record.**

It is well settled in this Circuit that "when the District Court fails to make the required Rule 32 findings or determine at the time of the sentencing, that sentence must be reversed, see **U.S. v. Fernandez-Angulo, 897 F.2d 1514,1516 (9th Cir.1990).**

In assessing the defendant's role in the offense, the Court should look and find "exercise of control" over at least one other participant in the crime, on other than a government agent or source. Than when it is found the required "exercise of control" to apply, then the Court should apply a two-prong test to establish how many levels applies for that aggravating role.

U.S.S.G. 3B1.1 reads:

Based on the defendant's role in the offense, increase the offense level:

a)   if the defendant was an organizer or leader of crimnal activity that involved five or more participants or was otherwise extensive, increase by **4 levels;**

b)   if the defendant was a manager or supervisor (but not an organizer or leader) and the crimnal activity inloved five or more participants or was otherwise extensive, increase by **3 levels;**

c)   if the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by **2 levels;**

To qualify for an adjustment under this section, **regardless** of how many participants are involved, or if is extensive or not, one has to have "some degree of control or organizational **authority** over others," see <u>**U.S. v. Mares-Molina, 913 F.2d 770, 773 (9th Cir.1990).**</u>

56

In this case the Government has not introduced any **scintilia** of evidence that the Petitioner "organized" or "controlled" another individual or medical entity, or the tax fraud itself, nor for the fact that the Medicare fraud involved in the underlying crime from which the charged conspiracy stemmed.

To make the matters worse, the Petitioner's counsel, the P.S.R., the Government, and the Court had seized their analysis upon the language of the "number of participants" or if the operation was "otherwise extensive." The whole part of the sentencing hearing was dedicated in establishing the number of participants, and the extensiveness of the crime, **but not the Petitioner's presence or lack of control, or recruitment** of another criminally culpable participant in the conspiracy.

The Ninth Circuit case law, makes it clear that if one does not exercise leadership in the form of control over another participant in the crime, then **there is no leadership no matter the number of participants or the extensiveness of the crime charged, see U.S. v. Jordan, 291 F.3d 1091 (9th Cir.2002).**

Here, in our case, the Government and the P.S.R., have justified the enhancement based on facts that can only show that the crime charged was committed (assuming arguendo). The reasons cited in support show only that the parties mutually agreed to participate in the offense, and they mutually provided each other with the means to commit the offense.

The whole case for the Petitioner's leadership enhancement, was as we see, centered on a faulty logic. A merely speculative logic cannot displace the need for evidence on such an issue, which cannot be decided by assumption or inference not based on fact, **U.S. v. Jordan, Supra at 1098.**

Moreover, just as "utilizing organizational skills" in a criminal endeavor "is not the same as organizing other like his co-conspirators," **U.S. v. Hoac, 990 F.2d 1099 (9th Cir. 1999)** the Petitioner instructions as "how he wants to be paid" for his (illegal or legal) services cannot be presumed to be a base for leadership.

Here, the District Court may have had insights and intuitions, from the defendant's trial, about respective role of the Petitioner and his conspirators, but factual contentions of the Petitioner's alleged leadership role, such as those contained in the P.S.R. are not supported by evidence in the pre-trail, trial or sentencing records.

For a 4-point upward adjustment to be appropriate, a preponderance of evidence must support a finding that the Petitioner was an organizer or leader, "not merely that the Petitioner was more culpable than other participants in the crime," see **U.S. v. Harper, 33 F.3d 1143,1150 (9th Cir. 1994).**

Here in our case, that kind of evidence (of control or of recruitment was missing) and the Court and the parties concentrated wrongly exclusively on the second-prong of

the leadership analysis, namely on the number of participants and the extensiveness of the crime charged.

**CONCLUSION:**

Therefore, as demonstrated above, the Petitioner has a valid and non-frivolous argument regarding his leadership enhancement, and his appellate counsel prejudiced him by not raising this issue in appeal, in spite the Petitioner's requesting to do so.

In Petitioner's view the appellate counsel deprived him of his right to an effective counsel.

### C) AMOUNT OF LOSS:

### 1. INTRODUCTION:

The P.S.R. and the Government, through their Sentencing submissions, recommended that the Petitioner be assigned a Base Offense Level of 24, based on a loss amount figure of $2,897,452.

The loss amount was calculated at a tax rate of 28% out of a figure of $10,348,043. The government claim was that this amount was the total "illegal" payments made to the Petitioner's various businesses, between 2004 and 2007. The said amount was summarized on a Spreadsheet attached as an "EXHIBIT B" to the Gov.Sentencing.Memorandum filed on December 29, 2008.

The defense counsel has argued that instead of $10,348,043 the sume supposed to be $8,407,957, therefore at a tax bracket at 28%, the loss amount should be $2,345,228, which in turn would assign a Base Offense Level of 22, according to U.S.S.G. §2T4.1(I). It is the Petitioner's position that the defense counsel was wrong, that it should have been argued and proven the loss amount and that the appellate attorney was ineffective because has not argued in appeal the loss amount, a non-frivolous argument that will be shown heretofore.

### 2. ANALYSIS:

**RULE 32(1)(3)(B)** of Federal Rules of Criminal Procedure, it directs the Court to:

> "(B) **must** – for any disputed portion of the presentence report other controversed matter – rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing."

The Petitioner, himself via his Pro Se submissions, and his counsel have objected vigorously to the P.S.R. and Government's loss calculation. As a matter of law, the government has the sole burden of proof with regards to the amount of loss. The burden is a "preponderance of evidence." A "preponderance of evidence" standard it is a lower standard of proof than the used at trial, namely the "beyond reasonable doubt," but it is not to be understood as being a standard that can be passed with any kind of circumstantial evidence, see **U.S. v. Medina, Supra.**

The Government has alleged in trial evidence, a sum of approx. $4,000,000 but at sentencing they increased the said amount by a staggering 250%, namely $10,000,000. The said amount allegedly represented the amount of payments that the companies owned and operated by the Petitioner received as payment for the advertising.

The government sum of $10,000,000 is basically payments that the governmet failed to prove that they are illegal payments. It has offered no proof whatsoever, aside from a chart. The said payments were not supported by any trial testimony, and the Government failed to determine the amount of money that was actually legal payments from alleged "illegal payments."

### A. Petitioner's counsel ineffective for failure to retain the services of a forensic accountaint as was agreed to and paid for in advance:

As we can see from the leter attatched to this Petition, and marked as (Exhibit 4), the defense counsel asked for an advance payment in order to retain a forensic accountant for trial, to testify as an expert witness for defense.

The Petitioner agreed and he has provided his counsel the funds requested, see Exhibit 5 A-F. The expert accountant, via a clear examination of the accounting and operations papers and documents of the Petitioner's businesses, if the advertising was real the real cost of publishing al the magazines and the calendars. If the said opinion was tendered, then the Petitioner verdict at trial would have been different, because the Government theory would be clearly and mathematically impossible. Let's examine it:

According to the Government Idictment at trial, Petitioner received around $4,000,000 "illegal" payments that were actually returned back in cash at a rate of 91-

93%. That means the Petitioner retained an "illegal commission" of 7-9%. That percentage translates into $280,000-$360,000. The average sum will then be $320,000.

As we know the Petitioner had 6 active businesses that were ran from 4 different locations, which puts the monthly rent at **$8,350** and the yearly rent at **$100,200;**

We also know a printing costs that was: 1) For the "Contact Weekly" **$89,440 a year;** 2) for the "Tet-a-Tet" approx **$200,000 a year;** 3) For the "kakadu" magazine approx, **$80,000 a year.**

Additionally, the monthly salaries and compensation for the employees and non-employees was around **$680,000** a year. If we add all the amounts we can see that the Petitioner, according to the Government, has cashed in **$320,000** in "illegal cash-back" funds, but spent **$3,450,000\*** in maintaining his businesses, that the Government alleges were "front" to his "scheme." It is the Petitioner position that if an expert accountant/forensic would have taken the stand and offered his testimony to the jury regarding the simple math done above, the jury would have dismissed the sheer absurdity of the Government novel story. It is practically impossible to perpetuate a fraud of **$320,000** and spend **TEN TIMES** that amount in setting it up.

One would be tempted to say that actually the amount of the "illegal payments" are in vicinity of $10,000,000 that the Government had alleged at sentencing. Well even if assuming that **arguendo** then it will fall again through simple math:

63

If the Petitioner's share was 7-9% out of $10,000,000, then again **How come the Petitioner spends $3.5 millions to perpetuate a fraud of barely 1 million?** Is the Petitioner insane or is he retarded? There was no proof to attest that of the Petitioner.

Additionally it was again a case of ineffective assistance of counsel, when the counsel failed to retain a forensic accountant for sentencing purposes, as we can see in the following.

The U.S.S.G. §2B1.1. App.Note 3(E)(i) states the following:

**"CREDITS AGAINST LOSS"** – Loss Shall be reduced by the following:

(i)     the money returned, and the fair market value of the .. services rendered, by the defendant or others persons acting jointly with the defendant.. before the offense was detected;

If the defense counsel would have retained the services of a forensic accountant, after an extensive expertise evaluation it could have been testified to the court, at sentencing, how much of $10,000,000 of payments were legitimate "services rendered by the defendant," namely how much it costs to run the advertising that the Petitioner actually have provided to the Medical companies. Only after that testimony, the Court would have been able to properly make the evaluation of the expert testimony, and the absence of proof from the Government to back up their purposed sum of $10,000,000 as

64

"illegal payments." The Court, in Petitioner's estimation, under the **Rule 32(i)(3)(B)** analysis would have found for Petitioner, or at least would have provided a good ground of appeal, create the record for the appellate review.

The Government, and the Court found that all the 10 millions payments, were Relevant Conduct to the crime that was found by the jury. A finding or relevant conduct is finding of fact, see <u>**U.S. v. Buck, 3224 F.3d 786,796 (5th Cir. 2003).**</u>

Under the Guidelines, a defendant's offense level is increased based on the amount of loss. The Government bears the burden of proof in proving the loss under the sentencing guidelines under a "preponderance of evidence." The preponderance of evidence standard goes to how convincing the evidence in favor of a fact with the evidence against it, see <u>**Greenwich v. Director OWCP, 990 F.2d 730,736 (3th Cir.1993).**</u> Even when the evidence to the fact allaged is even, which is not the case here, the party that bears the burden of proof <u>must loose</u>, <u>**see Greenwich v. Director OCWP, 512 U.S. 267,281 (1994).**</u> Therefore in our case, if the forensic accountant would have proffered the expert testimony the Gov. would have lost.

## 3. CONCLUSION:

It is the Petitioner's position that the fact that the defense counsel has not retained the services of a forensic accountant to prove the amount of loss, the Court did not have the required basis to make the necessary findings and the Petitioner was prejudiced.

It is also the Petitioners position that the appellate counsel was also ineffective because she failed to raise the said issue in appeal.

## D) OBSTRUCTION OF JUSTICE:

## 1. INTRODUCTION:

The Probation Officer in its P.S.R., and the Government in their sentencing submissions, recommended a 2 level upward adjust, for an alleged "Obstruction of Justice," see P.S.R. @P.47, and the Gov't Sent. Memo. @P.3, Line 17 -- @P.5, Line 15.

The whole enhancement basis was subtracted from the interview with two individuals that were convicted criminals, who pleaded guilty in their case (connected to the Petitioner's case), and also were COOPERATING WITNESSES against the Petitioner. The said witnesses, stated in open court that they are hoping for lower sentences for their "cooperation."

The "story" was that the Petitioner attempted to influence the testimony of the WITNESS GERSHELIS (GRIGORYAN son-in-law). Allegedly this attempt was made via a threatening letter that was **never** produced in Court as evidence. GERSHELIS claimed that he was brought to SAN BERNADINO C.J. on JANUARY 24, 2008, and some two days later he met the Petitioner. Within this 2 day window, GERSHELIS states that he had received a letter from the Petitioner, intended for GRIGORYAN, in which threatened the witness that "I will find you in Russia" if he testifies at trial. The letter written on a "green paper" that was sold in commissary, and the inmate had passed the letter forced him to throw it away. The "mistrious" inmate acted as a courier was never

produced. The said encounter allegedly was supposed to take place in the library at the jail.

## 2.  ANALYSIS:

The Government did not offer any proof whatsoever to sustain the alleged story of their "Cooperating Witnesses." Additionally, it is factually impossible that the story be true, because:

a.  **There is no Library at the jail,** in which inmates can walk and mingle freely within.

b.  **There is no "green paper"** sold on commissary at the jail.

c.  **There is no physical contact** at the jail because the Petitioner was housed at the Special housing wing, where the movement is very limited and restricted under the close supervision of deputies and cameras (solitary confinement).

d.  **Witness GERSHELIS IS NOT RUSSIAN,** but UKRAINIAN, actually from the west of UKRAIN that hate Russians. Although UKRAINE used to be part of the U.S.S.R. it became an independent country more than 20 years ago. That can be only a fabrication of a non-European.

e.  **The "threatening letter"** was never produced, nor the inmate that acted as a courier, nor a video recording that the alleged encounter ever took place. The jail is covered entirely with security cameras.

### 3. CONCLUSION:

It is the Petitioner's position that the appellate attorney was ineffective by not appealing this enhancement to the Court of Appeals. As explained above, the argument would not be frivolous and a prima facie was shown through verifiable facts.

**FAILURE TO IMPEACH / FALSE WITNESS TESTIMONY:**

## 1. INTRODUCTION:

An additional ground that can contribute to a finding of I.A.C. is the trial counsel failure to impeach the prosecution's witnesses, impeachment that probably would have changed the outcome of the trial.

It is the Petitioner's view that the motive behind his counsel's failure to impeach the prosecution witnesses testimony, was the **failure to investigate and prepare for trial,** a total failure of the required due diligence that an attorney is tasked to perform by the accepted and prescribed standards of professional conduct.

## 2. ANALYSIS:

In order to establish his claim, the Petitioner will show several examples of where the prosecution witnesses were lying or were testifying to something that was factual inaccurate or false without the defense counsel to impeach, and the proof of the said false testimony.

## A) WITNESS VENERA SARKISSIAN:

Witness Venera Sarkissian (hereinafter VENERA) testified that she was an employee of GRIGORYAN at the TOP CHOICE CLINCIAL LABORATORY, and also that she was knowingly involved in an illegal kickback scheme orchestrated by GRIGORYAN.

In essence, she testified that she was instructed by GRIGORYAN to take checks from TOP CHOICE to the Petitioners, on a weekly basis, or sometimes bi-weekly, See Trial. Transc. @P30-32. Further she went on to describe that once she handed the said checks to Petitioner personally (as instructed) she would receive an amount of cash corresponding with 90-93% of the face value of the checks, cash that she would later hand over to GRIGORYAN. After a while she realized that was something illegal and she quit her job with the TOP CHOICE CLINCAL LABORATORY.

The specific exchange was:

Q: Did you recall him (Grigoryan) asking you to take a check specifically to Andranik Petrosian or to take checks and get them cashed?

A: No, **he asked me specifically to take it to Andranik Petrosian.**

(Trial Transcript @ Page 14)

If the defense counsel would have done his job to investigate, read the discovery and prepare, would have cross-examined VENERA regarding certain inconsistencies in her story and testimony, namely:

71

**The Petitioner and GRIGORYAN met for the first time only after a year after VENERA quit her job at TOP CHOICE!** Only this fact alone, if came up in cross-examination, would have at least sounded an alarm in the jury's mind about how reliable or truthful her said testimony is, potentially to have changed the whole outcome of the trial.

If the defense would have exercised due diligence, and was well or minimally prepared, would have cross-examined VENERA regarding the umber of checks she estimates that she had handed to the Petitioner. After she would state a number (obviously over 5) the defense counsel would have introduced in the evidence the Gov.Ex.108-3 (Docket Number). With that exhibit as evidence, would have confronted VENERA as to **WHY THERE <u>IS ONLY ONE CHECK</u> (NO.1971) IN THE AMOUNT OF $5000 AND MADE PAYABLE TO CENTURY CALANDER, on the period before she quit her job with TOP CHOICE?** Wouldn't such evidence, if shown to the jury, have nullified her credibility as a witness, and also perhaps changed the jury's decision in the end?

Just as a last mention, the defense counsel did not show the Gov.Ex.012422, that states she in fact received cash from IGOR GRIGORYAN (GRIGORYAN'S son) in 2003, in total conflict with her testimony, and not to mention the absurdity of VENERA's claims that "the defendant could supply anybody with **any amount** of cash," but that also lent him $50,000?

## B) WITNESS HAROUTUN GULDERYAN:

Witness HAROUTUN GULDERYAN (herinafter GULDERYAN) was another participant in the so called "scheme," and was the boss of GRIGORYAN and the owner of TOP CHOICE. His initial testimonies with the F.B.I. and his subsequent trial testimony were in grave conflict.

On the stand he stated that he did not know why checks payable to the Petitioner's name were made, namely to CENTURY CALENDAR and All Jumps, and that if he needed cash he would use his own bank account.

It is a very interesting opinion, and a defense counsel (a well prepared one) would have to cross the witness and ask him to explain why his partner GRIGORYAN cashed the checks with the Petitioner, when he could use his own boss's account?

Additionally, he stated that APPOLO DIAGNOSTIC transferred his business accounts to SHARP DIAGNOSTIC, and that he had the express obligation to pay the kickback of approximately $15,000/week.

Again, we should ask the defense counsel to exercise a little due diligence, and by using a little bit of math, the government's own discovery to impeach the witness and destroy his credibility in the jury's eyes, as simple as this: The $15,000/week means $780,000/year, for a total of $1,560,000 in two years case time frame.

At this point, the "prepared" defense counsel should have had introduced in evidence the Government's own chart showing the checks paid to the Petitioner's businesses. Armed with this he should have cross-examined the witness and point it out to the jury that for all four years in question did not exceed $80,000 in transactions between SHARP and the Petitioner's companies. Again defense counsel could have eliminated the credibility of this witness and show to the jury that all the case rests on wrong assumptions and theories.

3.  CONCLUSION:

The Petitioner is well aware that just the failure to impeach the witnesses alone is not enough to justify an I.A.C. finding, but these clear examples of the defense failures due to his lack of case pre-trial preparation, taken together could justify such finding.

The Petitioner showed clear examples stemmed from the government own exhibits that the witnesses were lying, and if that the said lies were impeached by a well prepared counsel, the outcome of the trial would have been potentially different.

## CONCLUSION

It is the Petitioner's position and ultimate conviction that his trial and appellate attorneys were so ineffective that he was deprived of his 6th Amendment rights to effective assistance of counsel.

The mistakes presented here, are of constitutional dimension, and no matter how one can view the facts and the law, it is obvious that the Petitioner was prejudiced. If this Honorable Court orders a hearing, and according to RULE 7 of SECTION §2255 to expand the record is granted, the Court should have no doubts in granting this petition and order the sentence and conviction vacated.

Accordingly, the Petitioner respectfully requested that This Honorable Court receives his Petition, grants his Motion to Vacate Set Aside, or Correct a Sentence/Conviction, or at minimum grant a hearing and orders the record to be expanded.

## EVIDENTIARY HEARING REQUIRED

An evidentiary hearing pursuant to RULE 8 of SECTION 2255, is required in this case, as a way to expand the record under the RULE 7 of Section 2255.

Petitioner shown through this petition, that he has raised at least 4 non-frivolous grounds of potential ineffective assistance of counsel. Accordingly, the Petitioner is entitled to an evidentiary hearing, see **U.S. v. Withers, 638 F.3d 1055 (9th Cir.2010).**

In determining whether a hearing and findings of a fact and the conclusion of law are required, "the standard essentially is whether the movant has made specific factual allegations that, if true, state a claim on which relief could be granted," as the movant has shown here, see **U.S. v. Schaflander, 743 F.2d 714,717 (9th Cir. 1984).**

## <u>CERTIFICATE OF SERVICE</u>

I, ANDRANIK PETROSIAN, the PETITIONER, do hereby certify that I cause to be sent to a true copy of the:

## **MOTION TO VACATE, SET ASIDE, CORRECT SENTENCE UNDER 28 USC 2255**

Under Rule 5 of Fed.Civ.Proc, to the U.S. ATTORNEY'S OFFICE, after I applied First-Class Postage and deposited the same in the EDEN CI LEGAL MAILBOX, today 6-15-12 . I declare that the certificate of service is executed under the penalty of perjury, Title 28 USC 1746.

Signature,

Andranik Petrosian

Petitioner/Pro Se

c/o EDEN CI

P.O. BOX 605

EDEN, TEXAS 76837

## TABLE OF EXHIBITS / ATTACHMENTS

CRIMINAL DOCKET U.S.D.C. ……………………………………..…….EXHIBIT 1

SENTENCING TRANSCRIPT……………………………………………EXHIBIT 2

COURT OF APPEAL DECISION…………………………………………EXHIBIT 3

LETTER FROM ATTORNEY WERKSMAN TO PETITIONER…………EXHIBIT 4

RECEIPT OF FUNDS FOR RETAINER OF FORESIC ACCOUNTANT… EXHIBIT 5 (A-F)

LETTER FROM PETITIONER TO ATTORNEY WERKSMAN…………..EXHIBIT 6

COMPLAIN AGAINST ATTORNEY WERKSMAN TO CAL.STATE BAR.ASSOC…EXHIBIT 7

MISCELANIOUS DOCUMENTS FOR COURT'S REVIEW……………...EXHIBIT 8

APPEAL, CLOSED, RELATED-G

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## (Western Division - Los Angeles)
## CRIMINAL DOCKET FOR CASE #: 2:07-cr-00708-SVW-1

Case title: USA v. Petrosian

Date Filed: 07/18/2007
Date Terminated: 02/10/2010

| Date Filed | # | Docket Text |
|---|---|---|
| 07/18/2007 | 4 | INDICTMENT Filed as to Seal A (1) count(s) 1, 2. Offense occurred in LA. (ab) (Entered: 07/19/2007) |
| 07/18/2007 | 5 | CASE SUMMARY filed by AUSA Bruce H. Seaby as to Defendant Seal A; defendants Year of Birth: 1967 (ab) (Entered: 07/19/2007) |
| 07/18/2007 | 6 | MEMORANDUM filed by Plaintiff USA as to Defendant Seal A. This criminal action, being filed on 7/18/07, is not pending in the U. S. Attorneys Office before the date on which Judge Stephen G. Larson began receiving criminal matters. (ab) (Entered: 07/19/2007) |
| 07/18/2007 | 7 | MEMORANDUM filed by Plaintiff USA as to Defendant Seal A. is seeking authority for an investigative action, being filed on 7/18/07, does not relate to Magistrate Judge John Charles Rayburn Jr., Jacqueline Chooljian, Patrick J. Walsh, Jennifer T. Lum, Jeffrey W. Johnson. (ab) (Entered: 07/19/2007) |
| 07/18/2007 | 8 | NOTICE of Related Case(s) filed by Plaintiff USA as to Defendant Seal A Related Case(s): CR 06-299 SVW. (ab) (Entered: 07/19/2007) |
| 07/18/2007 | | Document unsealed as to Seal A, re: Memorandum by U S Attorney re Judge Assignment 6 , Memorandum by U S Attorney re Investigative Action, 7 , Indictment 4 , Notice of Related Case(s) 8 , Case Summary 5 . (ab) (Entered: 07/19/2007) |
| 07/30/2007 | 9 | MINUTES OF POST-INDICTMENT ARRAIGNMENT: held before Magistrate Judge Carolyn Turchin as to Andranik Petrosian (1) Count 1,2. Defendant arraigned, states true name: as charged. Defendant entered not guilty plea to all counts as charged. Attorney: Mark J Werksman for Andranik Petrosian, Retained, present. Case assigned to Judge George H. King., (Armenian) INTERPRETER Required Jury Trial set for 9/4/2007 09:30 AM before Judge George H. King. Status Conference set for 8/20/2007 03:30 PM before Judge George H. King. Court Smart: CS 7/30/07. (mco) (Entered: 08/06/2007) |

https://ecf.cacd.uscourts.gov/cgi-bin/DktRpt.pl?412259273493...

| 07/30/2007 | 10 | STATEMENT OF CONSTITUTIONAL RIGHTS filed by Defendant Andranik Petrosian (mco) (Entered: 08/06/2007) |
|---|---|---|
| 07/30/2007 | 11 | DESIGNATION AND APPEARANCE OF COUNSEL; filed by Mark J Werksman appearing for Andranik Petrosian (mco) (Entered: 08/06/2007) |
| 08/10/2007 | 12 | ORDER RE TRANSFER PURSUANT TO GENERAL ORDER 224 -Related Case- filed. Related Case No: CR 06-299 SVW. Case, as to Defendant Andranik Petrosian, transfered from Judge George H. King to Judge Stephen V. Wilson for all further proceedings. The case number will now reflect the initials of the transferee Judge CR 07-708 SVW.Signed by Judge Stephen V. Wilson (rn) (Entered: 08/13/2007) |
| 08/14/2007 | 13 | MINUTES OF IN CHAMBERS ORDER by Judge Stephen V. Wilson as to Defendant Andranik Petrosian. The Court, having received the above-entitled matter on August 10, 2007, vacates the August 20, 2007 status conference. The Court further advances the time of the September 4, 2007 trial from 9:30 a.m. to 9:00 a.m. (cbr) (Entered: 08/15/2007) |
| 08/15/2007 | 14 | STIPULATION to Continue Trial Date from September 4, 2007 to October 30, 2007 filed by Plaintiff USA as to Defendant Andranik Petrosian (Attachments: # 1 Proposed Order Re Continuance of Trial Date; and Findings Re Excludable Time)(Searby, Bruce) (Entered: 08/15/2007) |
| 08/16/2007 | 15 | ORDER RE: (1) CONTINUANCE OF TRIAL DATE; AND (2) FINDINGS RE: EXCLUDABLE TIME by Judge Stephen V. Wilson as to Defendant Andranik Petrosian, re Stipulation to Continue 14 ;. Trial continued to 10/30/2007 09:00 AM before Judge Stephen V. Wilson. (ab) Modified on 8/17/2007 (ab, ). (Entered: 08/17/2007) |
| 08/21/2007 | 16 | EX PARTE APPLICATION for Order for An Order requesting that Mr. Petrosian be housed at the Metropolitan Detention Center. Filed by Defendant Andranik Petrosian (Attachments: # 1 Proposed Order)(Werksman, Mark) (Entered: 08/21/2007) |
| 08/22/2007 | 17 | EX PARTE APPLICATION for Order for Order to House Mr. Petrosian at the Metropolitant Detention Center in Los Angeles Filed by Defendant Andranik Petrosian (Attachments: # 1 Proposed Order To U.S. Marshals Service to House Mr. Petrosian at the Metropolitan Detention Center in Los Angeles) (Werksman, Mark) (Entered: 08/22/2007) |
| 10/03/2007 | 18 | STIPULATION to Continue Trial Date from October 30, 2007 at 9:00 a.m. to January 29, 2008 at 9:00 a.m. filed by Plaintiff USA as to Defendant Andranik Petrosian (Attachments: # 1 Proposed Order Re: 1) Continuance of Trial Date; and 2) Findings Re Excludable Time)(Searby, Bruce) (Entered: 10/03/2007) |
| 10/12/2007 | 19 | ORDER TO CONTINUE Trial and re Excludable Time by Judge Stephen V. Wilson as to Defendant Andranik Petrosian. Jury Trial continued to 1/29/2008 09:00 AM before Judge Stephen V. Wilson. The period from October 30, 2007 |

| | | |
|---|---|---|
| | | to January 29, 2008,inclusive, shall be deemed an excludable period pursuant to 18U.S.C. § 3161(h)(8)(A). (rrey) (Entered: 10/12/2007) |
| 01/02/2008 | 20 | FIRST SUPERSEDING INDICTMENT Filed as to Andranik Petrosian (1) count(s) 1s. Added count 1s, 18 U.S.C. 371. Introductory allegations (18 U.S.C. 1519, 2 and 18 U.S.C. 1001) are incorporated and realleged into each count of this First Superseding Indictment. (rj) (Entered: 01/03/2008) |
| 01/02/2008 | 21 | CASE SUMMARY filed by AUSA Bruce H. Searby as to Defendant Andranik Petrosian; defendants Year of Birth: 1967 (rj) (Entered: 01/03/2008) |
| 01/02/2008 | 22 | MEMORANDUM filed by Plaintiff USA as to Defendant Andranik Petrosian. This criminal action, being filed on 1/2/2008, was not pending in the U. S. Attorneys Office before the date on which Judge Stephen G. Larson began receiving criminal matters. (rj) (Entered: 01/03/2008) |
| 01/02/2008 | 23 | MEMORANDUM filed by Plaintiff USA as to Defendant Andranik Petrosian is seeking authority for an investigative action, being filed on 1/2/2008, which is not related to a matter pending in the U. S. Attorneys Office before the date on which Magistrate Judges John Charles Rayburn Jr., Jacqueline Chooljian, Patrick J. Walsh, Jennifer T. Lum, and Jeffrey W. Johnson resigned their appointments, were personally involved or on which said Magistrate Judges were personally consulted while employed in the U. S. Attorneys Office. (rj) (Entered: 01/03/2008) |
| 01/04/2008 | 24 | MINUTES OF IN CHAMBERS ORDER by Judge Stephen V. Wilson: The Court ORDERS the defendant to appear at Post Indictment Arraignment (PIA) on 1/14/2008 at 8:30 AM, Room 341, Roybal Building. All previously set dates shall remain the same. After appearing at PIA, the parties are ORDERED to appear before this Court at 3:00 PM for a Pretrial Conference. (rj) (Entered: 01/04/2008) |
| 01/14/2008 | 25 | STATEMENT OF CONSTITUTIONAL RIGHTS filed by Defendant Andranik Petrosian (tba) (Entered: 01/15/2008) |
| 01/14/2008 | 26 | DESIGNATION AND APPEARANCE OF COUNSEL; filed by Mark J Werksman appearing for Andranik Petrosian (tba) (Entered: 01/15/2008) |
| 01/14/2008 | 29 | MINUTES OF POST-INDICTMENT ARRAIGNMENT: held before Magistrate Judge Charles F. Eick as to Andranik Petrosian (1) Count 1,1s,2. Defendant arraigned, states true name: As charged. Defendant entered not guilty plea to all counts as charged. Attorney: Mark J. Werksman, Retained present. Case assigned to Judge Stephen V. Wilson., (Armenian) INTERPRETER Required Pretrial Conference set for 1/14/2008 03:30 PM before Judge Stephen V. Wilson. Court Smart: CS01/14/2008. (tba) (Entered: 01/17/2008) |
| 01/14/2008 | 30 | MINUTES OF Pretrial Conference held before Judge Stephen V. Wilson as to Defendant Andranik Petrosian. The indictment has been superseded. At the |

| | | |
|---|---|---|
| | | parties' request, the Court continues the trial. Jury Trial is set for 3/4/2008 at 09:00 AM before Judge Stephen V. Wilson. The government is ORDERED to submit a stipulation and proposed order regarding excludable time. Defendant's Ex Parte Application to be removed from San Bernardino to the Metropolitan Detention Center is DENIED. Defendant is granted leave to file a motion for bail. The Bond Hearing is set for 1/22/2008 at 11:00 AM before Judge Stephen V. Wilson. Court Reporter: Deborah Gackle. (rj) (Entered: 01/17/2008) |
| 01/16/2008 | 27 | TRIAL MEMORANDUM filed by Defendant Andranik Petrosian (Attachments: # 1 # 2)(Werksman, Mark) (Entered: 01/16/2008) |
| 01/16/2008 | 28 | STIPULATION to Continue Trial Date from January 29, 2008 to April 8, 2008 filed by Plaintiff USA as to Defendant Andranik Petrosian (Attachments: # 1 Proposed Order)(Searby, Bruce) (Entered: 01/16/2008) |
| 01/22/2008 | 31 | GOVERNMENT'S OPPOSITION TO BAIL REVIEW MOTION BY DEFENDANT; MEMORANDUM OF POINTS AND AUTHORITIES filed by Plaintiff USA as to Defendant Andranik Petrosian (Searby, Bruce) (Entered: 01/22/2008) |
| 01/22/2008 | 32 | NOTICE of Manual Filing of Declaration of Bruce H. Searby in Support of Govement's Opposition to Bail Review Motion by Defendant; Exhibits A & B;Under Seal Pleadings1-2 filed by Plaintiff USA as to Defendant Andranik Petrosian (Searby, Bruce) (Entered: 01/22/2008) |
| 01/23/2008 | 33 | ORDER TO CONTINUE Trial by Judge Stephen V. Wilson as to Defendant Andranik Petrosian. The period from 1/29/2008 to 4/8/2008, inclusive, shall be deemed an excludable period pursuant to 18 U.S.C. 3161(h)(8)(A). Jury Trial is now set for 4/8/2008 at 09:00 AM before Judge Stephen V. Wilson. Nothing in this order shall preclude a finding that other provisions of the Speedy Trial Act dictate that additional time periods are excludable from the period in which trial must commence. (rj) (Entered: 01/23/2008) |
| 01/23/2008 | 34 | MINUTES OF MOTION FOR BAIL PENDING TRIAL held before Judge Stephen V. Wilson as to Defendant Andranik Petrosian. Motion for bail pending trial is denied. The Court vacates the March 4, 2008 trial date and continues the trial to April 8, 2008 at 9:00 a.m. Court Reporter: Gary George. (pj) (Entered: 01/29/2008) |
| 02/05/2008 | 35 | EX PARTE APPLICATION for Order for arrest warrant for material witness and request for detention Filed by Plaintiff USA as to Defendant Andranik Petrosian(pj) (Entered: 02/22/2008) |
| 02/05/2008 | 36 | ORDER by Magistrate Judge Jeffrey W. Johnson as to Defendant Andranik Petrosian, re EX PARTE APPLICATION for Order for arrest warrant for material witness and request for detention 35 . (pj) (Entered: 02/22/2008) |
| 02/05/2008 | 58 | SEALED DOCUMENT - Government's EXPARTE APPLICATION for Order Sealing Document; Declaration of Bruce H Searby. (ad) (Entered: 04/09/2008) |

| 02/05/2008 | 59 | SEALED DOCUMENT - ORDER SEALING DOCUMENTS. (ad) (Entered: 04/09/2008) |
|---|---|---|
| 02/05/2008 | 60 | SEALED DOCUMENT - DECLARATION of Bruce H Searby in support of Government's Opposition to Bail Review Motion by Defendant; Exhibits A & B. (ad) (Entered: 04/09/2008) |
| 02/26/2008 | 37 | NOTICE OF MOTION AND MOTION to Designate as Material Witness, Fernando Lantano, MOTION to Detain Material Witness, Fernando Lantano Filed by Plaintiff USA as to Defendant Andranik Petrosian (ja) (Entered: 02/29/2008) |
| 02/26/2008 | 38 | ORDER by Magistrate Judge Stephen J. Hillman as to Defendant Andranik Petrosian, re MOTION to Designate as Material Witness, Fernando Lantano MOTION to Detain Material Witness, Fernando Lantano 37 . (ja) (Entered: 02/29/2008) |
| 02/26/2008 | 39 | REPORT COMMENCING CRIMINAL ACTION as to Material Witness Fernando Lantano; Material Witness' Year of Birth: 1966; date of arrest: 2/26/2008 (ja) (Entered: 02/29/2008) |
| 02/26/2008 | 40 | MINUTES OF INITIAL APPEARANCE - MATERIAL WITNESS held before Magistrate Judge Stephen J. Hillman as to Material Witness Fernando Lantano. Attorney: Christopher W Dybwad for Fernando Lantano, DFPD, present. Court Smart: CS 2/26/08. (ja) (Entered: 02/29/2008) |
| 02/26/2008 | 41 | FINANCIAL AFFIDAVIT filed as to Material Witness Fernando Lantano. (ja) (Entered: 02/29/2008) |
| 02/26/2008 | 42 | COMMITMENT AND ORDER by Magistrate Judge Stephen J. Hillman specifying a detention facility specially designated for illegal aliens as place of confinement as to Material Witness Fernando Lantano. It is further ordered that if such specially designated detention facility for illegal aliens is not available, the witness shall be incarcerated in another facility approved by the Attorney General of the United States. It is further ordered that the Immigration and Customs Enforcement shall assist the Marshal to the extent possible in transporting the witness to and from the detention facility. (ja) (Entered: 02/29/2008) |
| 02/26/2008 | 43 | COMMITMENT AND ORDER by Magistrate Judge Stephen J. Hillman specifying Designeted for illegal aliens as place of confinement as to Material Witness Fernando Lantano. (dj) (Entered: 03/03/2008) |
| 03/06/2008 | 44 | STIPULATION for Order TO TAKE DEPOSITION OF MATERIAL WITNESS filed by Plaintiff USA as to Defendant Andranik Petrosian (Attachments: # 1 Proposed Order RE: DEPOSITION OF MATERIAL WITNESS)(Searby, Bruce) (Entered: 03/06/2008) |

| 03/07/2008 | 45 | ORDER by Judge Stephen V. Wilson as to Defendant Andranik Petrosian, re Stipulation for Order 44 . IT IS HEREBY ORDERED: 1. In this matter, plaintiff shall conduct the deposition of material witness FERNANDO LANTANO on or about March 14, 2008 at 1:30 p.m. at the United States Attorneys Office, absent changes pursuant to a subsequent written agreement signed by the parties and LANTANO. 2. Because of the exceptional circumstances of the case, it is in the interest of justice that the testimony of LANTANO be taken and preserved on videotape for use at trial. 3. Defendant shall be brought to attend the depositionin person pursuant to Rule 15(c)(1). Defendant shall have theservices of an Armenian language interpreter during thedeposition.4. The government shall provide the defense withadvance copies of witness statements required to be disclosed byRule 15(d). (pj) (Entered: 03/13/2008) |
|---|---|---|
| 03/17/2008 | 46 | EX PARTE APPLICATION for Release of Grand Jury Transcripts Filed by Plaintiff USA as to Defendant Andranik Petrosian (Attachments: # 1 Proposed Order Re Grand Jury Transcripts)(Searby, Bruce) (Entered: 03/17/2008) |
| 03/19/2008 | 49 | ORDER by Judge Stephen V. Wilson as to Defendant Andranik Petrosian, GRANTING EX PARTE APPLICATION for Release of Grand Jury Transcripts 46 . (sce) (Entered: 03/27/2008) |
| 03/21/2008 | 47 | NOTICE of 902(11) filed by Plaintiff USA as to Defendant Andranik Petrosian (Searby, Bruce) (Entered: 03/21/2008) |
| 03/24/2008 | 48 | NOTICE OF APPEARANCE of attorney Mark Hathaway, (Retained), appearing on behalf of Defendant Andranik Petrosian, filed by Defendant Andranik Petrosian. (Attachments: # 1 notice of attorney appearance-defendant)(Hathaway, Mark) (Entered: 03/24/2008) |
| 03/28/2008 | 50 | REPORT Pursuant to Rule 46(h)(2) regarding detained Material Witness, Fernando Lantano,filed by Plaintiff USA. (Searby, Bruce) (Entered: 03/28/2008) |
| 04/01/2008 | 51 | PROPOSED JURY INSTRUCTIONS (annotated on separate pg set) filed by Plaintiff USA as to Defendant Andranik Petrosian (Searby, Bruce) (Entered: 04/01/2008) |
| 04/03/2008 | 52 | PROPOSED VOIR DIRE QUESTIONS filed by Plaintiff USA as to Defendant Andranik Petrosian (Searby, Bruce) (Entered: 04/03/2008) |
| 04/03/2008 | 53 | TRIAL MEMORANDUM filed by Plaintiff USA as to Defendant Andranik Petrosian (Searby, Bruce) (Entered: 04/03/2008) |
| 04/07/2008 | 54 | NOTICE OF LODGING filed by Plaintiff Fernando Lantano as to Defendant Andranik Petrosian --*Proposed Order* (Attachments: # 1 Proposed Order Proposed Order)(Dybwad, Christopher) (Entered: 04/07/2008) |

| 04/07/2008 | 62 | MINUTES OF Pretrial Conference held before Judge Stephen V. Wilson as to Defendant Andranik Petrosian, Pretrial conference held. Court and counsel confer. Court allows time for material witness to be de-designated. Counsel to fileappropriate documents with the court. This matter to proceed to trial on April 8, 2008 at 9:00 a.m. Court Reporter: Deborah Gackle. (pj) (Entered: 04/09/2008) |
|---|---|---|
| 04/08/2008 | 55 | NOTICE of Manual Filing of Under Seal Application filed by Plaintiff USA as to Defendant Andranik Petrosian (Searby, Bruce) (Entered: 04/08/2008) |
| 04/08/2008 | 56 | STIPULATION RE: MEETING OF COUNSEL REGARDING GOVERNMENT EXHIBITS AND ADMISSIBILITY OF RECORDS filed by Plaintiff USA as to Defendant Andranik Petrosian (Searby, Bruce) (Entered: 04/08/2008) |
| 04/08/2008 | 63 | MINUTES OF JURY TRIAL - 1st Day held before Judge Stephen V. Wilson, jury selection begun as to Defendant Andranik Petrosian (1) on Count 1s. Jury empanelled and sworn. Opening statements made. Witnesses called, sworn and testified. Exhibits identified and admitted. Case continued to 4/9/2008 09:00 AM before Judge Stephen V. Wilson. Court Reporter: Deborah Gackle. (pj) (Entered: 04/09/2008) |
| 04/08/2008 | 65 | Government's EXPARTE APPLICATION for Order filing document In Camera and Under Seal (mat) (Entered: 04/14/2008) |
| 04/08/2008 | 66 | ORDER sealing documents (mat) (Entered: 04/14/2008) |
| 04/09/2008 | 57 | PROPOSED JURY VERDICT filed by Plaintiff USA as to Defendant Andranik Petrosian (Attachments: # 1 VERDICT FORM)(Searby, Bruce) (Entered: 04/09/2008) |
| 04/09/2008 | 61 | IN LIMINE MOTION REGARDING RULE 15 DEPOSITION OF FERNANDO LANTANO; ATTACHED EXHIBITS 1 & 2 filed by Plaintiff USA as to Defendant Andranik Petrosian (Attachments: # 1 Exhibit 1# 2 Exhibit 2)(Searby, Bruce) (Entered: 04/09/2008) |
| 04/09/2008 | 69 | MINUTES OF Jury Trial - 2nd Day held before Judge Stephen V. Wilson as to Defendant Andranik Petrosian. Witnesses called, sworn and testified. Exhibits identified and admitted. Jury Trial set for 4/10/2008 09:00 AM before Judge Stephen V. Wilson. Court Reporter: Deborah Gackle. (pj) (Entered: 04/16/2008) |
| 04/09/2008 | 81 | Jury Note as to Andranik Petrosian (pj) (Entered: 04/22/2008) |
| 04/09/2008 | 82 | Jury Note as to Andranik Petrosian (pj) (Entered: 04/22/2008) |
| 04/10/2008 | 64 | TRIAL BRIEF filed by Plaintiff USA as to Defendant Andranik Petrosian (Attachments: # 1 Exhibit Exhibit 1# 2 Exhibit Exhibit 2)(Searby, Bruce) (Entered: 04/10/2008) |

| 04/10/2008 | 70 | MINUTES OF Jury Trial - 3rd Day held before Judge Stephen V. Wilson as to Defendant Andranik Petrosian. Witnesses called, sworn and testified. Exhibits identified and admitted. Jury Trial set for 4/11/2008 09:00 AM before Judge Stephen V. Wilson. Court Reporter: Deborah Gackle. (pj) (Entered: 04/16/2008) |
| --- | --- | --- |
| 04/11/2008 | 71 | MINUTES OF Jury Trial - 4th Day held before Judge Stephen V. Wilson as to Defendant Andranik Petrosian. Witnesses called, sworn and testified. Exhibits identified and admitted. Closing arguments made. Court instructs jury. Bailiff sworn. Alternates excused. Jury retires to deliberate Jury Trial set for 4/14/2008 09:00 AM before Judge Stephen V. Wilson. Court Reporter: Deborah Gackle. (pj) (Entered: 04/16/2008) |
| 04/14/2008 | 73 | MINUTES OF Jury Trial - 5TH Day held before Judge Stephen V. Wilson as to Defendant Andranik Petrosian. Jury polled. Verdict reached. Jury finds: Andranik Petrosian (1) Guilty on Count 1s,3s. Jury hung on Count 2s. Defendant referred to Probation Office for Investigation and Report. Defendant Andranik Petrosian remanded to custody. Sentencing set for 7/21/2008 at 11:00 AM before Judge Stephen V. Wilson. Court Reporter: Deborah Gackle. (ca) (Entered: 04/18/2008) |
| 04/14/2008 | 75 | JURY INSTRUCTIONS as to by Defendant Andranik Petrosian. (ca) (Entered: 04/18/2008) |
| 04/14/2008 | 76 | LIST of Exhibits and Witnesses filed by Plaintiff USA as to Defendant Andranik Petrosian. (ca) (Entered: 04/18/2008) |
| 04/14/2008 | 78 | Jury Note (Number: 1) as to Andranik Petrosian (pj) (Entered: 04/22/2008) |
| 04/14/2008 | 79 | Jury Note (Number: 2) as to Andranik Petrosian (pj) (Entered: 04/22/2008) |
| 04/14/2008 | 80 | Jury Note (Number: 3) as to Andranik Petrosian (pj) (Entered: 04/22/2008) |
| 04/14/2008 | 83 | VERDICT FORM (pj) (Entered: 04/22/2008) |
| 04/15/2008 | 74 | RECEIPT FOR RELEASE OF EXHIBITS to Counsel Upon Verdict/Judgment at Trial; as to Defendant Andranik Petrosian. Pursuant to stip of counsel and/or by Order of the Court, all exhibits listed on joint exhibits list are returned to counsel for respective party(ies). (ca) Modified on 6/3/2010 (yl). (Entered: 04/18/2008) |
| 04/16/2008 | 72 | ORDER DE-DESIGNATING MATERIAL WITNESS Fernando Lantano by Judge Stephen V. Wilson. Fernando Lantano shall be released forthwith. (ca) (Entered: 04/17/2008) |
| 04/21/2008 | 77 | NOTICE OF MOTION AND MOTION for Acquittal Filed by Defendant Andranik PetrosianMotion set for hearing on 7/21/2008 at 11:00 AM before Judge Stephen V. Wilson. (Werksman, Mark) (Entered: 04/21/2008) |

| 07/07/2008 | 85 | OPPOSITION to MOTION for Acquittal 77 filed by Plaintiff USA as to Defendant ANDRANIK PETROSIAN [GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL UNDER FED. R. CRIM. PRO. 29; MEMORANDUM OF POINTS AND AUTHORITIES]. (Searby, Bruce) (Entered: 07/07/2008) |
| 07/07/2008 | 86 | POSITION WITH RESPECT TO PRESENTENCE REPORT filed by Plaintiff USA as to Defendant Andranik Petrosian (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Searby, Bruce) (Entered: 07/07/2008) |
| 07/14/2008 | 87 | STIPULATION to Continue Sentencing Hearing from July 21, 2008 to August 18, 2008 filed by Defendant Andranik Petrosian (Attachments: # 1 Proposed Order)(Werksman, Mark) (Entered: 07/14/2008) |
| 07/17/2008 | 88 | ORDER TO CONTINUE SENTENCING by Judge Stephen V. Wilson as to Defendant Andranik Petrosian: THE COURT HEREBY continues the sentencing in this matter from July 21, 2008 at 10:00 a.m. to August 18, 2008 at 11:00 a.m. (pc) (Entered: 07/17/2008) |
| 08/01/2008 | 89 | REQUEST FOR APPROVAL OF SUBSTITUTION OF ATTORNEY filed by Defendant Andranik Petrosian (Attachments: # 1 Proposed Order)(Tahmazian, Jilbert) (Entered: 08/01/2008) |
| 08/01/2008 | 90 | STIPULATION to Continue Sentencing Hearing from August 18, 2008 to October 6, 2008 filed by Defendant Andranik Petrosian (Attachments: # 1 Proposed Order)(Tahmazian, Jilbert) (Entered: 08/01/2008) |
| 08/08/2008 | 91 | STIPULATION to Continue Sentencing Hearing and Rule 29 Motion from August 18, 2008 to October 6, 2008 filed by Defendant Andranik Petrosian (Attachments: # 1 Proposed Order)(Tahmazian, Jilbert) (Entered: 08/08/2008) |
| 08/12/2008 | 92 | ORDER by Judge Stephen V. Wilson as to Defendant Andranik Petrosian, on Request for Approval of Substitution of Attorney. The Court hereby orders that the request to substitute Jilbert Tahmazian who is retained counsel as attorney or record in place and stead of Mark J. Werksman. 89 (es) (Entered: 08/14/2008) |
| 08/12/2008 | 93 | ORDER TO CONTINUE Sentencing by Judge Stephen V. Wilson as to Defendant Andranik Petrosian. Sentencing set for 10/6/2008 at 11:00 AM before Judge Stephen V. Wilson. The Rule 29 Motion is also set for hearing on 10/6/2008 at 11:00 AM. (rj) (Entered: 08/15/2008) |
| 09/29/2008 | 94 | NOTICE OF MOTION AND MOTION to Continue Sentencing and Rule 29 Motion from October 6, 2008 to December 8, 2008. Filed by Defendant Andranik Petrosian Motion set for hearing on 10/6/2008 at 09:00 AM before Judge Stephen V. Wilson. (Attachments: # 1 Proposed Order)(Tahmazian, Jilbert) (Entered: 09/29/2008) |

| 10/01/2008 | 95 | ORDER TO CONTINUE SENTENCING HEARING AND RULE 29 MOTION by Judge Stephen V. Wilson as to Defendant Andranik Petrosian: Based upon representations found in the Defendants Motion to Continue Sentencing Hearing and Rule 29 Motion, the Court finds that the ends of justice would be served by granting the continuance requested by the defendant. Accordingly, after due consideration, the Stipulation is hereby GRANTED. It is further ORDERED that the sentencing hearing and Rule 29 Motion is reset to December 8, 2008, at 11:00 a.m. (pc) (Entered: 10/01/2008) |
|---|---|---|
| 10/02/2008 | 96 | APPLICATION for Order for Transcript at Government Expense Filed by Defendant Andranik Petrosian (Attachments: # 1 Proposed Order)(Tahmazian, Jilbert) (Entered: 10/02/2008) |
| 10/09/2008 | 97 | REPLY APPLICATION for Order for Transcript at Government Expense 96 (Searby, Bruce) (Entered: 10/09/2008) |
| 10/28/2008 | 98 | ORDER by Judge Stephen V. Wilson as to Defendant Andranik Petrosian,To: Deborah Gackle, Official Shorthand Reporter for the United States District Court: GOOD CAUSE APPEARING THEREFOR, IT IS HEREBY ORDERED that you prepare at governments expense 1 copy of thefollowing hearings: Hearing Date: Proceedings: April 4 to April 14, 2008 Trial IT IF FURTHER ORDERED that these transcripts be delivered to the defense counsel,Julbert Tahmazian on or before December 31, 2008. 96 . (pj) (Entered: 11/10/2008) |
| 12/03/2008 | 99 | NOTICE OF MOTION AND MOTION to Continue Sentencing and Rule 29 hearing from December 8, 2008 to January 19, 2009. Filed by Defendant Andranik Petrosian (Attachments: # 1 Proposed Order)(Tahmazian, Jilbert) (Entered: 12/03/2008) |
| 12/03/2008 | 100 | STIPULATION to Continue Sentencing and Rule 29 hearing from December 8, 2008 to December 29, 2008 Re: MOTION to Continue Sentencing and Rule 29 hearing from December 8, 2008 to January 19, 2009. 99 *and Withdrawal of Previously Filed Motion for Continuance* filed by Defendant Andranik Petrosian (Attachments: # 1 Proposed Order)(Tahmazian, Jilbert) (Entered: 12/03/2008) |
| 12/03/2008 | 101 | ORDER TO CONTINUE SENTENCING HEARING AND RULE 29 MOTION by Judge Stephen V. Wilson as to Defendant Andranik Petrosian: It is further ORDERED that the sentencing hearing and Rule 29 Motion is reset to December 29, 2008, at 11:00 a.m. (pc) (Entered: 12/03/2008) |
| 12/12/2008 | 102 | IN CHAMBERS ORDER CONTINUING SENTENCING by Judge Stephen V. Wilson as to Defendant Andranik Petrosian: The Court, on its own motion, continues the sentencing, of the above-named defendant, from December 29, 2008 to January 12, 2009 at 11:00 a.m. (pc) (Entered: 12/12/2008) |

| 12/19/2008 | 103 | TRANSCRIPT (Trial Testimony Only) filed as to Defendant Andranik Petrosian for proceedings held on 4/8/08 1:30 PM. Court Reporter: Deborah K. Gackle, phone number (213) 620-1149. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date.Redaction Request due 1/9/2009. Redacted Transcript Deadline set for 1/19/2009. Release of Transcript Restriction set for 3/19/2009.(Gackle, Deborah) (Entered: 12/19/2008) |
|---|---|---|
| 12/19/2008 | 104 | TRANSCRIPT filed as to Defendant Andranik Petrosian for all proceedings held on 4/9/08 9:00 AM. Court Reporter: Deborah K. Gackle, phone number (213) 620-1149. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date.Redaction Request due 1/9/2009. Redacted Transcript Deadline set for 1/19/2009. Release of Transcript Restriction set for 3/19/2009.(Gackle, Deborah) (Entered: 12/19/2008) |
| 12/19/2008 | 105 | TRANSCRIPT filed as to Defendant Andranik Petrosian for all proceedings held on 4/10/08 9:00 AM. Court Reporter: Deborah K. Gackle, phone number (213) 620-1149. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date.Redaction Request due 1/9/2009. Redacted Transcript Deadline set for 1/19/2009. Release of Transcript Restriction set for 3/19/2009.(Gackle, Deborah) (Entered: 12/19/2008) |
| 12/19/2008 | 106 | TRANSCRIPT (Trial testimony only) filed as to Defendant Andranik Petrosian for proceedings held on 4/11/08 9:00 AM. Court Reporter : Deborah K. Gackle, phone number (213) 620-1149. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 1/9/2009. Redacted Transcript Deadline set for 1/19/2009. Release of Transcript Restriction set for 3/19/2009.(Gackle, Deborah) (Entered: 12/19/2008) |
| 12/22/2008 | 107 | NOTICE OF FILING TRANSCRIPT filed as to Defendant Andranik Petrosian for proceedings 4/08/08, 4/9/08, 4/10/08 & 4/11/08 (bem, ) (Entered: 12/22/2008) |
| 12/29/2008 | 108 | SENTENCING MEMORANDUM filed by Plaintiff USA as to Defendant Andranik Petrosian (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit)(Searby, Bruce) (Entered: 12/29/2008) |

| 12/30/2008 | 109 | TRANSCRIPT filed as to Defendant Andranik Petrosian for proceedings held on 4/7/08 9:00 AM. Court Reporter: Deborah K. Gackle, phone number (213) 620-1149. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 1/20/2009. Redacted Transcript Deadline set for 1/30/2009. Release of Transcript Restriction set for 3/30/2009.(Gackle, Deborah) (Entered: 12/30/2008) |
| --- | --- | --- |
| 12/31/2008 | 110 | NOTICE OF FILING TRANSCRIPT filed as to Defendant Andranik Petrosian for proceedings 4-7-08 9:00 a.m. (ha) (Entered: 12/31/2008) |
| 12/31/2008 | 111 | TRANSCRIPT filed as to Defendant Andranik Petrosian for all proceedings held on 4/8/08 9:00 AM. Court Reporter: Deborah K. Gackle, phone number (213) 620-1149. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 1/21/2009. Redacted Transcript Deadline set for 1/31/2009. Release of Transcript Restriction set for 3/31/2009.(Gackle, Deborah) (Entered: 12/31/2008) |
| 12/31/2008 | 112 | TRANSCRIPT filed as to Defendant Andranik Petrosian for all proceedings held on 4/11/08 9:00 AM. Court Reporter: Deborah K. Gackle, phone number (213) 620-1149. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 1/21/2009. Redacted Transcript Deadline set for 1/31/2009. Release of Transcript Restriction set for 3/31/2009.(Gackle, Deborah) (Entered: 12/31/2008) |
| 12/31/2008 | 113 | TRANSCRIPT filed as to Defendant Andranik Petrosian for all proceedings held on 4/14/08 3:00 PM. Court Reporter: Deborah K. Gackle, phone number (213) 620-1149. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 1/21/2009. Redacted Transcript Deadline set for 1/31/2009. Release of Transcript Restriction set for 3/31/2009.(Gackle, Deborah) (Entered: 12/31/2008) |
| 12/31/2008 | 114 | NOTICE OF FILING TRANSCRIPT filed as to Defendant Andranik Petrosian for proceedings 4/8/08 9:00 AM, 4/11/08 9:00 AM, 4/14/08 3:00 PM (mo) (Entered: 12/31/2008) |

| 01/02/2009 | 115 | NOTICE OF MOTION AND MOTION to Continue Sentencing and Rule 29 hearing from January 12, 2009 to January 26, 2009. Filed by Defendant Andranik Petrosian (Attachments: # 1 Proposed Order)(Tahmazian, Jilbert) (Entered: 01/02/2009) |
|---|---|---|
| 01/05/2009 | 116 | OPPOSITION to MOTION to Continue Sentencing and Rule 29 hearing from January 12, 2009 to January 26, 2009. 115 filed by Plaintiff USA as to Defendant ANDRANIK PETROSIAN. (Searby, Bruce) (Entered: 01/05/2009) |
| 01/21/2009 | 117 | ORDER TO CONTINUE SENTENCING HEARING AND RULE 29 MOTION by Judge Stephen V. Wilson as to Defendant Andranik Petrosian: It is further ORDERED that the sentencing hearing and Rule 29 Motion is reset to February 23, 2009, at11:00 a.m. The objections to PSR and supplemental memorandums to Rule 29 motion shall be filed on or before February 9, 2009. (pc) (Entered: 01/21/2009) |
| 02/16/2009 | 118 | NOTICE OF MOTION AND MOTION to Continue Sentencing and Rule 29 hearing Filed by Defendant Andranik Petrosian (Attachments: # 1 Proposed Order)(Tahmazian, Jilbert) (Entered: 02/16/2009) |
| 02/17/2009 | 119 | OPPOSITION to MOTION to Continue Sentencing and Rule 29 hearing 118 (Searby, Bruce) (Entered: 02/17/2009) |
| 02/19/2009 | 120 | ORDER TO CONTINUE SENTENCING HEARING AND RULE 29 MOTION 118 by Judge Stephen V. Wilson as to Defendant Andranik Petrosian : Based upon representations found in the Motion to Continue Sentencing Hearing and Rule 29 Motion, the Court finds that the ends of justice would be served by granting the continuance requested by the parties. Accordingly, after due consideration, the Stipulation is hereby GRANTED. It is further ORDERED that the sentencing hearing and Rule 29 Motion is reset to March 16, 2009, at 11:00 a.m. (lom) (Entered: 02/20/2009) |
| 03/11/2009 | 121 | NOTICE OF MOTION AND MOTION to Continue Sentencing and Rule 29 hearing from March 16, 2009 to April 27, 2009. Filed by Defendant Andranik Petrosian (Attachments: # 1 Proposed Order)(Tahmazian, Jilbert) (Entered: 03/11/2009) |
| 03/12/2009 | 122 | OPPOSITION to MOTION to Continue Sentencing and Rule 29 hearing from March 16, 2009 to April 27, 2009. 121 (Searby, Bruce) (Entered: 03/12/2009) |
| 03/12/2009 | 123 | ORDER by Judge Stephen V. Wilson as to Defendant Andranik Petrosian, re MOTION to Continue Sentencing and Rule 29 hearing from March 16, 2009 to April 27, 2009. 121 . Accordingly, after due consideration, the Motion is hereby GRANTED. It is further ORDERED that the sentencing hearing and Rule 29 Motion is reset to April 27, 2009 at 11:00 a.m. It is further ORDERED that the defense counsel file sentencing objections and supplemental memorandum to Rule 29 motion on or before April 13, 2009. The government shall file its opposition, if any, on or before April 20, 2009. (ca) (Entered: |

| | | 03/16/2009) |
|---|---|---|
| 04/14/2009 | 124 | ADDITIONAL POINTS AND AUTHORITIES IN SUPPORT OF RULE 29 MOTION filed by Defendant Andranik Petrosian (Tahmazian, Jilbert) (Entered: 04/14/2009) |
| 04/15/2009 | 125 | NOTICE OF MOTION AND MOTION to Continue Sentencing and Rule 29 hearing from April 27, 2009 to May 25, 2009. RE: Miscellaneous Document 124 . and Motion to Withdraw the Filing of Additional Points and Authorities in Support of Rule 29 Motion Filed by Defendant Andranik Petrosian (Attachments: # 1 Proposed Order)(Tahmazian, Jilbert) (Entered: 04/15/2009) |
| 04/17/2009 | 126 | DENIED BY ORDER OF THE COURT 125 as to Andranik Petrosian (1)ORDER TO WITHDRAW FILING OF ADDITIONAL POINTS AND AUTHORITIES IN SUPPORT OF RULE 29 MOTION AND TO CONTINUE SENTENCING HEARING AND RULE 29 MOTION (pj) (Entered: 04/20/2009) |
| 04/21/2009 | 127 | OPPOSITION to MOTION for Acquittal 77 (Searby, Bruce) (Entered: 04/21/2009) |
| 04/27/2009 | 128 | MINUTES OF SENTENCING - held before Judge Stephen V. Wilson as to Defendant Andranik Petrosian. Hearing held. The sentencing date is vacated, to be reset after hearing on the motion. The Court grants defendant up to and including May 18, 2009 to file his supplemental brief. The government's response is due no later than May 26, 2009. The hearing on the motion is continued to June 1, 2009 at 11:00 a.m. Court Reporter: Deborah Gackle. (es) (Entered: 05/06/2009) |
| 05/18/2009 | 129 | Defendant's Personally Requested Additiones to Memorandum of Points and Authorities to Rule 29 Motion filed by Defendant Andranik Petrosian Re: Miscellaneous Document 124 (Attachments: # 1 Supplement, # 2 Supplement) (Tahmazian, Jilbert) (Entered: 05/18/2009) |
| 05/19/2009 | 130 | SUPPLEMENT filed by Defendant Andranik Petrosian, re Miscellaneous Document 129 . (Tahmazian, Jilbert) (Entered: 05/19/2009) |
| 05/26/2009 | 131 | GOVERNMENT'S SECOND SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES IN RESPONSE TO DEFENDANT'S ADDITIONAL POINTS AND AUTHORITIES IN SUPPORT OF RULE 29 MOTION AND MOTION FOR RULE 33 NEW TRIAL filed by Plaintiff USA as to Defendant Andranik Petrosian (Searby, Bruce) (Entered: 05/26/2009) |
| 06/01/2009 | 132 | MINUTE ORDER DEFENDANT'S RULE 29 MOTION FOR JUDGMENT OF ACQUITTAL 77 (fld 04/21/08) by Judge Stephen V. Wilson: The Motion [is DENIED 77] as to Andranik Petrosian (1). The Court sets the defendants sentencing for July 6, 2009 at 11:00 a.m. Any documents the parties want the Court to consider must be filed five days prior to the sentencing. (ca) (Entered: 06/03/2009) |

| 06/10/2009 | 133 | NOTICE OF MOTION AND MOTION to Appoint Counsel Filed by Defendant Andranik Petrosian (Attachments: # 1 Proposed Order)(Tahmazian, Jilbert) (Entered: 06/10/2009) |
| 06/16/2009 | 134 | OPPOSITION to MOTION to Appoint Counsel 133 (Searby, Bruce) (Entered: 06/16/2009) |
| 06/26/2009 | 135 | NOTICE OF MOTION AND MOTION to Continue Sentencing Hearing from July 6, 2009 to July 27, 2009. RE: MOTION to Appoint Counsel 133 , Opposition to Motion (CR) 134 . Filed by Defendant Andranik Petrosian (Attachments: # 1 Proposed Order)(Tahmazian, Jilbert) (Entered: 06/26/2009) |
| 06/29/2009 | 136 | OPPOSITION to MOTION to Continue Sentencing Hearing from July 6, 2009 to July 27, 2009. RE: MOTION to Appoint Counsel 133 , Opposition to Motion (CR) 134 . MOTION to Continue Sentencing Hearing from July 6, 2009 to July 27, 2009. RE: MOTION to Appoint Counsel 133 , Opposition to Motion (CR) 134 . 135 (Searby, Bruce) (Entered: 06/29/2009) |
| 07/02/2009 | 137 | ORDER DENYING DEFENDANT'S MOTION FOR APPOINTMENT OF NEW COUNSEL by Judge Stephen V. Wilson. 133 (ake) (Entered: 07/02/2009) |
| 07/06/2009 | 138 | MINUTES OF SENTENCING - held before Judge Stephen V. Wilson as to Defendant Andranik Petrosian. The Court grants 135 Motion to Continue as to Andranik Petrosian. Sentencing is set for 9/14/2009 at 11:00 AM before Judge Stephen V. Wilson. Also, the Court grants defendant's request and relieves Jilbert Tahmazian as attorney of record. The Court orders the Office of the FPD to assist defendant in filling out his financial affidavit to determine his eligibility for appointed counsel. An FPD shall be appointed to represent defendant if he qualifies for appointed counsel and if there is no conflict of interest. Court Reporter: Margaret Babykin. (rj) (Entered: 07/09/2009) |
| 07/10/2009 | 139 | OPPOSITION TO THE GOVERNMENT SENTENCING MEMORANDUM filed by Defendant Andranik Petrosian (Attachments: # 1 Part 2)(pj) (Entered: 07/15/2009) |
| 07/10/2009 | 140 | Opposition to the Government Opposition Appointment of counsel of the defendant 133 filed by Defendant Andranik Petrosian. (pj) (Entered: 07/15/2009) |
| 07/23/2009 | 141 | LETTER to Honorable Judge Steve V Wilson filed by Defendant Andranik Petrosian (pj) (Entered: 07/29/2009) |
| 08/10/2009 | 142 | FINANCIAL AFFIDAVIT filed as to Defendant Andranik Petrosian. (pj) (Entered: 08/11/2009) |
| 08/10/2009 | 143 | MINUTES OF IN CHAMBERS ORDER by Judge Stephen V. Wilson: IN CHAMBERS ORDER re APPOINTMENT OF NEW COUNSELThe Court, having reviewed the defendants financial affidavit, appoints the attorney listed |

| | | below as counsel of record: Thomas Nishi 1000 Wilshire Blvd., Suite 600 Los Angeles, CA 90017213-629-9066. (Added attorney Thomas Nishi for Andranik Petrosian. Attorney Jilbert Tahmazian terminated in case as to Andranik Petrosian) (pj) (Entered: 08/11/2009) |
|---|---|---|
| 09/09/2009 | 144 | STIPULATION to Continue Sentencing from September 14, 2009 to October 26, 2009 filed by Defendant Andranik Petrosian (Attachments: # 1 Proposed Order)(Nishi, Thomas) (Entered: 09/09/2009) |
| 09/10/2009 | 145 | ORDER TO CONTINUE Sentencing by Judge Stephen V. Wilson as to Defendant Andranik Petrosian. Sentencing is now set for 10/26/2009 at 11:00 AM before Judge Stephen V. Wilson. (rj) (Entered: 09/11/2009) |
| 10/19/2009 | 146 | STIPULATION to Continue Sentencing from Oct. 26, 2009 to Nov. 16, 2009 filed by Defendant Andranik Petrosian (Attachments: # 1 Proposed Order) (Nishi, Thomas) (Entered: 10/19/2009) |
| 10/26/2009 | 147 | MINUTES OF SENTENCING - held before Judge Stephen V. Wilson as to Defendant Andranik Petrosian. The Court grants defendant's request to continue sentencing. Sentencing is now set for 12/7/2009 at 10:00 AM before Judge Stephen V. Wilson. Defendant's sentencing position shall be filed and served no later than 11/30/2009. Court Reporter: Sandra Becerra. (rj) (Entered: 10/27/2009) |
| 11/06/2009 | 148 | NOTICE OF DISCREPANCY AND ORDER by Judge Stephen V. Wilson ORDERING Defendant's Personal Statement of Objection, submitted by Defendant Andranik Petrosian, and received this month, is not to be filed but instead rejected. Denial based on: L.R. 11-3.8, L.R. 11-4.1, L.R. 11-6, FRCP 5(d). (rj) (Entered: 11/09/2009) |
| 11/30/2009 | 149 | SENTENCING MEMORANDUM filed by Defendant Andranik Petrosian (Attachments: # 1 Exhibit)(Nishi, Thomas) (Entered: 11/30/2009) |
| 12/04/2009 | 153 | SENTENCING MEMORANDUM filed by Plaintiff USA as to Defendant Andranik Petrosian (Searby, Bruce) (Entered: 12/04/2009) |
| 12/07/2009 | 155 | MINUTES OF SENTENCING Hearing held before Judge Stephen V. Wilson as to Defendant Andranik Petrosian (1). Defendant is hereby committed on Counte One and Three of the First Superseding Indictment to the custody of the Bureau of Prisons to be imprisoned for a term of Niney-Six (96) months. This term consists of Sixty (60) months on Count One and Thirty-Six (36) months on Count Three of the first Superseding Indictment, to be served consecutively. Upon release from imprisonment, the defendant shall be placed on Supervised Release for a term of Three (3) years. This term consists of Three years on each of Counts One and Three, such terms to be run concurrently. Defendant shall comply with the rules and regulations of the US Probation Office and General Order 318. Defendant shall pay a special assessment of $200. Defendant shall pay restitution in the total amount of |

| | | |
|---|---|---|
| | | $521,845.88 to victims. All fines are waived. Court Reporter: Deborah Gackle. (mg) (Entered: 12/11/2009) |
| 12/10/2009 | 156 | JUDGMENT AND COMMITMENT by Judge Stephen V. Wilson as to Defendant Andranik Petrosian (1). Defendant is hereby committed on Counts One and Three of the First Superseding Indictment to the custody of the Bureau of Prisons to be imprisoned for a term of Niney-Six (96) months. This term consists of Sixty (60) months on Count One and Thirty-Six (36) months on Count Three of the first Superseding Indictment, to be served consecutively. Upon release from imprisonment, the defendant shall be placed on Supervised Release for a term of Three (3) years. This term consists of Three years on each of Counts One and Three, such terms to be run concurrently. Defendant shall comply with the rules and regulations of the US Probation Office and General Order 318. Defendant shall pay a special assessment of $200. Defendant shall pay restitution in the total amount of $521,845.88 to victims. All fines are waived. (mg) (Entered: 12/11/2009) |
| 12/10/2009 | 157 | LIST OF EXHIBITS AND WITNESSES at trial as to Andranik Petrosian. (mg) (Entered: 12/11/2009) |
| 12/15/2009 | 158 | NOTICE OF APPEAL to Appellate Court filed by Defendant Andranik Petrosian waived. (Nishi, Thomas) (Entered: 12/15/2009) |
| 12/15/2009 | 160 | NOTICE OF APPEAL to Appellate Court filed by Defendant Andranik Petrosian re Judgment and Commitment, 156 Filed on: 12/10/09; Entered on: 12/11/09; Filing Fee. Waived. See document number 143. (lr) (Entered: 12/22/2009) |
| 12/16/2009 | 159 | NOTIFICATION by Circuit Court of Appellate Docket Number 09-50636 as to Defendant Andranik Petrosian, 9th CCA regarding Notice of Appeal to USCA - Final Judgment 158 . (lra) (Entered: 12/16/2009) |
| 01/04/2010 | 161 | TRANSCRIPT DESIGNATION AND ORDERING FORM as to Andranik Petrosian, for Dates: 4/7/08, 4/8/08, 4/9/08, 4/10/08, 4/11/08, 4/14/08, 4/27/09, 7/6/09, 10/26/09, 12/07/09; Court Reporter: Deborah Gackle, Margaret Babykin & Sandra Becerra; Court of Appeals Case Number: 09-50636; Re: Notice of Appeal to USCA - Final Judgment 158 (Nishi, Thomas) (Entered: 01/04/2010) |
| 01/05/2010 | 162 | CERTIFICATE OF RECORD Transmitted to USCA as to Defendant Andranik Petrosian, re Notice of Appeal to USCA - Final Judgment, 158 ; Court of Appeals Case Number: 09-50636. (dmap) (Entered: 01/05/2010) |
| 01/13/2010 | 163 | STIPULATION to Dismiss Counts : 2 of First Superseding Indictment filed by Defendant Andranik Petrosian (Attachments: # 1 Proposed Order)(Nishi, Thomas) (Entered: 01/13/2010) |
| 02/10/2010 | 164 | ORDER by Judge Stephen V. Wilson as to Defendant Andranik Petrosian, The court orders that Count two of the First Superseding Indictment is dismissed. |

| | | |
|---|---|---|
| | | The Court further orders that all remaining Counts of the underlying Indictment are dismissed. (pj) (Entered: 02/12/2010) |
| 02/17/2010 | 165 | ORDER of USCA filed as to Andranik Petrosian re Judgment and Commitment 156 , CCA #09-50636. Order received in this district on 2/17/10. Motion of Thomas Nishi, Esq., for appointment of substitute counsel and to file under his declaration in support of the motion is granted. The Clerk shall electronically serve this order on the appointing authority for the Central District of CA, who will locate appointed counsel. District court shall send notification of the name, address and telephone number of appointed counsel to the Clerk of this court within 14 days of locating counsel. Brief schedule set. (cbr) (Entered: 02/17/2010) |
| 03/31/2010 | 166 | First EX PARTE APPLICATION to Unseal Case Filed by Defendant Andranik Petrosian (Attachments: # 1 Proposed Order Proposed Order to Unseal)(Weed, Arthur) (Entered: 03/31/2010) |
| 04/03/2010 | 167 | TRANSCRIPT filed as to Defendant Andranik Petrosian for proceedings held on 12/7/09 10:15 am. Court Reporter: Deborah K. Gackle, phone number 213 620-1149. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through COURT REPORTER DEBORAH K. GACKLE OR PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 4/24/2010. Redacted Transcript Deadline set for 5/4/2010. Release of Transcript Restriction set for 7/2/2010. (Gackle, Deborah) (Entered: 04/03/2010) |
| 04/07/2010 | 168 | ORDER by Judge Stephen V. Wilson as to Defendant Andranik Petrosian, re: First EX PARTE APPLICATION to Unseal Documents 166 . It is hereby Ordered that the transcript of the following hearing be unsealed, prepared and provided to Defense Counsel, only, and that the jury notes be provided to both counsels. (cbr) (Entered: 04/08/2010) |
| 04/13/2010 | 169 | TRANSCRIPT filed as to Defendant Andranik Petrosian for proceedings held on July 6, 2009 11:38 A.M. to 11:43 A.M. Court Reporter/Electronic Court Recorder: Margaret J. Babykin, phone number (626) 963-0566. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 5/4/2010. Redacted Transcript Deadline set for 5/14/2010. Release of Transcript Restriction set for 7/12/2010.(Babykin, Margaret) (Entered: 04/13/2010) |
| 05/11/2010 | 170 | TRANSCRIPT filed as to Defendant Andranik Petrosian for proceedings held on Monday, October 26, 2009 at 10:45 A.M. Court Reporter/Electronic Court Recorder: Sandra Becerra, phone number /email VerbatimRecord@aol.com. |

| | | |
|---|---|---|
| | | Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 6/1/2010. Redacted Transcript Deadline set for 6/11/2010. Release of Transcript Restriction set for 8/9/2010.(Becerra, Sandra) (Entered: 05/11/2010) |
| 05/11/2010 | 171 | SEALED DOCUMENT- TRANSCRIPT filed as to Defendant Andranik Petrosian for proceedings held on Monday, October 26, 2009.. Court Reporter/Electronic Court Recorder: Sandra L. Becerra, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 6/1/2010. Redacted Transcript Deadline set for 6/11/2010. Release of Transcript Restriction set for 8/9/2010.(mat) (Entered: 05/11/2010) |
| 05/11/2010 | 172 | NOTICE OF FILING TRANSCRIPT filed as to Defendant Andranik Petrosian for proceedings 10/26/09 10:45am (Lopez, Margarita) (Entered: 05/11/2010) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 06/17/2010 10:57:47 | | | |
| PACER Login: | cm5386 | Client Code: | |
| Description: | Docket Report | Search Criteria: | 2:07-cr-00708-SVW Start date: 1/1/2006 End date: 6/17/2010 |
| Billable Pages: | 12 | Cost: | 0.96 |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

- - -

THE HONORABLE STEPHEN V. WILSON, U.S. DISTRICT JUDGE PRESIDING

THE UNITED STATES OF AMERICA,      )
                                   )
            Plaintiff,             )
                                   )
      vs.                          )     No. CR 07-708-SVW
                                   )
                                   )
ANDRANIK PETROSIAN,                )
                                   )
            Defendant.             )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

LOS ANGELES, CALIFORNIA

MONDAY, DECEMBER 7, 2009

**SENTENCING**

DEBORAH K. GACKLE, CSR, RPR
United States Courthouse
312 North Spring Street, Room 402A
Los Angeles, California 90012
(213) 620-1149

1    APPEARANCES OF COUNSEL:

2

3

4        For the Plaintiff:

5

6            ANDRÉ BIROTTE, JR.
             UNITED STATES ATTORNEY
7            BY:   BRUCE SEARBY
             ASSISTANT UNITED STATES ATTORNEY
8            1400 United States Courthouse
             312 North Spring Street
9            Los Angeles, California   90012

10

11       For the Defendant:

12

13           LAW OFFICES OF THOMAS NISHI
             BY:   THOMAS NISHI
14           1000 Wilshire Boulevard, Suite 600
             Los Angeles, California   90017
15           (213) 629-9066

16                          - - - - -

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
COURT REPORTER DEBORAH K. GACKLE

```
 1   LOS ANGELES, CALIFORNIA; MONDAY, DECEMBER 7, 2009; 10:15 A.M.
 2                            ---OOO---
 3
 4        THE CLERK:  Calling item 1, CR 07-708(A)-SVW, U.S.A.
 5   vs. Andranik Petrosian.
 6        Counsel, please state your appearances.
 7        MR. SEARBY:  Good morning, Your Honor.  Bruce Searby
 8   for the United States.
 9        MR. NISHI:  Good morning, Your Honor.  Thomas Nishi
10   on behalf of Mr. Petrosian, who is present in court.
11        THE COURT:  All right.  This is the time for
12   sentencing.
13        Has the defendant read the presentence report?
14        MR. NISHI:  Yes, he has.
15        THE COURT:  And you, Mr. Nishi, have submitted
16   pleadings regarding the sentencing, and this sentencing has had
17   some history of prior proceedings which the court is aware of.
18   So with that platform, you can address the court in any way you
19   wish.
20        MR. NISHI:  Your Honor, I was just the last attorney
21   on this particular case.
22        THE COURT:  I know that.
23        MR. NISHI:  And I thought I filed a fairly extensive
24   sentencing brief.
25        THE COURT:  You did.
```

1          MR. NISHI:  And so I don't feel that there's anything

2    I need to add unless the court has any questions.

3          THE COURT:  I don't.

4          And, Mr. Petrosian, you have the right to address the

5    court if you wish, and I'll hear from you, if you wish.

6          THE DEFENDANT:  Yes, Your Honor.

7          THE COURT:  You can proceed in any way you wish.

8          THE DEFENDANT:  Your Honor, I want to -- first of

9    all, Your Honor, I want to truly understand what my crime is.

10   I mean, I want to understand exactly what happened.  I mean,

11   why I'm here.  And I asked myself many time about that, but

12   today, I still don't know why government don't want to

13   understand what I'm saying, and I don't provide any false

14   statement to government, and I'm not conspired to anybody to

15   cheat the IRS.

16         Your Honor, I just -- I don't want to speak a lot

17   about the case anymore, but I want to speak only about the

18   government losses and, by my understanding -- also, I want to

19   present the document to the court.

20         MR. SEARBY:  Can I approach the clerk with this

21   exhibit?

22         THE COURT:  Yes.

23         I've received two pages.  The caption of the

24   submission is "List of Subcontractors and Employees Who

25   Represent Petrosian's Companies for 2003-2007."  And there are

1   four columns on the first page and three on Table B.  I'll mark
2   those -- I'll mark those papers as Exhibit 1 to this
3   proceeding.

4        THE DEFENDANT:  Your Honor, I want to say my view on
5   this situation.  I mean, whatever I feel, whatever I think,
6   I -- by my understanding, the false statement can be two, I
7   mean.  It's one of it -- it's the diagram --

8        MR. NISHI:  May I approach again, Your Honor?
9        THE COURT:  Yes.

10       I've received a second document which I'll mark as
11  Exhibit 2 to this proceeding, and it's actually captioned
12  Exhibit 2, and it's a handwritten diagram, in the center
13  circled is the word "Andranik."

14       Go ahead.

15       THE DEFENDANT:  Yeah.  Your Honor, this exhibit for
16  Mr. Paramo asked me, and, by my understanding, my answer --
17  don't let to -- I mean, for he collect the taxes or -- there's
18  the false statement.  But my statement was more truly -- I
19  mean -- because on that diagram, Mr. Paramo doesn't specify
20  that cash back going to whom, to the subcontractor or to --
21  going to the company, medical company.

22       As I testified on the trial, I pay commission to my
23  subcontractors, some of them in form of cash.  Over I want to
24  say for I paying to my subcontractor, not to the back medical
25  company, because medical company is a corporation.  I mean, if

2    But if somebody receive it behind the medical company and they
3    don't deliver to them, it mean this going to his personal
4    income. That is why I trying to explain to Mr. Paramo, but I
5    was charged for false statement.

6        About conspiracy, Your Honor, I don't conspire with
7    anybody. On purpose of my business was only to the business.
8    I don't have any target to cheat the IRS or anybody else. And,
9    for example, the -- I was under surveillance and Konstantin
10    Grigoryan was under surveillance. Why knowing -- why is
11    absence of evidence of any phone conversation or our
12    conversation? Because every time Konstantin Grigoryan come to
13    me, he say for he ever ordered for me, and he want to bring the
14    advertising order.

15        Your Honor, this exhibit -- Your Honor, I was in
16    jail, so I bring this -- not that much exhibit supporting that,
17    Exhibit 8, but any support exhibit -- I mean, any support I can
18    be by request presented to court.

19        MR. NISHI: May I approach, Your Honor?

20        THE COURT: Yes.

21        I've received another exhibit, which I'll mark as
22    Exhibit 3 to this proceeding, which is a collection of Xeroxed
23    copies of checks.

24        THE DEFENDANT: Also I want to discuss about the
25    government losses.

7

1        MR. NISHI:  Your Honor, may I approach with another
2    exhibit?

3        THE COURT:  Yes.

4        I'll mark this next one-paged exhibit with the
5    heading "Konica" -- K-o-n-i-c-a -- "Minolta Business Solutions"
6    as Exhibit 4 to this proceeding.

7        Let the record reflect that the court is allowing
8    to -- allowing the defendant to proceed at his own pace, but
9    that he is standing at the lectern for long periods of silence.
10   In fact, in between his last statement to the court and the
11   court's comments at the present, at least three or four moments
12   of silence have passed.  That is so with his prior comments,
13   also.

14       THE DEFENDANT:  Your Honor, I just waiting for Your
15   Honor.  I think --

16       THE COURT:  It's not my place to address you, it's
17   your place to address me.  So if you have something to say, now
18   is the time to say it.

19       THE DEFENDANT:  All right.  I want to speak about
20   government losses regarding the amount two and eight million
21   dollars.  Your Honor, I don't understand why government --

22       THE COURT:  The loss is 10 million, isn't it?

23       MR. SEARBY:  Your Honor, the loss is about
24   2.8 million.  The total number of transactions --

25       THE COURT:  It's 2.8 million based upon a tax rate of

1   28 percent on invoices that total over 10 million.

2        Isn't that the method of calculation?

3        MR. SEARBY:  Yes, Your Honor, based on check

4   transactions totaling $10 million, 28 percent tax rate,

5   yielding a tax loss of approximately $2.8 million of intended

6   loss.

7        THE DEFENDANT:  First of all, Your Honor, is not true

8   for all the checks was supplied by invoice.  I mean, is not --

9   the invoices were supplied mostly Grigoryan companies only

10  or -- and Rafik Manukyan group mostly.

11       Yeah, couple of people also asked me about invoices,

12  but most -- almost 80 percent, nobody asked about invoice or

13  tax deduction of my customers.  This is the first thing.

14       The second one, if I want to understand my role in

15  this situation, because if, for example, government lost

16  $208 million, did I get that money?  No.  I mean, it's not --

17  I'm not the one for get the benefit from that $2.8 million.

18  And if --

19       THE COURT:  Incidentally, just to make sure that I

20  have the calculation in mind correctly, his benefit was the

21  10 percent, wasn't it, that he kept?

22       MR. SEARBY:  Yes, Your Honor --

23       THE COURT:  In other words, the invoice was sent from

24  the defendant to the Medicare providers.  They would get back

25  90 percent of the -- they would get back 90 percent of the

1   invoice and 10 percent he would keep, correct?

2           MR. SEARBY:  Approximately 90 percent and

3   approximately 10 percent, Your Honor.  The rate appeared to be

4   subject to some negotiation.  We have the Grigoryans saying

5   nine to 10 percent; we have other of his customers apparently

6   at a seven percent rate, but we --

7           THE COURT:  But how was -- the amount in the

8   presentence report is a little over $500,000.  How was that

9   calculated?

10          MR. SEARBY:  I believe Your Honor's referring to the

11  restitution amount?

12          THE COURT:  Yes.

13          MR. SEARBY:  The restitution amount was a

14  conservative calculation based upon analysis of tax returns

15  that we actually had available to us, and the tax loss arising

16  from the deductions of the amounts paid to defendant's

17  businesses by the filers of those tax returns.

18          THE COURT:  In other words, it's based upon the tax

19  returns of the providers?

20          MR. SEARBY:  Yes, Your Honor.  And what amounts they

21  were deducting from their taxable income of the transactions

22  that they had with defendant.  So in many cases, it's a -- most

23  cases, we didn't have tax returns available; people may not

24  have even filed income returns.  That was part of their way of

25  using defendant's services, which is to withdraw cash from

1  their fraudulent businesses without being accountable in the

2  first place for that funding.

3          But what we did with the restitution number versus

4  the intended loss number was be very conservative and just look

5  at tax returns that we had on file, largely from the

6  Grigoryans, and looking at the impact upon those tax returns of

7  the deductions that were actually made.

8          THE COURT:  I understand.  Okay.

9          THE DEFENDANT:  Your Honor, it's another evidence

10 where people don't want to, I mean, cheat the IRS, how I

11 understand.  Because if they want to cheat the IRS, they should

12 do the tax return on the -- I mean, if the -- their intention

13 was just evade their taxes or forever, so they going to do it,

14 but only Grigoryan's group mostly did it.

15         And also Mr. --

16         THE COURT:  What percentage of the Grigoryan group

17 made up the tax loss here?

18         THE DEFENDANT:  About 17, Your Honor.

19         MR. SEARBY:  Your Honor?

20         THE COURT:  Yes.

21         MR. SEARBY:  Your Honor, the figures are a little --

22 I'm going from recollection.  I believe there's about a quarter

23 of the -- a quarter of the total -- approximately a quarter was

24 from the Grigoryans.

25         THE COURT:  A quarter of the invoices, correct?

1        MR. SEARBY:  A quarter of their fraudulent
2   transactions that we have estimated at $10 million.  I believe
3   about a quarter of that was with the Grigoryan group of
4   businesses.  And then in the first superseding indictment,
5   there were six other groups besides the Grigoryans that were
6   alleged to have participated in this, totaling just over
7   $4 million in transactions.

8        And then the balance between $4 million of charged
9   transactions and $10 million is made up of a variety of other
10  medical companies or management companies related to medical
11  companies that had these very same huge transactions with the
12  defendant.  So the $10 million is composed only by a fraction
13  of Grigoryan organization money.

14        THE DEFENDANT:  Your Honor, I make a calculation
15  before I came.  Grigoryan's group about $2 million, all years
16  together.  And also, Your Honor, I want to understand why
17  government lost the amount, $1.8 million.  If they paid -- the
18  companies paid to our companies and received the advertising,
19  why they lost, why the government lost in this situation.

20        THE COURT:  The government lost because the whole
21  transaction was phony.  There were no fees that related to the
22  advertising.  You were part of a phony scheme.  The jury found
23  that.

24        THE DEFENDANT:  Your Honor, I don't want to argue
25  with the court or anybody, but this exhibit people also phony

1    or -- I mean --

2           THE COURT:  No.  You were the phony one, sir.  You

3    were the fraudster.  You were the one who cheated and the jury

4    so found.  Now, you may disagree with that verdict, and you can

5    certainly appeal if you think the evidence was inadequate.  In

6    my view, it was very adequate.  It seemed compelling that you

7    were at the very center of this scheme to create phony

8    deductions, thereby allowing the medical providers a means of

9    cushioning the losses they would have by paying out the cash

10   payments.  Isn't that the essence of it?

11          MR. SEARBY:  Yes, Your Honor.  There were -- from the

12   standpoint of the medical providers, they had a couple

13   different motives:  One was to be able to deduct these kickback

14   payments that they were making.  In other words, to withdraw

15   cash, get cash out of their bank accounts for use in kickbacks

16   without being taxed on that withdrawal of cash from the bank

17   accounts the way that their accountants would --

18          THE COURT:  I understood it that way.  All right.

19          I mean, the jury has returned the verdict, and I

20   agree with the verdict.  It would be pointless to argue that to

21   me.  You ought to argue that to the court of appeals if you

22   believe you have a valid appeal.  In other words, it's not

23   helping your position now to tell me that you're innocent

24   because I don't believe you're innocent; I believe you're

25   guilty.

1     THE DEFENDANT:  I understand that, Your Honor, but I

2     just want to just a couple of words about the losses --

3          THE COURT:  Go ahead, sir.

4          THE DEFENDANT:  Because that money, cash money, for

5     example, they pay a kickback -- I don't believe the story.

6     But anyway, I want to continue that consideration for that

7     money -- the cash money which I paid the commission, the

8     people, it's go to the kickback to the patients.  Because the

9     taxes in United States, in America, the budget have a

10    47 percent spending on the back to the people, to the United

11    States population.

12         And if Konstantin or somebody else distributed the

13    amount of money between the people, I don't think that United

14    States, IRS lost the money.  It's not good if they did that

15    medical fraud, but where is the -- my point over there?  I

16    mean, I'm not involved in medical fraud.  I just pay them

17    commission.

18         Nine percent or 90 percent or whatever, I just can

19    say about that one thing, Your Honor:  They provide the

20    spreadsheet for $10 million, right?  Without calculator, I'm in

21    handcuff here, I can say $10 million divide by 80 months, which

22    is seven year from 2001 to 2007, it's 80 months, right?

23    Ten million, if you divide on 80 months, it become 120,000 per

24    month.

25         If, Your Honor, they saying about nine percent,

14

1   seven percent, if they take about eight percent middle, it's
2   mean from $10 million I have a -- some profit.  I don't know
3   how, but profit for like 7- or 800,000 because bank fee, other
4   charges.  700,000, Your Honor, is not enough to run the
5   business for seven years with expenses.  It's pretty obvious.
6   I mean -- but I don't want to -- about the things that I want
7   to clarify a little bit, it's not every month I had the
8   expenses, it's I take a high end, and -- but even if we take a
9   middle one, it's going to be around 60,000 a month, Your Honor.
10  Only United States operation.  That is about 90 percent story,
11  I mean.

12          And second thing, on the opening statement, Mr. Bruce
13  Searby tell the personal thank you from the United States
14  justice system.  This means that information he get, it's help
15  to prevent the future crime for all United States justice
16  system.  If we are talking about United States justice system,
17  we're talking about not $1 million or $10 million, we're
18  talking about billions of dollars prevented crime.

19          Correct, Mr. Bruce Searby?

20          I just want to understand why, then, just I don't
21  understand what I did bad for United States.  IRS or people to
22  United States, I should be recommended for sentencing in
23  imprisonment.

24          Moreover, Your Honor, about my role of -- my role in
25  United States economy.  I create the job for 30 people.

1   According to Newsweek magazine source, 30 -- 30 place to job,
2   I'm in one of the -- government position is create the job for
3   Americans for the purpose United States government spending
4   92,000 a year for created one job or 165,000 tax breaks because
5   of bureaucracy.  And 30 -- 30 place to job which I create, it's
6   already benefited for United States about $5 million.  There's
7   the first thing.

8           Another thing that money, cash money, if it was
9   distributed between Americans, it mean they are poor people
10  because they have a medical.  So it means government no loss in
11  this situation, any cents.  But the money avoid the government
12  and for economy is good because they increase the spending
13  power of population of United States, and economy was growing
14  all the time.

15          And also, Your Honor, I don't understand why Bruce
16  Searby, I mean, without any skills or knowledge of business,
17  should teach me, someone professional in business.  I'm not a
18  cheater or a liar, I'm businessman, Your Honor.  Thank you.

19          THE COURT:  Anything else?

20          MR. NISHI:  No, Your Honor.

21          THE DEFENDANT:  Thank you, Your Honor.  I just want
22  to add for whatever you're going to be your consideration about
23  my sentence, I just -- I just want to ask the court to the fair
24  consideration, send me to home to my wife and kids.  I was in
25  custody already 30 months, Your Honor.

1    THE COURT:  Let me review the guideline factors

2    first, because even though they're not mandatory, they are

3    required to be examined.

4         And with regard to the paragraph 44 of the two-level

5    increase for an offense involving a sophisticated scheme, it's

6    my view that even though the scheme was somewhat involved, it

7    didn't strike me as being sophisticated.  What was

8    sophisticated about it?

9    MR. SEARBY:  Well --

10   THE COURT:  I mean, it was just fraudulent.  In other

11.  words, every fraudulent scheme isn't necessarily sophisticated.

12   I mean, here the essence of it was that he arranged to issue

13   phony invoices to the various medical providers who would then

14   pay the invoice in check and he would return 90 percent of it.

15        What's so sophisticated about that?

16   MR. SEARBY:  Your Honor, I would focus on a couple of

17   other facts that came out at trial, in particular the use of

18   overseas transactions to actually get the cash to give over to

19   the check-writing medical businesses.  A classic type of

20   evidence of a sophisticated means in money laundering or tax

21   fraud is the use of overseas accounts.

22        And Agent Paramo from the IRS testified at trial

23   about defendant's proffer admissions in which he admitted that,

24   one, the way that he was able to mysteriously generate the cash

25   to give to the Grigoryans and others was by a couple of

1    different very involved methods involving wire transfers to
2    Armenia.

3         Now, the first way that that would play out, wire
4    transfer to Yerevan, Armenia, cash withdrawn in Yerevan,
5    Armenia, cash smuggled out of Armenia back into the United
6    States by people who, as defendant admitted, probably didn't
7    declare the money on Customs forms and brought the money back
8    into the United States, gave it to the defendant so that he
9    could have cash to give to the Grigoryans without showing a
10   cash withdrawal from his account in the United States.

11        THE COURT:  I see.  You've refreshed my recollection
12   as to a piece of the evidence I didn't recall.

13        With regard to the adjustment at paragraph 45, the
14   government hasn't identified five separate criminally culpable
15   participants, but you're looking to another provision of the
16   sentencing factor relating to organizer or leader of criminal
17   activity, and you're relying on the, quote, "otherwise," close
18   quote, extensive organization; is that it?

19        MR. SEARBY:  That's it, Your Honor.  We made an
20   argument that there were five or more participants.  We would
21   say that his direction of the co-conspirators and the details
22   of the scheme could qualify, but in our latest brief filed
23   Friday, we said the evidence of him having led an organized and
24   overwhelming -- an extensive scheme is so overwhelming, and
25   under the factors that that ground has been analyzed under, the

1  case is so strong about this being an otherwise extensive
2  criminal activity that he led and organized that the court need
3  not reach the other argument.

4         THE COURT:  So you're saying that the law allows that
5  adjustment even if five specific culpable participants are not
6  identified?

7         MR. SEARBY:  Absolutely, Your Honor, and the Rose
8  case in the Ninth Circuit stands specifically for that
9  provision.  The Rose case cited in our brief filed on Friday
10 says that the analysis under otherwise extensive criminal
11 activity led by the defendant obviates the need to go about
12 counting the number of criminal participants in reaching five
13 or more --

14        THE COURT:  But does that mean that you don't have to
15 identify five culpable participants?

16        MR. SEARBY:  Oh, it certainly helps, Your Honor, and
17 the government has identified many more than five.  We
18 identified in the first superseding indictment seven distinct
19 groups of culpable participants, the seven groups of which the
20 Grigoryan group was only one.

21        So -- and certainly you want under the otherwise
22 extensive analysis to be tallying both culpable participants
23 and unwitting participants, and the government thinks that
24 there is a constellation of culpable participants, including
25 those people I was referring to smuggling the cash back in from

1   Armenia, including the different co-conspirators who are

2   deducting these payments on their tax forms, but there

3   certainly were lots of unwitting participants that go to the

4   otherwise extensive --

5          THE COURT:  Like his employees you mean?

6          MR. SEARBY:  To the extent we cannot prove that they

7   knew what was going on, yes, his employees.

8          THE COURT:  Now, the -- at paragraph 47, there is an

9   adjustment for obstruction of justice.  That would pit his

10   testimony against -- what was his name, Gershogus?

11          MR. SEARBY:  Gershelis, Eduard Gershelis.

12          THE COURT:  And there hasn't been any testimony on

13   that.

14          MR. SEARBY:  No, Your Honor.  The court is entitled

15   to rely upon the hearsay statements that had been provided to

16   the court.

17          THE COURT:  I'm not satisfied that there's an

18   adequate record on that adjustment, so I'm not going to include

19   that.

20          MR. SEARBY:  Your Honor, may I interject there was

21   another ground?

22          THE COURT:  No, no.

23          MR. SEARBY:  Okay.

24          THE COURT:  So then the calculation would be 32

25   Offense Level with Criminal History of I, correct?

1    MR. SEARBY:  Yes, Your Honor.

2    THE COURT:  Any legal cause why sentence should not

3    now be imposed?

4    MR. NISHI:  No, Your Honor.

5    THE COURT:  Pursuant to the Sentencing Reform Act of

6    1984, it is the judgment of the court that the defendant,

7    Andranik Petrosian, is hereby committed on Count One and Three

8    of the first superseding indictment to the custody of the

9    Bureau of Prisons for a term of eight years.  This term

10   consists of five years on Count One and three years on

11   Count Three to be run consecutively.

12        He is ordered to pay restitution to the United States

13   Internal Revenue Service in the amount of $521,845.88.  He

14   shall pay that at the rate of not less than $25 per quarter

15   pursuant to the Bureau of Prisons' inmate financial

16   responsibility program.  If any amount remains unpaid after

17   release from custody, monthly payments of at least $300 shall

18   be made during the period of supervised release and shall begin

19   30 days after the commencement of supervision.  He shall pay a

20   special assessment of $200.  In light of the large amount of

21   restitution, all fines are waived.

22        Upon release from imprisonment, he shall be placed on

23   supervised release for a term of three years under the

24   following terms and conditions:  One, he shall comply with the

25   rules and regulations of the U.S. Probation Office and General

1    Order 318.

2              There's no evidence of drug use, is there, in this

3    case?

4              MR. SEARBY:  No, Your Honor.

5              THE COURT:  Is he a citizen?

6              MR. SEARBY:  No, Your Honor.

7              THE COURT:  He shall comply with the immigration

8    rules and regulations of the United States, and if deported

9    from this country, either voluntarily or involuntary, not

10   re-enter the United States illegally.

11             He shall cooperate in the collection of a DNA sample.

12             The reason for the sentence is the seriousness and

13   extensiveness of the crime.  He was clearly at the fulcrum of

14   an extensive money laundering operation, which he clearly knew

15   resulted in losses to the Internal Revenue Service based upon

16   the fact that the evidence showed that he was receiving -- he

17   was distributing phony invoices for payments, the majority of

18   which he would kick back in cash to the payors.

19             And while the court cannot pin down the precise

20   amount of money involved, clearly it was in the multiple of

21   millions, and even if the loss wasn't quite at the number the

22   government has calculated, given the clear evidence that the

23   losses were in the millions, the sentence would be the same.

24             That's the sentence.

25             MR. SEARBY:  Your Honor, for the record, could the

1   court make findings on the specific guideline factors that the

2   court was discussing with the parties earlier?

3           THE COURT:  Well, I agree with the report, except as

4   to the obstruction, because I find that the record is

5   inadequate to make that determination.  That's the sentence.

6           MR. SEARBY:  Thank you, Your Honor.

7           (Proceedings concluded at 10:53 a.m.)

8                         - - - - -

9

10                  C E R T I F I C A T E

11

12           I hereby certify that the foregoing is a true and

13   correct transcript from the stenographic record of

14   the proceedings in the foregoing matter.

15

16                                    April 3, 2010

17   _____        _____

18   Deborah K. Gackle                        Date
     Official Court Reporter
19   CSR No. 7106

20

21

22

23

24

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
COURT REPORTER DEBORAH K. GACKLE

FILED

**NOT FOR PUBLICATION**

JUL 28 2011

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 09-50636 |
| Plaintiff - Appellee, | D.C. No. 2:07-cr-00708-SVW-1 |
| v. | |
| ANDRANIK PETROSIAN, AKA Seal A, | MEMORANDUM[*] |
| Defendant - Appellant. | |

Appeal from the United States District Court
for the Central District of California
Stephen V. Wilson, District Judge, Presiding

Submitted July 12, 2011[**]
Pasadena, California

Before: FERNANDEZ, RYMER, and TALLMAN, Circuit Judges.

Andranik Petrosian appeals his conviction and sentence after a jury found

him guilty of providing false statements to a government agency, in violation of 18

U.S.C. § 1001, and conspiring to defraud the United States, in violation of 18

---

[*]      This disposition is not appropriate for publication and is not precedent
except as provided by 9th Cir. R. 36-3.

[**]     The panel unanimously concludes this case is suitable for decision
without oral argument. *See* Fed. R. App. P. 34(a)(2).

U.S.C. § 371.  We have jurisdiction pursuant to 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291, and we affirm.

The district court properly admitted the statements Petrosian made during a proffer session.  The district court's finding that Petrosian was not completely truthful was not clearly erroneous. *See United States v. Chiu*, 109 F.3d 624, 625 (9th Cir. 1997).  At the proffer meeting, Petrosian stated the advertisement for Dr. Winkler's office was legitimate and that Alex Ayriyan visited him for legitimate purposes.  Dr. Winkler, however, testified to writing large checks for advertisements after being threatened by Ayriyan.  She further testified that the advertisements ran for several months after her clinic's closing.

Petrosian's argument that the government acted in bad faith by providing him with an Armenian translator instead of a Russian one is unavailing.  Assuming the government was required to act in good faith and provide Petrosian with a translator, Petrosian presented no evidence of bad faith. He neither asked for a different translator nor suggested that the translator provided was inadequate.  In sum, the government was allowed to introduce his proffer statements under the agreement due to Petrosian's lack of candor.

Petrosian next argues that the district court erred by not replacing the word "witnesses" with their actual names in the jury instructions.  The district court did

2

not plainly err. *See United States v. Benny*, 786 F.2d 1410, 1416 (9th Cir. 1986)
(review is for plain error if defendant failed to object to the instruction at trial).
The precise phrasing of an instruction is within the district court's discretion and
the instruction provided adequate guidance to the jury. *See United States v.
Redlightning*, 624 F.3d 1090, 1122 (9th Cir. 2010); *United States v. Escobar de
Bright*, 742 F.2d 1196, 1198 n.5 (9th Cir. 1984). Petrosian also was not prejudiced
when the judge misread one word when giving the instruction. *See United States v.
Romero-Avila*, 210 F.3d 1017, 1022 (9th Cir. 2000) (plain error review requires
defendant to show prejudice). The jury was given a printed copy of the correct
instructions.

Sufficient evidence supports the jury's verdict. Petrosian's own proffer
statements provided ample details about his scheme to convert checks into cash to
assist his clients in defrauding the government of tax revenues. The government
also presented several of Petrosian's clients who testified about the details of the
scheme. Petrosian's argument that these witnesses were unreliable fails, as we
may not weigh the credibility of witnesses. *See United States v. Nevils*, 598 F.3d
1158, 1164 (9th Cir. 2010) (en banc). The jury's failure to convict him of a
separate count of obstructing an investigation does not call into doubt his
conviction on the conspiracy count. *United States v. Choy*, 309 F.3d 602 (9th Cir.

3

2002), is inapplicable because there was no legal error regarding the obstruction count, nor was obstruction the substantive offense underlying the conspiracy conviction.

There also was sufficient evidence to convict Petrosian of making a false statement. He told a special agent in his May 10, 2006 interview that he had never negotiated checks for cash. The trial evidence, including the testimony of his clients and his own proffer statements, indicated otherwise.

We do not reach Petrosian's ineffective assistance of counsel claim on direct appeal because it requires development of facts outside the record. *See United States v. Benford*, 574 F.3d 1228, 1231 (9th Cir. 2009). The record does not indicate why trial counsel decided to forego the filing of a motion for a mistrial.

Petrosian challenges his sentence both for procedural error and substantive unreasonableness.

First, the district court did not clearly err in finding that Petrosian played an aggravating role in the scheme. *See* U.S. Sentencing Guidelines Manual § 3B1.1(a); *United States v. Rivera*, 527 F.3d 891, 908 (9th Cir. 2008). Petrosian directed the medical businesses to write out checks to his various entities, negotiated the checks for cash, maintained several shell advertising businesses, laundered large amounts of cash from Armenia, and falsified invoices. The scope

4

of the illegal activity was wide, spanning the globe and involving millions of dollars. His participation was central. *See* U.S. Sentencing Guidelines Manual § 3B1.1 cmt. n.4; *United States v. Ingham*, 486 F.3d 1068, 1074 (9th Cir. 2007). The district court also did not clearly err in finding Petrosian used sophisticated means in aiding tax fraud. *See* U.S. Sentencing Guidelines Manual § 2T1.4(b)(2). Petrosian's scheme was "sufficiently more complex than routine tax evasion." *United States v. Aragbaye*, 234 F.3d 1101, 1108 (9th Cir. 2000) (quotation marks omitted). He used fictitious entities and offshore financial accounts that allowed his clients to hide assets. *See* U.S. Sentencing Guidelines Manual § 2T1.4(b)(2) cmt. n.3.

Next, Petrosian challenges the restitution award. This argument was not "coherently developed in the briefs" and is deemed abandoned. *See United States v. Velasquez-Bosque*, 601 F.3d 955, 963 n.4 (9th Cir. 2010).

Lastly, Petrosian's below-Guidelines sentence was not substantively unreasonable. Petrosian argues the district court should have given a particular mitigating factor more weight, but this is an attempt to reargue his leniency plea from district court. *See United States v. Blinkinsop*, 606 F.3d 1110, 1116 (9th Cir. 2010). Given the nature and scope of the scheme, that Petrosian was at the center

of it, and the resulting large amounts of loss to the IRS, Petrosian's sentence,

significantly below the Guidelines range, was reasonable.

AFFIRMED.

6

LAW OFFICES OF
## MARK J. WERKSMAN
888 WEST SIXTH STREET
FOURTH FLOOR
LOS ANGELES, CALIFORNIA 90017
TELEPHONE (213) 688-0460
FACSIMILE (213) 624-1942

MARK J. WERKSMAN
MICHELLE MICHAELS
STEVE MEISTER
KELLY C. QUINN
MARK M. HATHAWAY*
MELISSA A. WEINBERGER
NINA E. DALY

\*CERTIFIED SPECIALIST · TAXATION LAW
THE STATE BAR OF CALIFORNIA
BOARD OF LEGAL SPECIALIZATION

\*ADMITTED IN CALIFORNIA
NEW YORK AND WASHINGTON, D.C.

November 26, 2007

Mr. Adranik Petrosian
Booking #07-07300571
Central Detention Center
630 East Rialto Avenue
San Bernardino, CA 92415-0025

Ms. Narine Petrosian
1120 San Rafael Dr., Apt. G
Glendale, CA 91202

Dear Adranik and Narine:

I'm writing to confirm the status of your case, and discuss my need for additional fees to cover your trial and the costs of an expert accountant to review the evidence in the case.

First, a status report. As you know, the prosecutor Mr. Searby now intends to bring additional charges in a "superseding" indictment that will be filed by mid-December. Your refusal to resume the cooperation process last Friday was a provocation to Mr. Searby, because you had said you wanted to resume cooperating.

As you may recall, on Wednesday, November 7, we met at MDC (the day you also met with Mr. Alex Kessel for a "second opinion"), and you literally begged me to request that Mr. Searby give you one more chance to cooperate and not indict you, as he planned, on November 14. You explicitly told me you would continue to cooperate with the government and agreed to accept the draft plea agreement that had been offered to you, and which required you to plead guilty to making a false statement and obstruction of justice, and which would subject you to the risk of up to two years in jail (but which, in practice, would enable you to get a sentence of less than two years because of your cooperation).

LAW OFFICES OF
MARK J. WERKSMAN

Mr. Adranik Petrosian
Ms. Narine Petrosian
Page Two
November 26, 2007

I did just as you requested, and Mr. Searby agreed to postpone the November 14 indictment and, instead, meet with you that day.

Because the US Marshals couldn't get you to LA on Wednesday, November 14, our meeting was postponed until Friday, November 16. At that meeting, instead of agreeing to cooperate and plead guilty as you had said you would, you decided you did not want to plead guilty to any charges. You also revealed some things to me about the cooperation process which would have made that difficult.

The meeting Friday ended with Mr. Searby angrily telling you that he would seek a superseding indictment charging you with money laundering, conspiracy to commit health care fraud, and conspiracy to commit tax fraud, as well as the original false statement and obstruction of justice charges.

As a result it is now virtually certain that we will go to trial on January 29, 2008 on these more serious charges, which carry a potential, under the U.S. Sentencing Guidelines, for you to receive a sentence in the eight to nine year range.

Although your "flip flop" on cooperation caused me to lose some credibility with the prosecutor (I had promised him you would cooperate if he didn't indict you on November 14, because that's what you told me), I am still willing to represent you if you want me to because I would like to finish what we've started.

However, to do so, I will require an additional fee of $25,000. This is because I was originally retained on a much smaller two-count case with the expectation that you would cooperate (because that's what you said you wanted to do). We spent literally dozens of hours setting up and attending cooperation meetings, which now turn out to be a waste of time. I did what you asked, and basically used up most of your retainer because you chose to flip-flop on whether to cooperation. I was not retained to represent you in a larger money laundering, tax fraud and healthcare fraud case. The trial will be much longer than the original case for which I was originally retained; the issues will be much more complex; and the time spent in preparation will be much greater. Therefore, I will need an additional $25,000.

LAW OFFICES OF
MARK J. WERKSMAN

Mr. Adranik Petrosian
Ms. Narine Petrosian
Page Three
November 26, 2007


Finally, in order to properly defend you at trial, I must retain an expert accountant, called a "forensic accountant" to examine the books and records the government has provided and which will be the backbone of the government's case, in which they must prove that you received hundreds of thousands of dollars for advertisements that you never ran (but which money's you allegedly kicked back to the so-called advertisers as part of the money laundering/tax fraud scheme). I need to have an accountant testify for the defense that you ran ads for these clients, and that your books reflect that any "kickbacks" were, in fact, commission payments. This will be critical to your defense. Such an expert will likely cost about $10,000 to review the discovery, prepare a report, and testify about it at trial. I must have those funds in my trust in advance so I can go out and hire the right forensic accountant. With trial set on January 29, 2008, there's no time for delay.

Please call or write when you receive this letter, and I will arrange to meet with you so we can discuss. I will require the additional $25,000 retainer before appearing at a "post-indictment arraignment" on the new indictment. As for the forensic accountant, I urge you to please made those funds available to me immediately.

Yours,

Mark J. Werksman

MJW:ch

16-3717/1220      633215705

Washington Mutual Bank

PAY
TO
THE
ORDER
OF

MARK J. WERKSMAN

Issued by Integrated Payment Systems Inc., Englewood, Colorado Wells Fargo Bank Ltd. N.A., Los Angeles, CA

WASHINGTON
MUTUAL
**8,000.00**
EIGHT ZERO ZERO ZERO CTSCTS
************Jan 8, 2008 EIGHT THOUSAND   DOLLARS AND 00 CENTS ************

Washington Mutual Bank

DRAWER / PURCHASER COPY
NON-NEGOTIABLE

REMITTER
INFO PRESS, INC.

1576 120

4566 (10/99)



16-3717/1220   633215763

WASHINGTON MUTUAL

SEVEN   ZERO ZERO ZERO

**0 0 0 0 . 0 0 CTS/CTS**

*********Jan 10, 2008 SEVEN THOUSAND DOLLARS AND 00 CENTS *************

Washington Mutual Bank

DRAWER / PURCHASER COPY
**NON-NEGOTIABLE**

REMITTER
INFO-PRESS INC

1576

**Washington Mutual Bank**

PAY
TO
THE
ORDER
OF

MARK  J  WERKSMAN

Issued by Integrated Payment Systems Inc., Englewood, Colorado Wells Fargo Bank Ltd. N.A., Los Angeles, CA

4556 (10/99)

16-3717/1220   6332152777

WASHINGTON
MUTUAL   FIVE ZERO ZERO ZERO ZERO CTSCTS
**********Dec 17, 2007 FIVE THOUSAND DOLLARS AND 00 CENTS **********

Washington Mutual Bank

DRAWER / PURCHASER COPY
NON-NEGOTIABLE

REMITTER
INFO-PRESS, INC.

1576 1@

Washington Mutual Bank

MARK WORKSMAN

PAY
TO
THE
ORDER
OF

4556 (01/99)

Issued by Integrated Payment Systems Inc., Englewood, Colorado Wells Fargo Bank Ltd, N.A., Los Angeles, CA

Received $10,000.00
in partial payment
of legal fees.
12/17/07 Mark Lener

Receipt

Date: 7/28/07

~~$15,000~~

Received $15,000 from
Nora Petrosian for representation
of Adranik, consistent w/ retainer
agreement signed this date.

Steve Meiser
Law Offices of Mark Werksman

Received #10,000.00 (Ten thousand)
in legal fees from
Nara Petrosian
7/30/07    Mark Weiss

**Andranik Petrosian**
B/n 0800003100
P.O. Box 22003
Santa Ana, Ca 92702

Letter to Attorney at Law
**Mark J. Werksman (State Bar No 120767)**

888 West Six Street, 4-th floor
Los Angeles, Ca 90017
Tel: (213) 688-0460
Fax: (213) 624-1942

Dear Mr. Werksman:

You were hired on July of 2007 for the purpose of preparing all legal paperwork and representing me in a court preceding. Mr. Joseph Shemaria previously represented me.

The fee for your legal service was set at a retainer of $25,000, which was paid up front. I was informed that it would be a flat rate and that it didn't matter whether we went to trial or took a plea, only that it didn't cover an appeal if one was needed.

During your horrendous representation, I was very unhappy with your legal service. Beginning with my housing at the San Bernardino county jail. It was one of your first broken promises to have me transferred to M.D.C. LA so that I would be able to see my family members. Obviously, that never happened.

When you set the motion for a bond hearing. You didn't even try to obtain any positive information about me, recommendations from my wife, friends, or my employees. My wife received numerous support letters, approximately 50 from different people and organizations and brought them to your office. Many people wanted to see you during the duration of the trial, in the hopes of giving you any information necessary regarding to my character. You simply declined those offers and the letters of support, you said: " We don't need them "?! According to your 20 years of practice, knowledge, and skills, you couldn't even properly represent me during a bond hearing, which is a Constitutional right to anyone in criminal proceedings. Once you received your retainer, it became very difficult to reach you. When I informed you that I wanted to precede to trial, you opposed it because you refused to spend more time on my case. I felt as if you were pressuring me to plead guilty in order for you to make a deal with the U.S. Attorney's Office and be done with my case.

I have never been in a situation like this, nor have I ever been in incarcerated for breaking *any* laws. I couldn't imagine that my attorney would hinder my defense and make himself unreachable after the attorney fees were paid up front. I couldn't fire you at the time for the following reasons:

First being incarcerated, I was unable to cancel our contract and terminate your legal representation.

Secondly, I was paralyzed in San Bernardino county jail. I wasn't able to write a letter to you or anyone else because I not know good enough English, and criminal procedure.

When I finally decided that we were going to trial, you sent me a letter explaining that the trial will not be easy. You also informed me that we needed to do a more thorough investigation as well as hiring an independent audit increasing your fee to $50,000. Additionally you needed $10,000 more, to discover more evidence proving my innocence and do independent audit. You promised me that you would fly to Yerevan, Armenia and find more evidence to prove my innocence. I was agreeing to increase your fee, but set the limit on $55,000 including audit and bookkeeping. Before that the trial is started you're told me, I don't need to bother you, because you're working on my case, and have an 20 years experience, and I need to be a patient. In addition, during the time after that letter, months before my trial is started, you just simply ignored me. We didn't do any pretrial preparation, any audit, all you did before my trial was hand me a paper authorizing the release of $20,000 which the government seized at the time of my arrest. Of course, you never informed me what happened with that money, because I didn't received as you promise to me.

In addition, you did tell me "I going to vacation" right one week before my trial. I believe that was to simply avoid any pretrial preparations, or consulting with me.

On April 7, we were in front of the judge. He asked us if we were ready to start the trial the next day. Your answer was "yes." You were at that time my Mouth and my Brain. At only after your answer, I get noticed and was shocked by that fact that we didn't have any witnesses from our side. In addition, we didn't have any independent audit, and you didn't do any investigation to prove my innocence. You simply just wanted to see how the government would prove my guilt, by pure speculation of regular business citation transfer to the conspiracy, based just on the verbal evidence on people who sign the plea to reduce the sentence. All you needed to watch that show was a Soda and Popcorn. You didn't even read a witness statement; you didn't do any investigation, no independent audit like you told me in the letter. In addition you didn't do any pretrial, didn't prepare yourself and myself to cross examination and not learn the theory of innocence of the Defendant.

That was exactly opposite of my strategy, that's why you have been avoiding me all 9 months. Obviously, you choose the strategy without my approval. That strategy let you simply do nothing related with my case, and I just remember all the time during the 9 months (4 of which I was in solitary, and I was so extremely frustrated I started to visit a psychologist) before my trial your fraise: " *my friend!!! You have to be patient!!!*"

During that time, I wasn't able to run my business. I was the rescue to losing my business. I couldn't support my family, I didn't see my kids, but I needed to follow in your advice and be patient, and wait, was doing absolutely nothing, until maybe one day finally Mr. Werksman would find time for me.

Now I understand, you just tried to help to US attorney office, not to me, but I want to know in exchange of what? Because you've dealing with them every day, you didn't need me, but they are very important for your business. I just don't understand why then you promise every your client "good protection"?

Everybody knows how hard it is to wait one hour. I waited for that trial for 9 months, with believe, and hope on that you working on my case. Until that day on April 7, I believed you would do that which you promised me, do your professional service, and prove my innocence. You told me: "Andy, you didn't do anything wrong, and if we can prove that fact that you did advertising, its mean you are innocent ".

Moreover, every time when I see you don't even remember anything in my case, all question which I have telling you, I get just one answer: " its doesn't matter, and we are don't needed".

Before the trial started I continued do your job and discover more evidence which showed my innocence. I told you to obtain paperwork from the meeting with Armen Gukasyan which was the origination of the money found when they searched of my office. In addition, my office received the package from Armenia with the contents of invoices reflecting transactions between our companies with Margarita Petrosian. In addition, after many requests, to go and pick up that package which contained very important evidence, you refused. Again, I asked my wife pick up that package which was in the original postal seal which showing the fact that package came from Armenia. The package was delivered to your office and directly was transferred into your hands. Thank God, I have a many witnesses who saw that package.

Again, with your 20-year experience and skills, you couldn't even push that package into evidence. Because you opened that package and threw away the original postal package. You destroyed the evidence and on trial you just told the honorable Judge Stephen Wilson, that I were prepared and brought that evidence to you, and hide that fact, that you had it in your possession for more then four months and opened the package, broke original seal which showed that the original package came from Armenia, and not from me. In addition, when Judge asks you how much was total cost of those invoices your first answer was: "you don't know, or maybe the cost is $500,000." In that package which you simply ignored and opened was the major evidence proving my innocence, in other words it was my life and destiny. This showed the unprofessional relationship to your clients and disregard for important evidence, even after 20 years of experience. Now I imagine how many people received that "good " service from you.

The trial was starting, and I was shocked how you did the cross-examination of government witnesses. It showed you simply didn't prepare yourself for trial, more you were against me, you were trying to show picture more ugly on front of jury. Instead of make an argument there was not a medical fraud trial, you start proving medical fraud. In addition, it just a shows that you simply don't have any information about what's going on.

And it was culmination, when Honorable judge were asked you, if we want to do motion for mistrial, you asked me

" What you want to do?"

I replied:

"Of course, I'll take that chance"

You listened to me turned and said "

"Your Honor we shall continue"

Even HONORABLE JUDGE Steven Wilson asked you:

"You know and fully understanding the risk and circumstances? "

Yes, You're Honor.

When that was over; I think I went crazy, but I manage myself and follow your advice, and were patient. After that, you asked me not to do the testimony. If I listen to you, I will get found guilty on all counts. However, I broke your plan, to help the prosecution. However, you don't even let me explain my citation by simply asking questions. All your questions were incorrect, untalented, and irrelevant and the prosecution every second objected, and interrupted because you did not prepare yourself, and myself to trial. In addition, during the testimony, I didn't even see your help; you did not help no any objections, any protection, or me. That's why my answer was that much emotional, and the people think I'm kind of a crazy person, but that's only your fault because you made me frustrated on the very important for me day.

In addition, the time of my testimony Bruce asked me:

Mr. Petrosian why did AAA Medical pay Tetatet Magazine $50,000? I wanted to direct that question to you: "Mr. Werksman why did you receive $50,000 from me? How did this happen if AAA is paying me and I

do advertising on half page it's a crime.  However, you can charge me $50K and see me 3 time in your life its not a crime, its just a legitimate business, I need to be in jail, but you not.  In my situation its regarding just a business matter, in your is regarding risk of the people and their  business.

Obviously, I want to find an answer to my question, why did you do that to me, maybe somebody pay you for my blood?  What was a cost of that?

However, you are not a regular worker you are an attorney, you give oath to God to help the people. Anyway, it's very shameful to be an attorney like you, who's agenda just depurative his clients, and reap money from them, then send to the prison.  Obviously in jail, I see many people who received the same kind of " incredible" services from you.  Indeed, I'm not alone. However, I write this letter from my name.

In addition, I was surprised because on your web site nobody gives negative feedback.  Now I understand because everybody who is unhappy is in jail he or she cannot give feedback.

In addition, for the reasons set forth above now I am demanding my money back because I didn't received professional services as expected, and as was promised in opposite of that I receive totally ineffective assistance based on lie and deprivation.  Maybe you think that money was paid to you just to "review" my case. No, I paid that money and expected to receive qualified professional services.  Your assistance was completely ineffective, and I don't want the service you usually provide may harms also to the other people.

Moreover, to avoid any further legal action to collect my debt, late fees, interest and collection fees, please remit that money in the amount of $55,000.00 within 5 business days, after you received this notice.

Make the certified casher's check payable to: **Andranik Petrosian**

And send on the address listed below:

Law offices of
Jilbert Tahmazian
1518 W. Glenoaks blvd
Glendale, Ca 91201
Tel: (818) 242-8201

Sincerely yours

Andranik Petrosian

LAW OFFICES OF

# MARK J. WERKSMAN

801 SOUTH FIGUEROA STREET

11ᵗʰ FLOOR

LOS ANGELES, CALIFORNIA 90017

TELEPHONE (213) 688-0460

FACSIMILE (213) 624-1942

MARK J. WERKSMAN
MICHELLE MICHAELS
STEVE MEISTER
KELLY C. QUINN
MARK M. HATHAWAY*
MELISSA A. WEINBERGER
NINA E. DALY

*CERTIFIED SPECIALIST - TAXATION LAW
THE STATE BAR OF CALIFORNIA
BOARD OF LEGAL SPECIALIZATION

*ADMITTED IN CALIFORNIA
NEW YORK AND WASHINGTON, D.C.

July 27, 2007

Adranik Petrosian
c/o Nara Petrosian

Re:  **Adranik Petrosian**  *Representation through Trial*
~~Criminal Consultation through Post-Indictment~~
~~Arraignment~~ (an)

Dear Mr. Petrosian:

This will confirm that you have retained the Law Offices of Mark J. Werksman (hereinafter "the Firm") to represent you in connection with the above-referenced matter.  It is expressly agreed by and between you and the Firm as follows:

1.  The Firm will represent you in connection with the above-referenced case.  The representation shall include all factual and legal research, negotiations with interested parties, consultation regarding criminal law issues, and related steps, including initial appearances before US Magistrate, bail review hearings, negotiations with federal prosecutor over scheduling and plea offers, through ~~Post-Indictment Arraignment~~ (A.P.).  ~~If Mr. Petrosian wishes representation at the Post-Indictment Arraignment and beyond, then a new retainer agreement will be required~~ (A.P.) *Not include writs, appeals or retrials.* (an)

2.  In exchange for the foregoing, you have agreed to pay to the Firm a flat non-refundable fee in the amount of $25,000.00.  The first $15,000.00 of which is due immediately, and the remaining balance due on Monday, July 30, 2007 of $10,000.00.  These monies will be deposited into the Firm's operating account as a fee to the firm.  In the event hourly fees and costs exceed that amount, you will be charged accordingly to the schedule below.

3.  The hourly fees for attorneys and other personnel retained and employed by the Firm are as follows:

Petrosian.Retainer

LAW OFFICES OF
MARK J. WERKSMAN

Adranik Petrosian
c/o Nara Petrosian
July 27, 2007
Page 2

| | |
|---|---|
| Mark J. Werksman | $575.00 |
| Steve Meister | $525.00 |
| Mark Hathaway | $525.00 |
| Michelle Michaels | $525.00 |
| Kelly C. Quinn | $500.00 |
| Melissa Weinberger | $450.00 |
| Nina E. Daly | $400.00 |
| Paralegals | $105.00 |
| Wordprocessing Operators | $ 85.00 |
| Other Attorneys | $275.00 - $525.00 |

4.   You also have agreed to be responsible for all costs incurred in the Firm's representation of you.  Those costs may include, but may not be limited to, word processing, paralegals, other attorneys, photocopying, postage, facsimile transmittals, telephone calls, travel, messenger or other such costs.  In the event you wish an investigator or an expert to be retained, a separate retainer between you and any such expert or investigator will be required.

5.   You have agreed to cooperate fully with the Firm by supplying promptly all information and documents requested of you in this matter.

6.   You have acknowledged that no result has been or can be guaranteed to you in this matter.  We do pledge, however, our best efforts.

7.   You have acknowledged that the foregoing fee agreement has not been set by law but has been negotiated between you and the Firm.

8.   You have acknowledged that all amounts in excess of $10,000 paid to the Firm in the form of cash or certain other instruments, will be reported to the Internal Revenue Service.

9.   This will also acknowledge that all funds you have paid or will pay to the Firm are your own assets or money borrowed from friends, business associates and/or family.  You further acknowledge that none of the funds paid to the Firm, or that will be paid to the Firm, have been associated in any way or derived in any fashion from any unlawful activity of any sort.

10.  You have also acknowledged that in the event you relocate to a new address or changes telephone number(s), you

Petrosian.Retainer

Adranik Petrosian
c/o Nara Petrosian
July 27, 2007
Page 3

will notify the Firm within 24-hours of such a change.

    11.   After our services have concluded, the Firm will make available to you the file in this matter and any property in our possession.  If you do not request the file for this matter or instruct otherwise, we will maintain the file for five years after the matter is closed.  At the end of the five year period, we will have no further obligation to retain the file and may, at our discretion, destroy it without further notice to you.

    We are pleased you have chosen the Firm to assist you in this matter.  We look forward to representing you and working with you.

    If the foregoing conforms to your understanding of our agreement, kindly sign where indicated below.  By signing below, you are affirming that you are retaining the Firm to represent you in this matter.

Very truly yours,

By: _____
    Mark J. Werksman

The foregoing is approved this
____th day of July, 2007;

By: _____
    Adranik Petrosian
    c/o Nara Petrosian

LAW OFFICES OF

MARK J. WERKSMAN

801 SOUTH FIGUEROA STREET

11ᵀᴴ FLOOR

LOS ANGELES, CALIFORNIA 90017

TELEPHONE (213) 688-0460

FACSIMILE (213) 624-1942

MARK J. WERKSMAN
MICHELLE MICHAELS
STEVE MEISTER
KELLY C. QUINN
MARK M. HATHAWAY*
MELISSA A. WEINBERGER
NINA E. DALY

*CERTIFIED SPECIALIST · TAXATION LAW
THE STATE BAR OF CALIFORNIA
BOARD OF LEGAL SPECIALIZATION

*ADMITTED IN CALIFORNIA
NEW YORK AND WASHINGTON, D.C.

July 27, 2007

Adranik Petrosian
c/o Nara Petrosian

Re:  __Adranik Petrosian__  *Representation through Trial*
~~Criminal Consultation through Post Indictment~~
~~Arraignment~~ *(initials)*

Dear Mr. Petrosian:

This will confirm that you have retained the Law Offices of
Mark J. Werksman (hereinafter "the Firm") to represent you in
connection with the above-referenced matter.  It is expressly
agreed by and between you and the Firm as follows:

1.    The Firm will represent you in connection with the
above-referenced case.  The representation shall include all
factual and legal research, negotiations with interested parties,
consultation regarding criminal law issues, and related steps,
including initial appearances before US Magistrate, bail review
hearings, negotiations with federal prosecutor over scheduling
and plea offers, through ~~Post-Indictment~~ **TRIAL.** ~~Arraignment. If Mr.~~
~~Petrosian wishes representation at the Post-Indictment~~
~~Arraignment and beyond, then a new retainer agreement will be~~
~~required.~~ *(initials)* Not include writs, appeals or retrials. *(initials)*

2.    In exchange for the foregoing, you have agreed to pay
to the Firm a flat non-refundable fee in the amount of
$25,000.00.  The first $15,000.00 of which is due immediately,
and the remaining balance due on Monday, July 30, 2007 of
$10,000.00.  These monies will be deposited into the Firm's
operating account as a fee to the firm.  In the event hourly fees
and costs exceed that amount, you will be charged accordingly to
the schedule below.

3.    The hourly fees for attorneys and other personnel
retained and employed by the Firm are as follows:

Petrosian.Retainer

LAW OFFICES OF
MARK J. WERKSMAN

Adranik Petrosian
c/o Nara Petrosian
July 27, 2007
Page 2

| | |
|---|---|
| Mark J. Werksman | $575.00 |
| Steve Meister | $525.00 |
| Mark Hathaway | $525.00 |
| Michelle Michaels | $525.00 |
| Kelly C. Quinn | $500.00 |
| Melissa Weinberger | $450.00 |
| Nina E. Daly | $400.00 |
| Paralegals | $105.00 |
| Wordprocessing Operators | $ 85.00 |
| Other Attorneys | $275.00 - $525.00 |

4.    You also have agreed to be responsible for all costs
incurred in the Firm's representation of you.  Those costs may
include, but may not be limited to, word processing, paralegals,
other attorneys, photocopying, postage, facsimile transmittals,
telephone calls, travel, messenger or other such costs.  In the
event you wish an investigator or an expert to be retained, a
separate retainer between you and any such expert or investigator
will be required.

5.    You have agreed to cooperate fully with the Firm by
supplying promptly all information and documents requested of you
in this matter.

6.    You have acknowledged that no result has been or can be
guaranteed to you in this matter.  We do pledge, however, our
best efforts.

7.    You have acknowledged that the foregoing fee agreement
has not been set by law but has been negotiated between you and
the Firm.

8.    You have acknowledged that all amounts in excess of
$10,000 paid to the Firm in the form of cash or certain other
instruments, will be reported to the Internal Revenue Service.

9.    This will also acknowledge that all funds you have paid
or will pay to the Firm are your own assets or money borrowed
from friends, business associates and/or family.  You further
acknowledge that none of the funds paid to the Firm, or that will
be paid to the Firm, have been associated in any way or derived
in any fashion from any unlawful activity of any sort.

10.    You have also acknowledged that in the event you
relocate to a new address or changes telephone number(s), you

Adranik Petrosian
c/o Nara Petrosian
July 27, 2007
Page 3

will notify the Firm within 24-hours of such a change.

11.  After our services have concluded, the Firm will make
available to you the file in this matter and any property in our
possession.  If you do not request the file for this matter or
instruct otherwise, we will maintain the file for five years
after the matter is closed.  At the end of the five year period,
we will have no further obligation to retain the file and may, at
our discretion, destroy it without further notice to you.

We are pleased you have chosen the Firm to assist you in
this matter.  We look forward to representing you and working
with you.

If the foregoing conforms to your understanding of our
agreement, kindly sign where indicated below.  By signing below,
you are affirming that you are retaining the Firm to represent
you in this matter.

Very truly yours,

By: _____
    Mark J. Werksman

The foregoing is approved this
28th day of July, 2007;

By: _____
    Adranik Petrosian
    c/o Nara Petrosian

**From: Petrosian Andranik**
B/N 0800003100
P.O. Box 22003
Santa Ana, Ca 92702
LEGAL MAIL

To: **The State Bar of California**
    Scott J. Drexel
    1149 South Hill Street
    Los Angeles, Ca 90015-2299

November 05, 2009

Dear Sirs: I hired Mr. Mark Werksman (SBN 120767) on July of 2007, to prepare the paperwork, needed to have him represent me at court for criminal proceeding, and for necessary investigation related to my case.

Due my arrest, my wife used to deal and pay fees to Mr. Werksman. The retainer he set for flat rate $25,000, which was paid upfront. Mr. Werksman explained that no matter what we'd take a plea deal or will go to the trial.

I was arrested first time in my life, and I wasn't familiar with criminal proceeding, and always follow the advise of my attorney.

1) My attorney told me that I should take a deal rather then go to trial because the Fed's usually win 99% of all cases. I was against the deal because by my understanding I hadn't broken the law. Then he set up a hearing in USAO, for them to introduce with evidence what they have against me.

2) Mark advised me to make a proffer statement. Mark didn't let me even read that document. He didn't care about translating that document by my request, and did not explain to me properly. He ordered me to believe him and sign that document. All I understood on that document was that the USAO never would use that information against me. After signing that document, he hurried out to received phone calls and left me alone, in USAO. After twenty-thirty minutes, Ms. Nina Daily came to represent me. I saw her for the first time in my life and she didn't really understand what's the case was about. She didn't say a word during that meeting. I stopped and concluded that meeting, because I found out the interpreter was not properly translating my statement.

3) Immediately after that meeting, USAO Assistant Mr. Bruce Searby told me that: I should plead guilty on charges because according to the information I provided (*he start using that information against me immediately*) in my proffer statement I had broken the law. Then he started changing my words, I was surprised because he even wasn't present in my proffer statement. My attorney Mr. Nina Daily was just smiling during that conversation between Mr. Searby and me.

November 05, 2009

4) Indeed, after that I made a decision to take them to trial. Mr. Mark Werksman was against that. He told me that I must take the deal. I told him I don't need his representation and requested my money back.

5) After some delay I rehired him again because I realized that he would not give me my money back. I could not find any new attorney from jail, and my wife could not afford any new attorney.

6) On my bond hearing, he refused to collect any positive information from my friends or Community members, or employees. My wife got numerous letter of support and would delivery to my Attorney.

7) Mark send me letter and explained to me that a trial would not be easy, and he needed more money $25,000 and additional $10,000 for investigation purposes and we needed to do independent audit. In that letter, he held that he wouldn't start to do anything unless he saw that money in his trust account. Then I made a deal with him, and set the limit for additional $30,000 instead of his requested $35K. Mark agreed and was very happy about the arrangement. Then promised me to do the whole investigation that was necessary, and promised me he would fly to Yerevan Armenia to collect important information to bring all witnesses on our side. We borrowed a portion of Mark's $30,000 fee from our friends.

8) On April 7 of 2007, we were in the front of Honorable Judge Stephen Wilson. He asked us if we were ready. My attorney's answer was "yes, your honor." Just two weeks before that Mr. Werksman notified me that, he was going to out of town vacation and I didn't need to bother him. I was confused, because I was expecting pre-trial preparation. That pre-trial never happened.

9) Mark didn't bring my notes to court. Those notes were my whole pre-trial preparation and were 12 pages handwritten. Mark brought only 5 pages (bad copies) of that notes out of 12.

10) When trial started on April 8, 2007, I realized that we didn't have any witnesses in our side. My Attorney strategies were "save the time" strategies. He chose not to do anything.

11) Where was the independent audit and business analyst that was promised?

12) **During the trial, when started the issue about proffer statement, Judge Wilson asked if we want to do mistrial motion. Mark asked me:" What do you want to do?" I replied "of course I'll take a this chance for mistrial" he listen me, turn to the Judge and pronounced: " Your honor, my client doesn't want to do mistrial motion at this time, we will continue." Even translator was shocked by his answer. She asked me if my attorney crazy?**

13) Mark Werksman didn't prepare himself to trial. He doesn't have any understanding what's really going on. He didn't even read the witness statement. His entire questioning of witnesses was entirely irrelevant.

14) After many requests, Mark didn't bring any evidence of my Investment to USA economy, which were highly relevant to the issue of trial.

15) Mark didn't follow any directions that I gave him.

16) Before the trial, by my many requests, Mark failed to bring any photos, or other evidence from 72000 pages of my discovery. I was showed only witness statement. Those 72000 pages of my discovery were printed in my office on my expense, but he still refused to show me.

17) Every time when I asked about my requests, I realize that he didn't even remember my requests. His permanent answer was: " that is not important, or we don't need that"

18) I wanted to testify but he was opposed, and many times he were decline my demand to testify, at the end he change his mind and allow me. We were not ready for testimony in court. He didn't ask me enough questions during the testimony so I could properly explain the situation to the jury. At the end, he totally frustrated me with his irrelevant questions.

19) Mark failed to mention any of my arguments to the court.

20) About 4 to 5 months prior the trial, my office received package from Armenia by US Mail. That package contains very important evidence related to my case and contains accounting data. After numerous requests, Mark refuses to pick up that package. Later on, that sealed package was transferred directly to Mr. Mark Werksman in his office. Mr. Werksman opened that package, and destroyed the envelope, which shows that package was come from Armenia. He brought some parts of those documents during the trial, and court rejected those documents from its admission into to evidence.

21) At the <u>opening statement</u> prosecutor already knew what I was going to say and do in my defense.

22) During the trial, my mother was present in Los Angeles; she came from Armenia and wanted to be a witness in my case. He would not listen to me, and left on vacation without paying any attention to this important witness.

23) After even guilty verdict, we still can clarify the situation. On my request to do any motion for that, he refuse to consult me, and filed motion for Rule 29 instead of Rule 59. He refuses to see me after the trial, and avoids any future consulting. He was very happy that finally the trial was ended. Those failures were passed very important timeframe, which is one week after the jury verdict; and jury was retired.

24) Even after the Trial, it was impossible to accurately determine what particular crime was allegedly committed.

25) Mr. Werksman disregard to all violation by the Government of my Constitutional Rights regarding my Indictment, First Superceding Indictment, and whole pre-investigation and investigation process.

– 4 –                                           November 05, 2009

In short, my attorney simply chose to do nothing with regard to extremely important facts regarding my defense. During all the time of his representation, I felt that he had a good business relationship with USAO, and he didn't want to help me, because they (USAO) are more important for his business than one client like me. In speaking with me and even in court, he frequently protected their arguments and their (USAO) interest.

I don't know what Ms. Nina Daily told my Probation Officer. The probation officer recommended to Judge Wilson maximum sentencing for me, and had disregarded a whole ocean of positive information about me.

Mark was fired after the trial, before sentencing.

Right now, according to USPO recommendation I'm facing 120 month of imprisonment. I'm sure that recommendation is partially based on the information that was provided by my attorney.

Ms. Nina Daily was present at my interview with USPO. By my understanding, she was trying to tell to USPO that I had taken a plea deal. [1]

During that interview, USPO asked me about that plea deal. I told her truth, I didn't sign any plea deal. U.S.P.O. further consideration was based sole on the information that was provided by USAO, and was disregarded on facts and events on those counts, which was hung jury. The U.S.P.O. didn't ask me anything about my crime, or anything relating to my view on the situation. In addition, I don't think my Attorney had provided any truthful or positive information about me.

All abovementioned information is true and corrects at the best of my knowledge.

Sincerely

Andranik Petrosian _____
                              (Signature)

P.S. my present attorney is:

Mr. Thomas Nishi
1000 Wilshire Suite, 600
Los Angeles, Ca 90017
Tel: (213) 629-9066
Fax: (213) 629-9022

---

[1] The USAO created a draft, 2-year plea deal between USAO and me. I refused to sign that document, because it contained not truthful information.




| Mailing Services | Turnaround Options | Printplace Guarantee | |
|---|---|---|---|

## >> Popular Products

Booklets
Bookmarks
Brochures
Business cards
Calendars
Catalogs
Door Hangers
Envelopes
File Folders
Flyers
Folded Postcards
Foldover Business Cards
Greeting Cards
Hang Tags
Letterhead
Menus
Note Pads
Postcards
Posters
Presentation Folders
Rack Cards
Sales Sheets
Table Tents

## >> Services

Affiliate Program
File Repair Services
Mailing Services

## >> Specialty Products

Calendars
Envelopes
Labels & Stickers
Plastic Products

## >> Call Us Now!



877.405.3949
7am-8pm CST

1. Pick a product    2. Payment    3. Upload artwork    4. Review & Send to Press

## ✑ Magazine Printing



Product      Templates      Marketing Tips:      Mailing

### Magazine Printing

Get the features you need, the options you demand, and the best prices in the industry for magazine printing with PrintPlace.com. Full color printing, lots of paper sizes, and even different paper types are available right from our Instant Pricing form.

### Details: Magazine Printing

- Sizes shown represent page size (finished size)
- Three self cover stock options (cover stock the same stock as the inside pages)
- One plus-cover stock option (cover stock is heavier than inside pages)
- Saddle-Stitched binding (magazine is stapled on the left edge)
- Five standard magazine printing sizes or custom trim to size
- Custom trim minimum size: 6" high (binding edge) x 4" wide
- No additional cost for landscape orientation/short side binding
- Mailing Services available
- 5.5x8.5" and 6x9" mini magazines can mail at Letter rate if double tabbed

Drilling, tabbing, and shrink wrapping are even more options immediately available, and you can even create a custom trimming order without ever picking up the phone. PrintPlace.com makes magazine printing easy and simple. With our industry leading Price Match, On Time, and Satisfaction guarantees, you can order with confidence knowing we stand behind our products and services.

### Instant Pricing                    $9,338.50

**Standard Options**

| Size (?) | Printing (?) |
|---|---|
| 11x8.5 | 4 Color Both Sides |

| Page Count (?) | Quantity (?) |
|---|---|
| 88 Pages (Cover+84 pages) | 1000 |

| Paper Type (?) | Turnaround (?) |
|---|---|
| 80# Text, Gloss Text | 7 Business Days |

| Cover Stock (?) | Proof (?) |
|---|---|
| Same As Inside | Electronic Proof |

**Finishing Options**

| Front Finish (?) | Back Finish (?) |
|---|---|
| Aqueous Coating | Aqueous Coating |

| Hole Drilling (?) | Hole Drilling Location (?) |
|---|---|
| No Drilling | N/A |

| Tabs (?) | Shrink Wrapping (?) |
|---|---|
| No Tabbing | No   sets of: 50 |

| Binding (?) |
|---|
| Saddle Stitching |

**Custom Size**

Custom Trim?  No    Height: 11    Width: 8.5

**$9,338.50**
( $9.3385 each)

+ Add To Cart

EMAIL THIS QUOTE        ADD TO FAVORITES

TURNAROUND OPTIONS      GET HELP



Request a Free Sample Pack
Products, Coating & Stocks

---

- Booklet Printing
- Brochure Printing
- Business Cards
- Calendar Printing
- Catalog Printing
- Greeting Cards
- Door Hangers
- Business Printing
- Letterhead Printing
- Wholesale Printing
- Print Menus
- Newsletter Printing
- Color Printing
- Dallas Printing
- Custom Printing
- UV Coating
- Postcards
- Poster Printing
- Presentation Folders
- Quality Printing
- Offset Printing
- Table Tent Cards

©2008 PrintPlace.com All Rights Reserved | Privacy Policy | Terms & Conditions

Call us at 877.405.3949

# Print Place
PASSIONATE ABOUT PRINTING

Login
Items in cart (0)

| Mailing Services | Turnaround Options | Printplace Guarantee | | Go |

1. Pick a product     2. Payment     3. Upload artwork     4. Review & Send to Press

## ≫ Popular Products
Booklets
Bookmarks
Brochures
Business cards
Calendars
Catalogs
Door Hangers
Envelopes
File Folders
Flyers
Folded Postcards
Foldover Business Cards
Greeting Cards
Hang Tags
Letterhead
Menus
Note Pads
Postcards
Posters
Presentation Folders
Rack Cards
Sales Sheets
Table Tents

## ≫ Services
Affiliate Program
File Repair Services
Mailing Services

## ≫ Specialty Products
Calendars
Envelopes
Labels & Stickers
Plastic Products

## ≫ Call Us Now!

**877.405.3949**
7am-8pm CST

## ☺ Magazine Printing



Product | Templates | Marketing Tips | Mailing

### Magazine Printing

Get the features you need, the options you demand, and the best prices in the industry for magazine printing with PrintPlace.com. Full color printing, lots of paper sizes, and even different paper types are available right from our Instant Pricing form.

### Details: Magazine Printing

- Sizes shown represent page size (finished size)
- Three self cover stock options (cover stock the same stock as the inside pages)
- One plus-cover stock option (cover stock is heavier than inside pages)
- Saddle-Stitched binding (magazine is stapled on the left edge)
- Five standard magazine printing sizes or custom trim to size
- Custom trim minimum size: 6" high (binding edge) x 4" wide
- No additional cost for landscape orientation/short side binding
- Mailing Services available
- 5.5x8.5" and 6x9" mini magazines can mail at Letter rate if double tabbed

Drilling, tabbing, and shrink wrapping are even more options immediately available, and you can even create a custom trimming order without ever picking up the phone. PrintPlace.com makes magazine printing easy and simple. With our industry leading Price Match, On Time, and Satisfaction guarantees, you can order with confidence knowing we stand behind our products and services.

### Instant Pricing                    $8,648.00

#### Standard Options

| Size (?) | Printing (?) |
|---|---|
| 11x8.5 | 4 Color Both Sides |

| Page Count (?) | Quantity (?) |
|---|---|
| 88 Pages (Cover+84 pages) | 500 |

| Paper Type (?) | Turnaround (?) |
|---|---|
| 80# Text, Gloss Text | 7 Business Days |

| Cover Stock (?) | Proof (?) |
|---|---|
| Same As Inside | Electronic Proof |

#### Finishing Options

| Front Finish (?) | Back Finish (?) |
|---|---|
| Aqueous Coating | Aqueous Coating |

| Hole Drilling (?) | Hole Drilling Location (?) |
|---|---|
| No Drilling | N/A |

| Tabs (?) | Shrink Wrapping (?) |
|---|---|
| No Tabbing | No   sets of: 50 |

| Binding (?) | |
|---|---|
| Saddle Stitching | |

#### Custom Size

Custom Trim? No   Height: 11   Width: 8.5

**$8,648.00**
( $17.296 each)

+ Add To Cart

EMAIL THIS QUOTE | ADDITIONAL OPTIONS
TURNAROUND OPTIONS | MAILING SERVICES


Request a Free Sample Pack
Products, Coating & Stocks

Home | About Us | Contact Us | My Account | Help Center | View Cart | Testimonials | Tips & Tricks | Locations | Site Map

- Booklet Printing
- Brochure Printing
- Business Cards

- Calendar Printing
- Catalog Printing
- Greeting Cards
- Door Hangers

- Business Printing
- Letterhead Printing
- Wholesale Printing

- Print Menus
- Newsletter Printing
- Color Printing
- Dallas Printing

- Custom Printing
- UV Coating
- Postcards
- Poster Printing

- Presentation Folders
- Quality Printing
- Offset Printing
- Table Tent Cards

©2008 PrintPlace.com All Rights Reserved | Privacy Policy | Terms & Conditions





**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**
312 North Spring Street, Room G-8  Los
Angeles, CA  90012
Tel: (213) 894-7984

**SOUTHERN DIVISION**
411 West Fourth Street, Suite 1053
Santa Ana, CA 92701-4516
(714) 338-4570

**EASTERN DIVISION**
3470 Twelfth Street, Room 134
Riverside, CA 92501
(951) 328-4450

**TERRY NAFISI**
District Court Executive
and Clerk of Court

Thursday, August 02, 2012

**ANDRANIK PETROSIAN**
**45050-112**
**P.O. BOX 605**
**EDEN, TX 76837-0605**


Dear Sir/Madam:

A [ ] Petition for Writ of Habeas Corpus was filed today on your behalf and assigned civil case number
_____

A [X] Motion pursuant to Title 28, United States Code, Section 2255, was filed today in criminal case
    number **CR07-708-SVW**      and also assigned the civil case number      **CV12- 6661 SVW**

A [ ] Motion for Extension of Time to File Habeas Corpus Petition was filed today on your behalf and
    assigned civil case number _____

Please refer to these case numbers in all future communications.

Please Address all correspondence to the attention of the Courtroom Deputy for:
    [X] District Court Judge    **Stephen V. Wilson** _____
    [ ] Magistrate Judge    _____
at the following address:

    [X]  U.S. District Court          [ ] Ronald Reagan Federal        [ ]  U.S. District Court
         312 N. Spring Street             Building and U.S. Courthouse      3470 Twelfth Street
         Civil Section, Room G-8          411 West Fourth St., Suite 1053   Room 134
         Los Angeles, CA  90012           Santa Ana, CA  92701-4516         Riverside, CA 92501


The Court must be notified within fifteen (15) days of any address change.  If mail directed to your
address of record is returned undelivered by the Post Office, and if the Court and opposing counsel
are not notified in writing within fifteen (15) days thereafter of your current address, the Court may
dismiss the case with or without prejudice for want of prosecution.

                              Very truly yours,

                              Clerk, U.S. District Court


                        By:   APEDRO _____

                              Deputy Clerk